**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **PHILIP E. GAUCHER, JR. and JOEY GIAMICHAEL,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**DIGITAL BRANDS GROUP INC.,**<br><br>**Defendant.** | **Case No.: 26-cv-6889** |

Plaintiffs Philip E. Gaucher, Jr. ("Gaucher") and Joey Giamichael ("Giamichael") (Gaucher and Giamichael are collectively referred to as "Plaintiffs"), by and through its undersigned counsel, as and for its complaint against defendant Digital Brands Group, Inc. ("DBGI" or "Defendant"), allege as follows:

## NATURE OF THE ACTION

1. This is an action for breach of contract, declaratory judgment, indemnification, and injunctive relief arising from Defendant's repeated and continuing refusal to honor Plaintiffs' contractual rights to convert shares of Series D Convertible Preferred Stock ("Series D Shares") into shares of Defendant's common stock ("Common Shares"), notwithstanding Plaintiff's full compliance with all conditions precedent to conversion under their respective Securities Purchase Agreement dated August 8, 2025 (the "SPA") and the amendment to that agreement dated September 18, 2025 (the "SPA Amendment").

2. Plaintiffs each invested one million dollars with Defendant through the SPA. That investment provided Plaintiffs each with 1,250 Series D Shares at a purchase price of $800 per share. The Series D Shares were each initially convertible into $1,000 of registered and freely

1

transferable DBGI common stock using contractually agreed upon formulas.  This was then modified in the SPA Amendment (section 3.b.i) to increase the stated value of each Series D Preferred Share from $1,000 per share to $1,150 per share.

3.      The capital infusion provided by Plaintiffs was much needed by Defendant. Defendant had retained Plaintiffs employer, RBW Capital Partners LLC ("RBW") to assist Defendant to raise investment funds sufficient to facilitate an uplisting to NASDAQ.

4.      While RBW was able to raise significant investment funds, it was two million dollars short of what was necessary to accomplish the uplist.  To that end, the Plaintiffs each invested $1,000,000.

5.      Plaintiffs, as well as other investors, received the Series D Shares having a value of $1,000 initially which was amended in the SPA Amendment to $1,150 per share.  By way of example, each $800 share of the Series D Shares converted to $1,150 of Common Shares.

6.      Prior to the Series D Shares becoming 144 eligible and unrestricted, another investor in the Series D Shares approached the other holders of the outstanding Series D Shares and offered to purchase them.  The purchase was to be in two equal tranches.  The purchase offer of the first tranche was made to all investors in the Series D transaction except for the Plaintiffs and one additional party.  The investor did not purchase the first tranche of the Series D Shares from Plaintiffs or the additional party. The investor then had the option to purchase the second tranche of shares from Plaintiffs which was extended until May 31, 2026.  The investor did not purchase the second tranche of shares from Plaintiffs and the agreement to purchase was automatically terminated

7.      When the first tranche was not purchased from the Plaintiffs, each Plaintiff was able to convert the unpurchased half of their Series D Shares (625 shares).  Those conversions

were effectuated based upon the terms of the SPA as well as the agreement with the transfer agent, VStock Transfer LLC. Pursuant to the terms of the transfer agent reserve agreement and SPA, to effectuate any conversion Plaintiffs were required to submit to the transfer agent a Conversion Notice, an Opinion Letter from either Defendant's or Plaintiff's counsel stating there are no restrictions precluding the conversion of shares from preferred to common and a payment of the conversion fee.

8.      Section 4.1(e) of the SPA provides that once a Purchaser requests delivery of unlegended Common Shares, Defendant "may not refuse to deliver unlegended shares based on any claim that such Purchaser . . . has not complied with Purchaser's obligations under the Transaction Documents, or for any other reason," unless Defendant first obtains, on notice, an injunction or temporary restraining order from a court and posts a surety bond in the amount specified in the SPA.

9.      From February through July 30, Plaintiffs effectuated multiple conversions of Series D Shares into Common Shares. In each instance Plaintiffs submitted the appropriate Notice of Conversion and paid the requisite fee. Importantly, it was Defendant's counsel, Lukosky Brookman LLP ("Lukosky"), that issued the requisite opinion letters. Subsequent to Defendant approving the respective conversions, Plaintiffs sold all the converted common shares the same day they were received after each conversion.

10.     For reasons unknown to Plaintiffs, beginning on July 30, 2026, Defendant, acting through its Chief Executive Officer John Hilburn Davis, IV ("Davis"), refused to approve or honor the conversions submitted by Plaintiffs.[1] At no time did Defendant secure, in accordance with

---

[1] Evidencing the arbitrary and baseless nature of the rejections, Davis refused to approve a July 30, 2026, Notice of Conversion submitted by Plaintiff Giamichael to convert 19 Series D Shares, but approved a Notice of Conversion submitted by Plaintiff Gaucher to convert 67 Series D Shares.

Section 4.1(e) of the SPA, a court order from this Court or New York Supreme, New York County, enjoining the conversion of the Series D Shares, nor did Defendant post the requisite Bond.

11.    Defendant and Davis had no issue taking the $2,000,000 from Plaintiffs to save the company. And proving that "no good deed goes unpunished", Defendant has summarily stopped Plaintiffs from receiving the benefit of their bargain with Defendant.

12.    Defendant's conduct is part of a continuing pattern of obstruction of Plaintiffs' contractual conversion rights that, left unremedied, threatens Plaintiffs with harm that cannot adequately be redressed through money damages alone, including the loss of a time-sensitive opportunity to realize the value of freely tradeable shares in a thinly-traded, volatile security, and the risk that Defendant will continue to withhold delivery of Common Shares indefinitely, without judicial authorization, for so long as Plaintiffs hold any remaining Series D Shares. Plaintiffs accordingly seek, in addition to damages, declaratory and injunctive relief compelling Defendant's compliance with the SPA.

**PARTIES**

13.    Plaintiff Philip E. Gaucher, Jr. is an individual and a "Purchaser" under the SPA, domiciled in and a citizen of the Commonwealth of Puerto Rico, with an address at 1511 Ave Ponce de Leon, Unit 1092, San Juan, Puerto Rico 00909.

14.    Plaintiff Joey Giamichael is an individual and a "Purchaser" under the SPA, domiciled in and a citizen of the Commonwealth of Puerto Rico, with an address at Las Verandas 5242, Rio Grande, Puerto Rico 00745.

15.    For purposes of diversity jurisdiction under 28 U.S.C. § 1332, Puerto Rico is deemed a State pursuant to 28 U.S.C. § 1332(e).

4

16.     Defendant Digital Brands Group, Inc. is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business as set forth in its most recent filing with the Securities and Exchange Commission is at 350 Texas Avenue, Suite 250, Round Rock, Texas 78664. DBGI is the "Company" under the SPA and its common stock trades on a NASDAQ exchange.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiffs, citizen of Puerto Rico, and Defendant, a citizen of Delaware and Texas, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

18.     This Court has authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, because an actual and justiciable controversy exists between the parties regarding their respective rights and obligations under the SPA.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and pursuant to Section 5.9 of the SPA, in which each party "irrevocably submit[ted] to the exclusive jurisdiction of the state and federal courts sitting in New York County, New York" for the adjudication of any dispute arising under or in connection with the SPA and the other Transaction Documents. This District includes New York County.

20.     Pursuant to Section 5.9 of the SPA, the SPA and the rights and obligations of the parties thereunder are governed by and construed in accordance with the internal laws of the State of Delaware, without regard to conflict-of-laws principles.

## FACTUAL BACKGROUND

**A.    The Securities Purchase Agreement and Series D Preferred Stock**

21.    On August 8, 2025, DBGI and Plaintiffs entered into the SPAs, pursuant to which each Plaintiff purchased 1,250 shares of DBGI's Series D Convertible Preferred Stock, par value $0.0001 per share, at a purchase price of $800 per share, for a total Subscription Amount of $1,000,000.

22.    The terms, preferences, and rights of the Series D Shares, including their conversion into common stock, are set forth in the Certificate of Designations, Preferences and Rights of the Series D Convertible Preferred Stock of Digital Brands Group, Inc. (the "Series D COD"), attached to the SPA as Exhibit A

23.    In connection with the closing of the SPA, DBGI and its transfer agent, VStock Transfer, LLC, executed an irrevocable reservation and instruction letter dated August 8, 2025 (the "TA Letter"), pursuant to which DBGI irrevocably instructed the transfer agent to reserve shares of common stock for issuance on conversion and confirmed that "the Company hereby requests that your firm act promptly, without unreasonable delay and without the need for any action or confirmation by the Company with respect to the issuance of Common Stock pursuant to any Conversion Notices received from the Investors."

24.    On August 11, 2025, Defendant's counsel, Lukosky, issued an opinion letter covering the Series D Shares and permitting the conversions to be effectuated.

25.    Initially the conversions were effectuated without any considerable delay.

26.     Subsequently, and upon information and belief, based upon a dispute with another investor from a prior transaction, Defendant and Davis parted ways with VStock and thereafter contracted with another transfer agent, CT Corporation.

27.     The effect of the change in transfer agents is profound.  Unlike with VStock, there is no TA Letter with CT Corporation requiring the transfer agent to effectuate the conversions so long as the requisite conversion notices are accompanied by the requisite fee payment and opinion letter.[2]

28.     CT Corporation requires approval by the issuer for any conversions.

29.     Defendant and Davis, after taking Plaintiffs' money, turned on Plaintiffs and now refuse to approve their respective conversions.

**B.     Defendant's Contractual Restrictions on Refusing Conversions**

30.     Section 4.13 of the SPA, entitled "Conversion Procedures," provides that the form Notice of Conversion attached to the SPA as Exhibit E "sets forth the totality of the procedures required of the Purchasers in order to convert the Series D Shares," that "[n]o additional legal opinion, other information or instructions shall be required of the Purchasers to convert their Series D Shares," and that DBGI "shall honor conversions of the Series D Shares and shall deliver Conversion Shares in accordance with the terms, conditions and time periods set forth in the Transaction Documents."

31.     Section 4.1(e) of the SPA further provides that DBGI "may not refuse to deliver unlegended shares based on any claim that such Purchaser or anyone associated or affiliated with such Purchaser has not complied with Purchaser's obligations under the Transaction Documents, or for any other reason, unless an injunction or temporary restraining order from a court, on notice,

---

[2] Pursuant section 1.1 of the PSA, Transfer Agent is defined as VStock or any successor transfer agent of Defendant.

restraining and or enjoining delivery of such unlegended shares shall have been sought and obtained by the Company and the Company has posted a surety bond for the benefit of such Purchaser" equal to the greater of 150% of the aggregate purchase price of the relevant Common Shares or the highest VWAP during the five Trading Days before the injunction multiplied by the number of shares at issue, with such bond "to remain in effect until the completion of the litigation of the dispute."

32.    Section 4.1(e) thus imposes an unambiguous condition precedent on DBGI's right to withhold Common Shares from a Purchaser: absent a court-ordered injunction or restraining order obtained on notice, together with a posted surety bond, ***DBGI has no contractual right to refuse to honor a properly submitted conversion notice.***

33.    Section 4.8 of the SPA further obligates DBGI to "indemnify and hold [Plaintiff] and its directors, officers, shareholders, members, partners, employees and agents . . . harmless from any and all losses, liabilities, obligations, claims, contingencies, damages, costs and expenses, including all judgments, amounts paid in settlements, court costs and reasonable attorneys' fees and costs of investigation . . . that any such Purchaser Party may suffer or incur as a result of or relating to (a) any breach of any of the representations, warranties, covenants or agreements made by the Company in this Agreement or in the other Transaction Documents."

**C.    Plaintiffs' Prior Conversions Were Honored**

34.    Between February 13, 2026, and February 18, 2026, Plaintiffs submitted, and DBGI and VStock honored, a series of conversion notices converting their Series D Shares into common stock and thereafter selling out their respective positions on the day the shares were converted.

35.    Beginning on July 24, 2026, following a reverse stock split by DBGI, Plaintiffs began submitting conversion notices for part of their remaining Series D Shares. DBGI's counsel,

Lucosky, issued a legal opinion, confirming Plaintiffs' ability to convert their remaining shares. With the exception of one notice of conversion submitted by Plaintiff Gaucher, Davis refused to approve the remainder of the notices.

36.    The frivolity of the ownership position is exemplified by Davis approving a small amount of conversions previously submitted by Plaintiffs.  When this was raised to Davis, Davis immediately instructed his attorneys to cease providing opinion letters to Plaintiffs for the conversions.

37.    Notwithstanding Plaintiffs' full compliance with the SPA, Defendant, through Davis, again refused to approve or authorize issuance of the Common Shares

38.    More troubling is the moving target that was provided by Davis as his reason for refusing to approve the conversions.  In a series of emails Davis objected to the conversions.  First Davis stated a supposed "collusion" involving Plaintiffs and stated the approval would have to wait until a lawsuit was filed and depositions were taken.

39.    Then Davis turned course and stated the refusal was based upon a Leak-Out agreement precluding sales of more than 3% of Common Shares.

40.    Apparently realizing that is reliance upon the Leak-Out agreement was preposterous as the conversion of Series D Shares has nothing to do with the sale of Common Shares, Davis stated Plaintiffs sold their Series D Shares to a third party and thus did not own the Series D Shares sought in the Notices of Conversion.  Davis made this false statement with full knowledge that Plaintiffs converted and sold shares just days prior - - with his authorization and company's counsel opinion letter.

41. Plaintiffs had the third party whom Davis stated allegedly purchased Plaintiffs' Series D Shares send an email to Davis stating the Series D Shares were never purchased by the third party from Plaintiffs.

42. Davis, with no other theories to stop Plaintiffs from converting, reverted to the supposed "collusion" basis for his refusal to permit the conversions to be effectuated.

43. At no time before, upon, or after refusing to honor the conversion notices did Defendant seek or obtain an injunction or temporary restraining order from any court, on notice to Plaintiffs, restraining or enjoining delivery of the Common Shares, nor did Defendant post any surety bond, as required by Section 4.1(e) of the SPA, as a precondition to any such refusal.

44. Defendant's refusal to honor the conversion notices therefore had no basis under the SPA and constituted a direct and material breach of Sections 4.1(e) and 4.13 of the SPA.

45. As of the filing of this Complaint, Plaintiffs continue to hold outstanding Series D Shares that remain subject to conversion, and Defendant has given no indication that it will honor future conversion notices absent judicial intervention.

**D.    Lost Profits**

46. Below is a chart of the rejected Conversion Notices for each of the Plaintiffs, together with the dates, the amount of Series D Shares sought to be converted, the amount of common shares that should have been obtained in the conversion, the conversion price per share:

| Conversion Notice | Holder | Series D / Common Shares | Conv. Price |
|---|---|---|---|
| Jul 30, 2026 | Giamichael | 19 / 2,274 | $9.608 |
| Jul 31, 2026 | Giamichael | 14 / 1,675 | $9.61 |
| Aug 3, 2026 | Giamichael | 18 / 2,154 | $9.608 |
| Aug 5, 2026 | Giamichael | 148 / 14,993 | $11.352 |
| Aug 5, 2026 | Gaucher | 150 / 15,196 | $11.352 |

47.     The Volume-Weighted Average Price ("VWAP") for the common stock for July 30, 2026, was $13.92.  VWAP is a trading benchmark that calculates the average price a security has traded at throughout the day, weighted by both price and volume.  This benchmark thus avoids pricing a sale at the high or the low price of the day and is the general method of how Plaintiffs sold their Common Shares.

48.     If the conversion notice was approved, Plaintiff Giamichael would have converted his 19 Series D Shares into 2,274 Common Shares.  Utilizing the VWAP price of $13.92, the Common Shares would have sold for $31,654, with profits of $9,805.

49.     The VWAP for the common stock on July 31, 2026, was $14.07.  Plaintiff Giamichael would have converted his 14 Series D Shares into 1,675 Common Shares.  Utilizing the VWAP price of $14.07, the Common Shares would have sold for $23,581, with profits of $7,478.

50.     The VWAP for the common stock on August 3, 2026, was $17.40.  Plaintiff Giamichael would have converted his 18 Series D Shares into 14,993 Common Shares.  Utilizing the VWAP price of $17.40, the Common Shares would have sold for $37,480, with profits of $16,784.

51.     On August 5, 2026, conversion notices, DBGI common stock was trading on volume of 2,457,900 shares.  Plaintiffs would have converted and thereafter sold the totality of their respective holdings.  On said date Plaintiff Gaucher had 474 Series D Shares remaining and Plaintiff Giamichael, had the three prior conversion been effectuated, would have had 502 Series D Shares remaining.

52.     The VWAP for the common stock for August 5, 2026, was $29.47.  Had Defendant not interfered with the Plaintiffs' conversions, Plaintiff Gaucher would have converted the totality

11

of his 474 Series D Shares into 48,018 Common Shares. Utilizing the VWAP price of $29.47, Plaintiff Gaucher's Common Shares would have sold for $1,415,090, with profits of $869,990.

53.    Similarly, Plaintiff Giamichael would have converted his 502 Series D Shares into 50,854 Common Shares. Utilizing the VWAP price of $29.47, the Common Shares would have sold for $1,498,667, with profits of $921,373.

54.    As a direct and proximate result of Defendant's breaches, Plaintiffs have been damaged in an amount to be proven at trial, including but not limited to the proceeds Plaintiffs would have realized had Defendant timely delivered the Common Shares underlying the rejected conversion notices and Plaintiffs sold those shares at prevailing market prices, which damages Plaintiffs estimate, on a preliminary basis, to exceed $1,800,000 alone, exclusive of interest, costs, and fees.

55.    Plaintiffs have also incurred, and continues to incur, attorneys' fees and costs in connection with Defendant's breach, for which Defendant is separately liable under Section 4.8 of the SPA.

E.    **Liquidated Damages**

56.    Section 4.1(d) of the SPA provides that, in addition to a Purchaser's other available remedies, "the Company shall pay to a Purchaser, in cash, as partial liquidated damages and not as a penalty, for each $1,000 of the Stated Value of the Series D Shares . . . being converted, $10 per Trading Day for each Trading Day after the Legend Removal Date (increasing to $20 per Trading Day after the fifth Trading Day) until such certificate is delivered without a legend."

57.    The "Legend Removal Date" is defined in Section 4.1(c) of the SPA as the second Trading Day following delivery to the Company or its transfer agent of a certificate representing restricted Series D Shares or Common Shares issued with a restrictive legend.

58.     In Section 4.1(d), Plaintiffs and DBGI agreed that this per-diem sum constitutes a reasonable, bargained-for estimate of the loss Plaintiffs would suffer as a result of DBGI's delay or refusal to deliver unlegended Common Shares — damages the parties recognized, at the time of contracting, would be difficult to ascertain with precision given fluctuations in the trading price of DBGI's common stock. The clause expressly disclaims any characterization as a penalty.

59.     Plaintiffs rejected conversion notices satisfied all conditions to conversion under Section 4.13 of the SPA, triggering the running of the applicable Legend Removal Date for each conversion, and more than two Trading Days have elapsed since each submission without delivery of the corresponding Common Shares free of any restrictive legend.

60.     The Stated Value of each Series D Share is $1,150.00, subject to the definition of "Stated Value" set forth in the Series D COD and applying the formula set forth in Section 4.1(d) requires applying a dollar amount of liquidated damages that accrue for the first five Trading Days (as defined in the SPA) following the applicable Legend Removal Date, and doubled dollar amount for each Trading Day thereafter, continuing to accrue until DBGI delivers the underlying Common Shares free of any restrictive legend.

61.     The liquidated damages provided in Section 4.1(d) are enforceable under Delaware law, which governs the SPA pursuant to Section 5.9 of the SPA. At the time of contracting, actual damages resulting from DBGI's delay or refusal to deliver unlegended shares of a volatile, thinly traded security were difficult to estimate with precision, and the per-diem formula set forth in Section 4.1(d) represents a reasonable forecast of the probable loss to a Purchaser in that circumstance, bears a reasonable relationship to the Stated Value of the shares at issue, and scales appropriately with the duration of DBGI's delay. The clause is not a penalty and should be enforced according to its terms.

**F.    Irreparable Harm Requiring Specific Performance**

62.    DBGI common stock is, on information and belief, a thinly-traded, highly volatile microcap security whose price has fluctuated dramatically over short periods, including the reverse stock split and subsequent price movements described above. The value of the Common Shares to which Plaintiff is entitled is accordingly time-sensitive, and each day that Defendant withholds delivery exposes Plaintiffs to the risk that the shares' value will decline before they can be delivered and sold, in an amount that is inherently difficult to calculate with precision and that may not be fully recoverable through a subsequent damages award.

63.    Defendant's repeated refusals to honor conversion notices — notwithstanding Plaintiff's undisputed ownership of the underlying Series D Shares, Defendant's own prior acknowledgment of that ownership, and the absence of any court order authorizing Defendant's refusal — demonstrate that Defendant will continue to withhold Common Shares from Plaintiff for so long as it is permitted to do so without judicial intervention, causing recurring injury that cannot be fully remedied by a single damages award for past conversions.

64.    And to make matters worse, Defendant's sole basis for refusing to provide its approval for the conversions is based upon its chief executive officers statements of "collusion" involving Plaintiffs and unknown third parties regarding an unknown issue.

65.    The SPA itself recognizes the inadequacy of money damages for breaches of this nature: Section 5.15 provides that "monetary damages may not be adequate compensation for any loss incurred by reason of any breach of obligations contained in the Transaction Documents" and that the parties are "entitled to specific performance," and each party expressly waived any defense that a remedy at law would be adequate in an action for specific performance.

66.     Absent injunctive relief, Plaintiffs will be forced to submit successive conversion notices and separately petition this Court, or otherwise negotiate on an *ad hoc* basis with Defendant, each time Defendant unilaterally elects to withhold delivery of Common Shares without seeking the injunction and bond that Section 4.1(e) requires — an outcome that is precisely what Section 4.1(e) was designed to prevent, and that exposes Plaintiffs to piecemeal, recurring, and irreparable harm.

67.     On information and belief, Defendant's refusal to honor Plaintiffs' conversion notices, if permitted to continue, will result in continuing dilution of Plaintiffs' ability to realize the bargained-for value of his investment relative to other holders of Defendant's securities who are not subject to similar unauthorized restrictions, further compounding the harm to Plaintiffs in a manner not readily quantifiable in money damages alone.

68.     Plaintiffs have no adequate remedy at law because a retrospective damages award, even if obtained, would not restore Plaintiffs to the position they would have occupied had Defendant timely delivered the Common Shares and allowed Plaintiffs to sell into the market at prevailing prices, and would not prevent Defendant's continued unauthorized withholding of Common Shares underlying Plaintiffs' remaining Series D Shares.

## COUNT I
## <u>BREACH OF CONTRACT</u>

69.     Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

70.     The SPA is a valid and binding contract between Plaintiffs and Defendant, supported by adequate consideration.

71.     Plaintiffs performed all conditions, covenants, and obligations required of them under the SPA. First, they each invested $1,000,000.  Second, they each provided the requisite

conversion notice, including submitting a conforming Notice of Conversion, paying the applicable fees, and furnishing the required legal opinions.

72.     Section 4.1(e) of the SPA obligated Defendant either to honor Plaintiffs' conversion notices or to obtain, on notice, a court injunction or restraining order together with a posted surety bond before refusing delivery of the Common Shares. Defendant did neither.

73.     Defendant breached Section 4.1(e), Section 4.13, and its corresponding obligations under the Series D COD by refusing to honor Plaintiffs' July and August conversion notices without first seeking or obtaining any such injunction, restraining order, or bond.

74.     As a direct and proximate result of Defendant's breach, Plaintiffs have suffered compensatory and liquidated damages in an amount to be determined at trial, but believed to exceed $2,000,000, together with pre- and post-judgment interest.

**COUNT II**
**DECLARATORY JUDGMENT (28 U.S.C. §§ 2201–2202)**

75.     Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

76.     An actual, substantial, and justiciable controversy exists between Plaintiffs and Defendant concerning their respective rights and obligations under Sections 4.1(e) and 4.13 of the SPA, including whether Defendant may refuse to honor a conforming Notice of Conversion absent a court-ordered injunction or restraining order obtained on notice and a posted surety bond.

77.     Defendant's conduct in refusing Plaintiffs conversion notices — and, on information and belief, its position that considerations such as an alleged 3% trading "leakout" restriction or disparaging "collusion" statements justify withholding conversions outside the procedure set forth in Section 4.1(e) — reflects a live and continuing dispute over the scope of

Defendant's obligations that will continue to recur with respect to Plaintiffs' remaining Series D Shares absent a judicial declaration of the parties' rights.

78.    Plaintiffs are entitled to a judicial declaration that: (a) Section 4.13 and Exhibit E of the SPA set forth the totality of the procedures required for Plaintiffs to convert their Series D Shares, and no additional information, opinion, or instruction may be required of Plaintiffs to effect a conversion; (b) Defendant may not refuse to honor a conforming Notice of Conversion, or withhold delivery of the corresponding Common Shares, for any reason — including any asserted trading-volume, "leakout," or similar restriction not set forth in the Series D COD or the Notice of Conversion — unless Defendant first obtains, on notice to Plaintiffs, an injunction or temporary restraining order from a court of competent jurisdiction as delineated in the SPA, and posts the surety bond required by Section 4.1(e); and (c) Defendant's refusals to honor Plaintiffs' conversion notices violated Section 4.1(e) of the SPA.

79.    A declaration of the parties' rights and obligations will resolve the controversy between the parties and will guide the parties' future conduct with respect to Plaintiffs' remaining, unconverted Series D Shares, thereby avoiding a multiplicity of future disputes.

**COUNT III**
**<u>INDEMNIFICATION</u>**

80.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

81.    Pursuant to Section 4.8 of the SPA, Defendant agreed to indemnify and hold Plaintiffs, as a Purchaser Party, harmless from any and all losses, liabilities, damages, costs, and expenses, including reasonable attorneys' fees and costs of investigation, suffered or incurred by Plaintiffs as a result of or relating to any breach of Defendant's representations, warranties, covenants, or agreements under the SPA or the other Transaction Documents.

82.     Defendant's refusal to honor Plaintiffs' conversion notices, in violation of Sections 4.1(e) and 4.13 of the SPA, constitutes a breach of Defendant's covenants and agreements under the SPA within the meaning of Section 4.8.

83.     As a direct result of that breach, Plaintiffs have suffered and continues to suffer losses, costs, and expenses, including lost profits and reasonable attorneys' fees and costs incurred in investigating and pursuing their rights under the SPA, for which Defendant is obligated to indemnify Plaintiffs pursuant to Section 4.8.

84.     Plaintiffs have given, or will give, Defendant notice of the losses for which indemnification is sought in accordance with Section 4.8 of the SPA.

**COUNT IV**
**<u>INJUNCTIVE RELIEF</u>**

85.     Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

86.     Plaintiffs are likely to succeed on the merits of their breach of contract claim, as the SPA unambiguously required Defendant to obtain a court order and post a bond before refusing to honor Plaintiffs' conversion notices, and Defendant admittedly did neither.

87.     As set forth above, Plaintiffs will suffer irreparable harm absent injunctive relief, including the loss of a time-sensitive opportunity to realize the value of their Common Shares in a volatile market, and the prospect of continuing, recurring refusals by Defendant to honor future conversion notices absent judicial intervention, for which money damages alone cannot make Plaintiffs whole.

88.     The balance of hardships favors Plaintiffs: an injunction would require Defendant to do no more than what it already contractually agreed to do — honor conforming conversion

notices or seek a court order before refusing to do so — whereas the absence of an injunction leaves Plaintiffs without recourse other than serial litigation each time Defendant elects to withhold delivery.

89.    The public interest favors enforcement of contractual undertakings voluntarily made by public reporting companies to investors, including the specific procedural protections against unilateral non-delivery that Defendant itself proposed and agreed to in Section 4.1(e) of the SPA.

90.    Pursuant to Section 5.15 of the SPA, the parties expressly agreed that monetary damages may not be an adequate remedy for breach of the Transaction Documents, that each party is entitled to specific performance, and that neither party would assert that a remedy at law would be adequate in an action for specific performance.

91.    Plaintiffs are entitled to a preliminary and permanent injunction (a) compelling Defendant to honor and process Plaintiffs' outstanding conversion notices without any restrictions based upon daily volume, and any future conforming conversion notices submitted by Plaintiffs with respect to their respective remaining Series D Shares, in accordance with Sections 4.1 and 4.13 of the SPA, and (b) enjoining Defendant from refusing to honor any such conversion notice unless and until Defendant first obtains, on notice to Plaintiffs, an injunction or temporary restraining order from a court of competent jurisdiction and posts the surety bond required by Section 4.1(e) of the SPA.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in his favor and against Defendant Digital Brands Group, Inc. as follows:

19

a. Awarding Plaintiffs compensatory and liquidated damages in an amount to be determined at trial, but believed to exceed $1,800,000;

b. Entering a Declaratory Judgment in favor of Plaintiffs as set forth in Count II above;

c. Awarding Plaintiffs indemnification for their losses, costs, and reasonable attorneys' fees pursuant to Section 4.8 of the SPA;

d. Entering a preliminary and permanent injunction requiring Defendant to honor Plaintiffs' outstanding and future conforming conversion notices, and enjoining Defendant from refusing to honor any such notice absent a court order and posted bond as required by Section 4.1(e) of the SPA;

e. Awarding Plaintiffs pre-judgment and post-judgment interest as permitted by law;

g. Awarding Plaintiffs their reasonable attorneys' fees and costs incurred in this action pursuant to Section 5.9 of the SPA and Section 4.8 of the SPA;

h. Awarding Plaintiffs the costs and disbursements of this action; and

i. Granting such other and further relief as the Court deems just and proper.

Dated:  August 12, 2026

**LAW OFFICES OF BARRY M. BORDETSKY**

By:  /s/ Barry M. Bordetsky
Barry M. Bordetsky (BB4218)
570 Lexington Avenue, 24th Floor
New York, New York 10022
Tel: (212) 688-0008
Email: barry@bordetskylaw.com
Attorneys for Plaintiffs