**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PHILIP E. GAUCHER, JR. and JOEY GIAMICHAEL,

Plaintiffs,

v.

DIGITAL BRANDS GROUP, INC.,

Defendant.

Case No. 26-cv-6889 (JMF)

## DEFENDANT DIGITAL BRANDS GROUP, INC.'S ANSWER TO THE AMENDED COMPLAINT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

Defendant and Counterclaim-Plaintiff Digital Brands Group, Inc. ("DBGI" or "Defendant"), by and through its undersigned counsel, answers the Amended Complaint (the "Complaint") of plaintiffs Philip E. Gaucher, Jr. ("Gaucher") and Joey Giamichael ("Giamichael") (together, "Plaintiffs"), and asserts the counterclaims set forth below, as follows. Except as expressly admitted herein, DBGI denies each and every allegation of the Complaint. Headings, titles, and footnotes in the Complaint are not allegations requiring a response; to the extent any such heading, title, or footnote is deemed to contain allegations, DBGI denies them.

## ADMISSIONS & DENIALS

1. DBGI admits that Plaintiffs purport to assert claims for breach of contract, declaratory judgment, indemnification, injunctive relief, and defamation per se, and that DBGI and Plaintiffs executed a Securities Purchase Agreement dated August 8, 2025 (the "SPA") and an amendment dated September 18, 2025 (the "SPA Amendment"). DBGI respectfully refers the Court to the SPA, the SPA Amendment, and the Series D Certificate of Designations for their complete and accurate terms. DBGI denies that it wrongfully or without justification refused to

honor any conversion, denies that Plaintiffs satisfied all conditions precedent to conversion, and denies the remaining allegations of paragraph 1.

2. DBGI admits that each Plaintiff purchased 1,250 shares of Series D Convertible Preferred Stock (the "Series D Shares") at a purchase price of $800 per share, for a total subscription amount of $1,000,000 each. DBGI admits that the Series D Shares carried an initial stated value of $1,000 per share. DBGI respectfully refers the Court to the SPA and the Series D Certificate of Designations for the conversion terms and denies any allegation in paragraph 2 inconsistent with those documents.

3. DBGI admits that it sought capital investment and that it retained RBW Capital Partners LLC ("RBW"), which is owned by Plaintiffs, to serve as placement agent in connection with a capital raise to facilitate an uplisting to Nasdaq. DBGI denies the remaining allegations of paragraph 3.

4. DBGI admits that the SPA Amendment increased the stated value of each Series D Share from $1,000 to $1,150. DBGI respectfully refers the Court to the SPA, the SPA Amendment, and the Series D Certificate of Designations for the applicable conversion formula and denies the remaining allegations of paragraph 4.

5. DBGI lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 5 concerning these specific purported private arrangements among Plaintiffs and other investors, and on that basis denies them, except DBGI denies that any such arrangements were arm's-length. DBGI denies the remaining allegations of paragraph 5.

6. DBGI admits that it and its then-transfer agent, VStock Transfer, LLC ("VStock"), honored certain conversion notices submitted by Plaintiffs, and admits that the applicable conversion process called for a notice of conversion, an opinion letter, and payment of a fee. DBGI

lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of paragraph 6, including the specific numbers of shares alleged, and on that basis denies them, except DBGI denies that Plaintiffs' conversions complied with the SPA.

7. DBGI admits that the SPA contains a Section 4.1(e) and respectfully refers the Court to that Section for its complete and accurate terms. DBGI denies Plaintiffs' characterization of Section 4.1(e) to the extent inconsistent with its text, and denies that the conditions for Plaintiffs to invoke Section 4.1(e) were satisfied.

8. DBGI admits that it approved certain conversions of Series D Shares between February and July 2026 and that Lucosky Brookman LLP ("Lucosky") issued opinion letters in connection with certain of those conversions. DBGI lacks knowledge or information sufficient to form a belief about the truth of the allegation that Plaintiffs sold all converted shares on the day of receipt, and on that basis denies it, and denies the remaining allegations of paragraph 8.

9. DBGI admits that, beginning on or about July 30, 2026, it declined to approve certain conversion notices submitted by Plaintiffs. DBGI denies that it did so "for reasons unknown" to Plaintiffs or that its decisions were arbitrary or baseless. Answering footnote 1, DBGI admits that it approved one conversion notice submitted by Gaucher and declined a conversion notice submitted by Giamichael; DBGI denies that its differing treatment of notices was arbitrary or baseless; and DBGI lacks knowledge or information sufficient to form a belief about the truth of the allegation, made on information and belief, concerning conversions by other investors, and on that basis denies it.

10. DBGI admits that it received $2,000,000 in the aggregate from Plaintiffs in connection with the SPA. DBGI denies the characterizations in paragraph 10, including the suggestion that the amount was necessary to "save the company" and the suggestion that it

wrongfully deprived Plaintiffs of any benefit of their bargain, and denies the remaining allegations of paragraph 10.

11. DBGI denies the allegations of paragraph 11.

12. DBGI admits that Plaintiffs seek damages and declaratory and injunctive relief. DBGI denies that it engaged in any pattern of obstruction, denies that Plaintiffs face any harm that cannot be remedied by money damages, and denies the remaining allegations of paragraph 12.

13. DBGI admits that Gaucher is a "Purchaser" under the SPA. DBGI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of paragraph 13, and on that basis denies them.

14. DBGI admits that Giamichael is a "Purchaser" under the SPA. DBGI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of paragraph 14, and on that basis denies them.

15. Paragraph 15 states a legal conclusion to which no response is required.

16. DBGI admits that it is a corporation organized under the laws of the State of Nevada, that it is the "Company" under the SPA, that its common stock trades on Nasdaq, and that its most recent SEC filing lists a principal place of business in Round Rock, Texas. DBGI denies the remaining allegations of paragraph 16.

17. DBGI admits that the amount in controversy alleged exceeds $75,000 and does not contest that this Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a). DBGI denies the remaining allegations of paragraph 17, including that it is a citizen of Delaware.

18. DBGI admits that this Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201–2202 in an appropriate case. DBGI denies that Plaintiffs are entitled to any declaratory relief and denies the remaining allegations of paragraph 18.

19. DBGI admits that the SPA contains a Section 5.9 and respectfully refers the Court to that Section for its complete and accurate terms. DBGI does not contest that venue lies in this District. DBGI denies any characterization of Section 5.9 inconsistent with its text, and expressly reserves, and does not waive, its rights under the arbitration provisions of the Transaction Documents. DBGI denies the remaining allegations of paragraph 19.

20. DBGI admits that it filed the Certificate of Designations, Preferences and Rights of the Series D Convertible Preferred Stock (the "Series D COD") and that Plaintiffs were not signatories to the Series D COD. DBGI respectfully refers the Court to the Series D COD for its complete and accurate terms and denies any allegation of paragraph 20 inconsistent with that document, including Plaintiffs' characterizations of it. DBGI denies the remaining allegations of paragraph 20.

21. DBGI admits that it and Plaintiffs executed SPAs dated August 8, 2025 and respectfully refers the Court to the SPAs for their complete and accurate terms. DBGI denies Plaintiffs' characterization of the SPAs to the extent inconsistent with their text, and denies the remaining allegations of paragraph 21.

22. DBGI admits that the SPA was amended on September 18, 2025 to increase the stated value of each Series D Share from $1,000 to $1,150, and respectfully refers the Court to the SPA Amendment for its complete and accurate terms. DBGI denies Plaintiffs' characterization of the SPA Amendment to the extent inconsistent with its text.

23. DBGI admits that the SPA contains a Section 4.1(e) and respectfully refers the Court to that Section for its complete and accurate terms. DBGI denies Plaintiffs' characterization of Section 4.1(e) to the extent inconsistent with its text.

24. Paragraph 24 states legal conclusions and characterizations to which no response is required; to the extent a response is required, DBGI respectfully refers the Court to Section 4.1(e) of the SPA for its terms, denies Plaintiffs' characterization of that Section, and denies the remaining allegations of paragraph 24.

25. DBGI admits that the SPA contains a Section 4.8 and respectfully refers the Court to that Section for its complete and accurate terms. DBGI denies Plaintiffs' characterization of Section 4.8 to the extent inconsistent with its text.

26. DBGI admits that the SPA contains a Section 4.13 and respectfully refers the Court to that Section for its complete and accurate terms. DBGI denies Plaintiffs' characterization of Section 4.13 to the extent inconsistent with its text.

27. DBGI admits that it and VStock executed an irrevocable reservation and instruction letter dated August 8, 2025 in connection with the closing of the SPA, and respectfully refers the Court to that letter for its complete and accurate terms. DBGI denies any allegation of paragraph 27 inconsistent with that document.

28. DBGI admits that, between February 13, 2026 and February 18, 2026, it and VStock honored certain conversion notices submitted by Plaintiffs. DBGI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of paragraph 28, including the allegations concerning Plaintiffs' sales of converted shares, and on that basis denies them.

29. DBGI admits that it ceased using VStock as its transfer agent and thereafter retained ClearTrust, LLC ("ClearTrust") as its successor transfer agent. DBGI denies the remaining allegations of paragraph 29.

30. DBGI denies the allegations of paragraph 30 as characterized and respectfully refers the Court to the respective transfer-agent agreements for their complete and accurate terms.

31. DBGI admits that ClearTrust required an opinion letter regarding removal of a restrictive legend and payment of a fee in connection with conversions. With respect to footnote 2, DBGI respectfully refers the Court to Section 1.1 of the SPA for the definition of "Transfer Agent." DBGI denies the remaining allegations of paragraph 31.

32. DBGI admits that, following the change in transfer agents, ClearTrust sought DBGI's approval in connection with conversions and that John Hilburn Davis, IV ("Davis") communicated approvals or rejections of conversion notices by email. DBGI denies the remaining allegations of paragraph 32 as characterized.

33. DBGI admits that a reverse stock split occurred, that Plaintiffs submitted additional conversion notices beginning on or about July 24, 2026, and that Lucosky issued an opinion in connection with certain conversions. DBGI denies that Plaintiffs' submissions complied with the SPA in light of Plaintiffs' prior breaches and denies the remaining allegations of paragraph 33 as characterized.

34. DBGI admits that it approved one set of conversions submitted by Gaucher and declined to approve the remainder of the notices. DBGI denies that its decisions were improper. DBGI denies the remaining allegations of paragraph 34.

35. DBGI admits that it received the investment from Plaintiffs. DBGI denies the characterizations in paragraph 35, denies that it wrongfully denied Plaintiffs any right, and denies the remaining allegations of paragraph 35.

36. DBGI admits that Lucosky issued an opinion letter in connection with a conversion notice prepared by Gaucher on or about July 24, 2026. DBGI lacks knowledge or information

sufficient to form a belief about the truth of the remaining allegations of paragraph 36, including Gaucher's internal preparation of the notice, and on that basis denies them.

37. DBGI admits that Gaucher submitted conversions on or about July 29 and July 31, 2026. DBGI denies that Davis offered "excuses," and lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of paragraph 37, including Gaucher's reasons for restructuring his conversions, and on that basis denies them.

38. DBGI admits that it approved a conversion of 84 Series D Shares, that Davis raised a leak-out issue and questioned a further conversion, and that Davis sent an email referencing collusion, and respectfully refers the Court to that email for its complete and accurate contents. DBGI denies the remaining allegations of paragraph 38 as characterized.

39. DBGI admits that Gaucher responded by email disputing DBGI's statements and respectfully refers the Court to that email for its complete and accurate contents. DBGI denies Plaintiffs' characterization of the email to the extent inconsistent with its text.

40. DBGI admits that its transfer agent wrote to Mr. Davis and respectfully refers the Court to that email for its complete and accurate contents. DBGI denies Plaintiffs' characterization of that email to the extent inconsistent with its text. DBGI denies the remaining allegations of paragraph 40.

41. DBGI admits that Davis questioned whether Gaucher still owned the Series D Shares identified in his conversion notice. DBGI denies the remaining allegations of paragraph 41 as characterized.

42. DBGI denies the allegations of paragraph 42.

43. DBGI admits that it permitted the July 31, 2026 conversion and that Davis communicated that further conversions would not be permitted, and respectfully refers the Court

to the referenced email for its complete and accurate contents. DBGI denies the remaining allegations of paragraph 43 as characterized.

44. DBGI admits that no lawsuit had been filed as of the date referenced in paragraph 44. DBGI denies the remaining allegations of paragraph 44.

45. DBGI admits that it declined to approve the July 30, 2026 and July 31, 2026 conversion notices submitted by Giamichael, and that those notices sought to convert 19 Series D Shares into 2,274 Common Shares and 14 Series D Shares into 1,675 Common Shares, respectively. DBGI respectfully refers the Court to those notices for their complete and accurate terms. DBGI denies that its refusals were wrongful and denies the remaining allegations of paragraph 45 as characterized.

46. DBGI admits that it cited collusion as a basis for declining Plaintiffs' conversions. DBGI denies the remaining allegations of paragraph 46 as characterized.

47. DBGI admits that Giamichael and Gaucher each submitted conversion notices on or about August 3, 2026, that Giamichael's notice sought to convert 18 Series D Shares into 2,154 Common Shares, and that Gaucher's notice concerned Series D Shares; DBGI respectfully refers the Court to those notices for their complete and accurate terms. DBGI denies the remaining allegations of paragraph 47 as characterized.

48. DBGI admits that Davis declined to approve the conversions and referenced potential collusion and an anticipated lawsuit, and respectfully refers the Court to the referenced email for its complete and accurate contents. DBGI denies the remaining allegations of paragraph 48.

49. DBGI admits that it did not authorize further opinion letters for Plaintiffs' conversions. DBGI avers that it did so because of Plaintiffs' breaches and manipulation, and denies the remaining allegations of paragraph 49 as characterized.

50. DBGI admits that Davis questioned the accuracy of Gaucher's representations regarding the number of Series D Shares converted and remaining. DBGI denies the remaining allegations of paragraph 50.

51. DBGI admits that Gaucher submitted a conversion notice on or about August 5, 2026 seeking to convert 150 Series D Shares into 15,196 Common Shares, and respectfully refers the Court to that notice for its complete and accurate terms. DBGI denies the remaining allegations of paragraph 51 as characterized.

52. DBGI admits that Giamichael submitted a conversion notice on or about August 5, 2026 seeking to convert 148 Series D Shares into 14,993 Common Shares, and respectfully refers the Court to that notice for its complete and accurate terms. DBGI denies the remaining allegations of paragraph 52 as characterized.

53. DBGI admits that Davis communicated that the conversion notices were being held in light of the dispute, and respectfully refers the Court to the referenced email for its complete and accurate contents. DBGI denies Plaintiffs' characterization of the email to the extent inconsistent with its text.

54. DBGI admits that it had not filed a lawsuit against Plaintiffs as of August 5, 2026. DBGI denies the remaining allegations of paragraph 54.

55. DBGI admits that it declined to approve Plaintiffs' conversions, and admits that its transfer agent communicated that an opinion letter stating the legal basis for any denial was required and set a date by which the conversions would otherwise be processed; DBGI respectfully

refers the Court to the referenced correspondence for its complete and accurate contents. DBGI lacks knowledge or information sufficient to form a belief about the contents or characterization of any communications between Plaintiffs and the transfer agent to which DBGI was not a party, and denies the remaining allegations of paragraph 55 as characterized.

56. DBGI admits that the referenced email exists and that Davis requested additional time to provide an opinion letter and respectfully refers the Court to the referenced email for its complete and accurate contents. DBGI denies Plaintiffs' characterization of the email to the extent inconsistent with its text.

57. DBGI admits that the referenced email exists and that Davis referenced a potential collusion lawsuit, and respectfully refers the Court to that email for its complete and accurate contents. DBGI denies Plaintiffs' characterization of the email to the extent inconsistent with its text.

58. DBGI admits that it had not filed a lawsuit alleging collusion against Plaintiffs as of the date of the email referenced in paragraph 57.

59. DBGI admits that the referenced email exists and that Davis communicated that the conversions would not proceed in light of the dispute, and respectfully refers the Court to the referenced email for its complete and accurate contents. DBGI denies Plaintiffs' characterization of the email to the extent inconsistent with its text.

60. DBGI admits that it did allow certain holders to convert a portion of their Series D Shares during part of the time period referenced in paragraph 60. DBGI otherwise denies the allegations of paragraph 60.

61. DBGI denies the allegations of paragraph 61.

62. DBGI respectfully refers the Court to the referenced April 15, 2026 agreement for its complete and accurate terms, denies Plaintiffs' characterization of that agreement to the extent inconsistent with its text, and denies that DBGI or Davis breached it or made any false or disparaging statement. DBGI denies the remaining allegations of paragraph 62.

63. DBGI admits that it declined to approve the conversion notices identified in the chart in paragraph 63, and respectfully refers the Court to those notices for their complete and accurate terms. DBGI denies that Plaintiffs were entitled to the conversions or the number of Common Shares stated therein, denies that the refusals were wrongful, denies that any damages are owing, and denies Plaintiffs' damages calculations and the remaining allegations of paragraph 63.

64. DBGI denies the allegations of paragraph 64.

65. DBGI denies the allegations of paragraph 65.

66. DBGI denies the allegations of paragraph 66.

67. DBGI denies the allegations of paragraph 67 as characterized, and respectfully refers the Court to the Transaction Documents for any provision concerning liquidated damages.

68. DBGI denies the allegations of paragraph 68 as characterized, and avers that any harm Plaintiffs allege is quantifiable and compensable by monetary damages.

69. DBGI denies the allegations of paragraph 69.

70. DBGI admits that it filed a Form 10-Q with the SEC and respectfully refers the Court to that filing for its complete and accurate contents. DBGI denies Plaintiffs' characterization of the filing to the extent inconsistent with its text.

71. DBGI denies the allegations of paragraph 71.

72. To the extent paragraph 72 states a legal conclusion, no response is required. DBGI admits that the SPA contains a Section 5.15 and respectfully refers the Court to that Section for its complete and accurate terms. DBGI denies Plaintiffs' characterization of Section 5.15 to the extent inconsistent with its text and denies that it establishes any entitlement to injunctive relief.

73. To the extent paragraph 73 states a legal conclusion, no response is required. To the extent a response is required, DBGI denies the allegations of paragraph 73.

74. DBGI denies the allegations of paragraph 74.

75. To the extent paragraph 75 states a legal conclusion, no response is required. To the extent a response is required, DBGI denies the allegations of paragraph 75.

76. DBGI repeats and realleges its responses to the allegations in paragraphs 1 through 75 of the Complaint as if fully set forth herein.

77. To the extent paragraph 77 states a legal conclusion, no response is required. DBGI admits that it and Plaintiffs executed the SPA and that the SPA was supported by consideration. DBGI denies the remaining allegations of paragraph 77, and avers that Plaintiffs' fraudulent inducement and material breaches of the SPA bar their claims.

78. To the extent paragraph 78 states a legal conclusion, no response is required. DBGI admits that each Plaintiff paid $1,000,000 and submitted certain conversion notices, fees, and opinion letters. DBGI denies that Plaintiffs performed all conditions, covenants, and obligations required of them under the SPA. Specifically, DBGI denies that Plaintiffs satisfied their representation and warranty in Section 3.2(b) of the SPA that they were acquiring the securities for their own account with no arrangement or understanding to distribute them, and denies that Plaintiffs complied with their covenant in Section 4.1(a) of the SPA to dispose of the securities

only in compliance with federal and state securities laws. DBGI denies the remaining allegations of paragraph 78.

79. To the extent paragraph 79 states a legal conclusion, no response is required. DBGI admits that it did not obtain a court injunction or temporary restraining order and did not post a surety bond. DBGI denies that it was obligated to honor Plaintiffs' conversion notices or to obtain an injunction or post a bond because of Plaintiffs' prior breaches of the SPA, respectfully refers the Court to Section 4.1(e) of the SPA for its terms, and denies the remaining allegations of paragraph 79.

80. Paragraph 80 states a legal conclusion to which no response is required. To the extent a response is required, DBGI denies the allegations of paragraph 80.

81. To the extent paragraph 81 states a legal conclusion, no response is required. To the extent a response is required, DBGI denies the allegations of paragraph 81.

82. DBGI repeats and realleges its responses to the allegations in paragraphs 1 through 81 of the Complaint as if fully set forth herein.

83. To the extent paragraph 83 states a legal conclusion, no response is required. DBGI admits that a controversy exists between the parties concerning their respective rights and obligations under the SPA. DBGI otherwise denies the allegations of paragraph 83.

84. DBGI admits that a dispute exists. DBGI denies the allegations of paragraph 84 as characterized, and avers that its refusals to honor Plaintiffs' conversion notices were justified by Plaintiffs' material breaches of the SPA and their manipulation of DBGI's stock.

85. Paragraph 85 states a legal conclusion to which no response is required. DBGI otherwise denies the allegations of paragraph 85.

86. Paragraph 86 states a legal conclusion to which no response is required. DBGI otherwise denies the allegations of paragraph 86.

87. DBGI repeats and realleges its responses to the allegations in paragraphs 1 through 86 of the Complaint as if fully set forth herein.

88. DBGI admits that the SPA contains a Section 4.8 and respectfully refers the Court to that Section for its complete and accurate terms. DBGI denies Plaintiffs' characterization of Section 4.8 to the extent inconsistent with its text.

89. Paragraph 89 states a legal conclusion to which no response is required. DBGI otherwise denies the allegations of paragraph 89.

90. To the extent paragraph 90 states a legal conclusion, no response is required. DBGI otherwise denies the allegations of paragraph 90.

91. DBGI denies that Plaintiffs have satisfied the notice and other conditions of Section 4.8 of the SPA, respectfully refers the Court to Section 4.8 for its terms, and lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of paragraph 91, and on that basis denies them.

92. DBGI repeats and realleges its responses to the allegations in paragraphs 1 through 91 of the Complaint as if fully set forth herein.

93. DBGI admits that it did not obtain a court order or post a surety bond. DBGI denies that Plaintiffs are likely to succeed on the merits, avers that Plaintiffs' material breaches and fraudulent inducement bar their claims, and denies the remaining allegations of paragraph 93.

94. Paragraph 94 states a legal conclusion to which no response is required. DBGI otherwise denies the allegations of paragraph 94.

95. Paragraph 95 states a legal conclusion to which no response is required. DBGI otherwise denies the allegations of paragraph 95.

96. Paragraph 96 states a legal conclusion to which no response is required. DBGI otherwise denies the allegations of paragraph 96.

97. To the extent paragraph 97 states a legal conclusion, no response is required. DBGI admits that the SPA contains a Section 5.15 and respectfully refers the Court to that Section for its complete and accurate terms. DBGI denies Plaintiffs' characterization of Section 5.15 to the extent inconsistent with its text and otherwise denies the allegations in paragraph 97.

98. Paragraph 98 states a legal conclusion to which no response is required. DBGI otherwise denies the allegations of paragraph 98.

99. DBGI repeats and realleges its responses to the allegations in paragraphs 1 through 98 of the Complaint as if fully set forth herein.

100. To the extent paragraph 100 states a legal conclusion, no response is required. DBGI denies that Plaintiffs fully performed their obligations under the referenced Consent Agreement, respectfully refers the Court to that agreement for its complete and accurate terms.

101. Paragraph 101 states a legal conclusion to which no response is required. To the extent a response is required, DBGI denies the allegations of paragraph 101.

102. DBGI admits that the Consent Agreement contains a Paragraph 3 and respectfully refers the Court to that Paragraph for its complete and accurate terms. DBGI denies Plaintiffs' characterization of Paragraph 3 to the extent inconsistent with its text.

103. Paragraph 103 states a legal conclusion to which no response is required. DBGI otherwise denies the allegations of paragraph 103.

104. Paragraph 104 states a legal conclusion to which no response is required. DBGI otherwise denies the allegations of paragraph 104.

105. Paragraph 105 states a legal conclusion to which no response is required. DBGI otherwise denies the allegations of paragraph 105.

106. Paragraph 106 states a legal conclusion to which no response is required. To the extent a response is required, DBGI denies the allegations of paragraph 106.

107. Paragraph 107 states a legal conclusion to which no response is required. To the extent a response is required, DBGI denies the allegations of paragraph 107.

108. The unnumbered WHEREFORE paragraph following paragraph 107, including subparagraphs (a) through (i), states Plaintiffs' demand for relief, to which no response is required. To the extent a response is required, DBGI denies that Plaintiffs are entitled to the relief requested, or to any relief whatsoever.

## AFFIRMATIVE AND OTHER DEFENSES

109. DBGI asserts the following defenses without assuming any burden of proof that it would not otherwise bear, and without waiving any denial set forth above. DBGI's investigation is ongoing, and DBGI expressly reserves the right to amend or supplement these defenses as discovery proceeds. Headers preceding affirmative defenses are for readability and do not limit the defenses.

### 1. Failure to State a Claim

110. The Complaint fails, in whole or in part, to state a claim upon which relief can be granted.

**2. Prior Material Breach**

111. Plaintiffs' claims are barred, in whole or in part, by their own prior material breach of the SPA. Plaintiffs materially breached Section 3.2(b) of the SPA, in which each Plaintiff represented and warranted that it was acquiring the securities as principal for its own account, with no present intention of distributing them in violation of the securities laws, and with no direct or indirect arrangement or understanding with any other person regarding the distribution of the securities, and Section 4.1(a) of the SPA, which required that the securities be disposed of only in compliance with federal and state securities laws. Plaintiffs' breaches preceded and excused any performance by DBGI, including any obligation to honor the conversion notices at issue.

**3. Fraudulent Inducement**

112. Plaintiffs' claims are barred, in whole or in part, by fraud. Plaintiffs induced DBGI to enter into the SPA by falsely representing in Section 3.2(b) that they were acquiring the securities for their own account and had no arrangement or understanding with others regarding distribution, and by concealing material facts, including that Plaintiffs and other members of the Series D Group were acting in concert as a single economic unit to accumulate and control a substantial percentage of DBGI's outstanding shares, that they intended to manipulate the market for DBGI's stock, and that Scott Gelbard — an individual permanently enjoined by the SEC from penny-stock activity and criminally indicted for substantially similar conduct — was involved in the scheme. Had DBGI known these facts, it would not have entered into the SPA on the same terms, if at all.

**4. Illegality and Violation of Securities Laws**

113. Plaintiffs' claims are barred, in whole or in part, by the doctrine of illegality. Plaintiffs acquired and used the securities in furtherance of a scheme to manipulate the price of

DBGI's stock in violation of the federal securities laws, including Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, Section 9(a) of the Exchange Act, and the beneficial-ownership disclosure requirements of Section 13(d) of the Exchange Act and Rules 13d-3 and 13d-5. The relief Plaintiffs seek would require DBGI to facilitate the continuation of that unlawful scheme.

**5. Unclean Hands**

114. Plaintiffs' claims for equitable relief are barred by the doctrine of unclean hands. Plaintiffs' participation in the coordinated scheme to manipulate DBGI's stock, and their concealment of that scheme from DBGI, directly relate to the subject matter of this action and bar the equitable relief they seek.

**6. In Pari Delicto**

115. Plaintiffs' claims are barred, in whole or in part, by the doctrine of in pari delicto, because Plaintiffs bear at least equal responsibility for the conduct underlying this dispute, including the coordinated accumulation and manipulation of DBGI securities described above.

**7. Breach of the Implied Covenant of Good Faith and Fair Dealing**

116. Plaintiffs' claims are barred, in whole or in part, because Plaintiffs breached the implied covenant of good faith and fair dealing inherent in the SPA by participating in, and concealing, the scheme to manipulate DBGI's stock.

**8. Standing**

117. Plaintiffs' claims are barred, in whole or in part, to the extent Plaintiffs lacks standing to assert such claims or to seek the requested relief against DBGI. or are not the real parties in interest with respect to the shares at issue.

**9. Adequate Remedy at Law; No Irreparable Harm**

118. Plaintiffs' claims for injunctive relief and specific performance are barred because Plaintiffs have an adequate remedy at law. Any injury Plaintiffs allege is quantifiable and compensable by monetary damages. Indeed, Plaintiffs have calculated their alleged damages. Additionally, Plaintiffs cannot establish irreparable harm.

**10. Improper Expansion of Contractual Terms**

119. Plaintiffs' requested relief is improper because it seeks to add terms to, and rewrite, the SPA. Among other things, the SPA provides no basis for an order requiring DBGI to approve future conversion notices without limitation or permitting conversions and sales of common shares without any restriction relating to daily trading volume.

**11. Truth; Privilege; Opinion — Defamation**

120. Plaintiffs' claims for defamation per se and for breach of the Consent Agreement are barred because the challenged statements were true or substantially true, constituted non-actionable statements of opinion, were subject to applicable privileges, and/or were not made with the requisite fault or malice.

**12. Failure to Mitigate; Speculative Damages**

121. Plaintiffs' damages claims are barred or limited to the extent Plaintiffs failed to mitigate their alleged damages, and to the extent the alleged damages are speculative, remote, or unsupported.

**13. Unjust Enrichment**

122. Plaintiffs' claims are barred, in whole or in part, to the extent that any recovery from DBGI would result in their unjust enrichment and/or a duplicative recovery.

**14. Equitable Estoppel**

123. Plaintiffs' claims are barred, in whole or in part, on the grounds of equitable estoppel based on misrepresentations or omissions Plaintiffs made with reason to believe DBGI would rely upon them, on which DBGI reasonably relied to its detriment.

**15. Setoff and Recoupment**

124. Any recovery by Plaintiffs must be offset, set off, or recouped by the amounts owed by Plaintiffs to DBGI, including the damages sought in DBGI's Counterclaims.

**16. Unenforceable Penalty**

125. Plaintiffs' claim for liquidated damages is barred, in whole or in part, to the extent the applicable provision is an unenforceable penalty because the amount bears no reasonable relationship to any actual loss and Plaintiffs' actual damages, if any, are readily ascertainable.

**17. Waiver, Estoppel, and Ratification**

126. Plaintiffs' claims are barred, in whole or in part, by the doctrines of waiver, estoppel, and ratification.

**18. Reservation of Rights**

127. DBGI has not knowingly or intentionally waived any applicable defense, and reserves the right to assert additional defenses that become available or apparent during the course of discovery and to amend its Answer accordingly.

**PRAYER FOR RELIEF ON THE AMENDED COMPLAINT**

WHEREFORE, Defendant Digital Brands Group, Inc. respectfully requests that the Court:

A. Dismiss the Amended Complaint in its entirety, with prejudice;

B. Enter judgment in DBGI's favor and against Plaintiffs on all claims, and deny Plaintiffs any and all relief requested;

C. Award DBGI its costs and reasonable attorneys' fees, including as provided by the SPA; and

D. Grant DBGI such other and further relief as the Court deems just and proper.

**COUNTERCLAIMS**

Defendant and Counterclaim-Plaintiff Digital Brands Group, Inc. ("DBGI"), by and through its undersigned counsel, as and for its counterclaims against plaintiffs and counterclaim-defendants Philip E. Gaucher, Jr. ("Gaucher") and Joey Giamichael ("Giamichael") (together, "Counterclaim-Defendants"), alleges as follows.[1]

**NATURE OF THE COUNTERCLAIMS**

1. This dispute does not arise from a simple refusal to honor conversion rights. It arises from Counterclaim-Defendants' knowing participation in a sophisticated and coordinated scheme to manipulate the market for DBGI's common stock. Counterclaim-Defendants induced DBGI to enter into the Securities Purchase Agreement dated August 8, 2025 (the "SPA") by falsely representing that they were acquiring DBGI securities as principal for their own account, with no arrangement or understanding with any other person regarding the distribution of those securities, when in truth they were acting in concert with a group of investors and nominees to accumulate and control a substantial percentage of DBGI's outstanding shares, to conceal the group's beneficial ownership from DBGI and the public, and to manipulate the price of DBGI's stock for the group's collective benefit and at DBGI's expense.

2. The scheme followed a consistent playbook: core members of the group purchased shares directly from DBGI, through the SPA and other offerings, and then distributed those shares to a network of nominees, each of whom held just under the 5% ownership threshold that triggers

[1] In support of its counterclaims, DBGI incorporates by reference ECF No. 31 (Declaration of Stephen W. Tountas) and the accompanying exhibits (ECF No. 31.1 - 31.30).

mandatory beneficial-ownership disclosure under the federal securities laws, so that the group could act as a single economic unit controlling a substantial percentage of DBGI's shares while concealing that control.

3. Had DBGI known all the facts — that Counterclaim-Defendants and their affiliates were operating in concert as a group, that the group's accumulated ownership would trigger disclosure obligations under the federal securities laws, and that Scott Gelbard, an individual permanently enjoined by the SEC from penny-stock activity and criminally indicted for substantially similar conduct, was involved in the scheme — DBGI would not have entered into the SPA on the same terms, if at all.

4. DBGI asserts these counterclaims to recover the damages it has suffered as a result of Counterclaim-Defendants' breaches and fraud, and to obtain a declaration of the parties' rights.

## THE PARTIES

5. Counterclaim-Plaintiff DBGI is a corporation organized under the laws of the State of Nevada, with its principal place of business in Texas.

6. Counterclaim-Defendant Gaucher is a natural person who is domiciled in the Commonwealth of Puerto Rico.

7. Counterclaim-Defendant Giamichael is a natural person who is domiciled in the Commonwealth of Puerto Rico.

## JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction over these counterclaims under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between DBGI, on the one hand, and Counterclaim-Defendants, on the other, and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court also has subject-matter jurisdiction over Counts IV and V under

28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367(a) because these counterclaims arise from the same transactions and occurrences as the claims asserted in the Complaint and form part of the same case or controversy.

9. Venue is proper in this District under 28 U.S.C. § 1391(b) and, Counterclaim-Defendants having invoked it, under Section 5.9 of the SPA.

**FACTUAL ALLEGATIONS**

10. DBGI is a publicly traded apparel company. From on or about October 2, 2024 through December 18, 2024, DBGI experienced significant financial challenges that culminated in its delisting from Nasdaq and the suspension of trading in its stock, and DBGI sought capital investment to support a relisting.

11. On or about October 28, 2024, DBGI retained RBW Capital Partners LLC ("RBW"), a division of Dawson James Securities Inc. that is owned by Counterclaim-Defendants, to serve as the exclusive placement agent for a planned public offering of approximately $3 million, amounting to up to 4,929,143 units of DBGI securities.

12. MavDB Consulting LLC, a firm controlled by David Joshua Bartch ("Bartch"), executed a vendor agreement for consulting services on or about January 21, 2025 that included stock options among its compensation provisions.

13. Bartch executed a securities purchase agreement in his personal capacity on or about February 13, 2025 to purchase DBGI common shares, pre-funded warrants, and common warrants, together with a common share purchase warrant and a pre-funded common share purchase warrant that each capped exercise at 4.99% beneficial ownership. A majority of these shares were subsequently distributed to a group of network of investors who purchased them at nominal value and operated as a group directed by Bartch and each held a stake just under 5% -

the threshold which triggers disclosure obligations under Section 13(d) of the Securities Exchange Act of 1934.

14. To raise additional capital for a NASDAQ uplisting, on or about August 5, 2025, DBGI authorized a private placement (the "PIPE") of up to 15,000 shares of Series D Convertible Preferred Stock (the "Series D Shares") at $800 per share, with RBW again serving as the exclusive placement agent for an 8% fee. The conversion price was set at 80% of the lowest closing price over the preceding five trading days.

15. On August 8, 2025, DBGI executed the SPA with a number of investors, including Counterclaim-Defendant Gaucher ($1,000,000) and Counterclaim-Defendant Giamichael ($1,000,000), as well as Target Capital 16 LLC (the lead purchaser, $6,000,000), Alois Rubenbauer of Secure Net Capital ($2,000,000), Turnpoint Capital ($500,000), BMG ($425,000), and Cobra Alternative Capital ($300,000). RBW was paid $898,000 to place these shares.

16. In Section 3.2(b) of the SPA, each Counterclaim-Defendant represented and warranted that they:

> acquir[ed] [DBGI] Securities as principal for its own account and not with a view to or for distributing or reselling such Securities or any part thereof in violation of the Securities Act or any applicable state securities law, [had] no present intention of distributing any of such Securities in violation of the Securities Act… and [had] no direct or indirect arrangement or understandings with any other persons to distribute or regarding the distribution of such Securities in violation of the Securities Act.

17. In Section 4.1(a) of the SPA, each Counterclaim-Defendant covenanted that "[t]he Series D Shares and the Conversion Shares may only be disposed of in compliance with state and federal securities laws."

18. Those representations and warranties were false when made. At the time each Counterclaim-Defendant executed the SPA, each was a member of a group of investors —

including Counterclaim-Defendants, Bartch, BMG, Target Capital 16 LLC, Secure Net Capital LLC, Turnpoint Capital, Cobra Alternative Capital, and others, together with their counsel and Eric Boehnke (the "Series D Group") — that was acting in concert pursuant to arrangements and understandings regarding the acquisition, holding, and disposition of DBGI securities.

19. Upon information and belief, following the Series D private placement approximately 77.4% of DBGI's outstanding shares were under the common control and beneficial ownership of the group, unbeknownst to DBGI at the time.

20. DBGI was relisted and recommenced trading on Nasdaq on or about August 20, 2025.

21. After the PIPE, upon information and belief, members of the group, including Scott Gelbard, paid marketing firms to promote DBGI's stock and to encourage outside investors to purchase it.

22. Gelbard was included in discussions with the marketing consultant i2i in or about May 2025 to coordinate those promotional efforts.

23. Upon information and belief, once DBGI's stock price reached a sufficient level, the group coordinated sales and short sales through its nominees, determining which members could sell, when and how much they could sell, and how much of the proceeds each could retain.

24. On multiple occasions, including June 1, 2026, June 3, 2026, June 11, 2026, June 15, 2026, June 18, 2026, July 7, 2026, July 8, 2026, July 20, 2026, August 3, 2026, August 5, 2026, August, 12, 2026, the price of DBGI securities rose briefly after a positive news release, only to quickly fall– a pattern consistent with coordinated selling by the Series D Group.

25. The Series D Group's coordination is reflected in extensive communications in DBGI's possession. Among other things, members of the group engaged in transactions that could

not have resulted from arm's-length dealing. Turnpoint Capital, Cobra Alternative Capital, and Secure Net Capital purchased Series D Shares for a collective price of approximately $2,800,000, yet sold those same interests to Bartch, in the aggregate, for approximately $2,000,000. Based on the terms of the instruments — which carried an approximately 43% original issue discount and were convertible into common stock at a 20% discount to the market price — DBGI believes those interests were worth approximately $4,800,000, such that the group sold a package worth roughly $4.8 million to Bartch for about $2 million.

26. Trading among the group was monitored and restricted. On an e-mail chain to the Series D Group on January 26, 2026, at 3:29 p.m., an attorney working on behalf of the Series D Group sent revisions to a side letter signed by some or all of the Series D Group, which added "a leak out for [Plaintiffs]" and adjusted "the number of shares on annex A for [Plaintiffs] to reflect today's stock price." While leak-out provisions between an issuer and a purchaser are routine, leak-out provisions among shareholders indicate either coordination or control by one side over the other.

27. Bartch asked DBGI to provide weekly reports reflecting the quantity of shares each holder possessed, which allowed him to monitor who was selling and who was not.

28. The group coordinated payouts. On or about January 25, 2026, Bartch wrote to the Series D Group regarding a Series D side letter: "In addition to [Plaintiffs] Joe and Phil, [BMG] will also not be receiving payment as that would be paying ourselves. Not sure if that needs to be reflected as well? Please advise."

29. On or about January 26, 2026, Bartch wrote to the Series D Group: "To be clear the intention is to buy out in full, Turnpoint, Cobra and Secure Net for a total of $2,013,650." The only Series D holders Bartch did not buy out were Counterclaim-Defendants and BMG — the

holders Bartch had, one day earlier, described as "ourselves." Upon information and belief, Bartch was consolidating the outside positions while leaving the insiders' positions, including those of Counterclaim-Defendants and BMG, in place.

30. Upon information and belief, members of the Series D Group also moved DBGI-related assets among themselves off the books and papered the transfers after the fact. On or about January 25, 2026, an attorney working on behalf of the Series D Group circulated a side letter explaining that Counterclaim-Defendants "have agreed with [Bartch] to extend the time for [Bartch] to purchase the second tranche of their shares," and that the signatories needed to execute it so that "the fact that the first payment to [Plaintiffs] will not be made will not cause the agreement to terminate." Two days later, on or about January 27, 2026, MavDB transferred 40,000 pre-funded warrants to each Counterclaim-Defendant, each transfer stated to be "as per the Share Purchase Agreement" and each signed by Bartch as "Consultant."

31. When DBGI's Chief Executive Officer, Davis, asked Bartch to explain the logic of these transfers, Bartch answered: "It's part of my note purchase I did with them."

32. Later, on or about July 29, 2026, after DBGI identified inconsistencies in the number of shares and questioned the ownership of certain Series D interests, Bartch prepared an email for Counterclaim-Defendants to forward to Davis stating: "That's correct, your notes were not purchased by me. I paid you both in shares and cash to extend the conversion date of the notes. You are still the owner of the notes."

33. Upon information and belief, Scott Gelbard was involved in the scheme from an early date, operating largely behind the scenes. In or about May 2025, Gelbard was copied on a private email thread with the marketing firm i2i concerning the promotion of DBGI. Apart from Davis, Gelbard was the only individual Bartch included on that thread.

34. Gelbard has a documented history of securities-fraud violations. In 2009, the Securities and Exchange Commission brought an enforcement action against Gelbard, his company The Regency Group, LLC, and others, alleging that they carried out "pump and dump" schemes to manipulate the stock of two companies by selling shares in unregistered distributions, promoting the stock through materially false mailers and spam emails, and then selling additional shares after the promotions increased price and volume. The complaint further alleged that the conspirators concealed their ownership by, among other things, filing a fraudulent Schedule 13D falsely stating that Gelbard was the sole owner of certain restricted shares while other conspirators retained concealed interests. Gelbard consented to the entry of a final judgment that, without his admitting or denying the allegations, among a range of other penalties, permanently barred Gelbard from "participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or attempting to induce the purchase or sale of any penny stock."

35. On September 2, 2015, Gelbard was indicted in the District of Massachusetts for a conspiracy similar to the instant scheme. In announcing the indictment, the press release from the U.S. Attorney's Office stated that he "commit[ted] securities fraud by promoting shares of a company and then secretly selling them, without disclosing that he and his co-conspirators controlled almost all of the available shares." Gelbard and his co-conspirators allegedly "conceal[ed] their control and trading of [the company's] stock by using nominee entities, individuals, and accounts," as well as "[c]oncealing the transfer of proceeds" through the same mechanisms. They then allegedly intentionally failed to disclose that they had accumulated over 85% of the company's shares, despite SEC requirements. Upon information and belief, Gelbard relocated to Canada before his indictment, and the criminal case remains pending.

36. Counterclaim-Defendants concealed from DBGI the existence and nature of the Series D Group, the group's coordinated accumulation and control of DBGI shares, the group's intended manipulation of DBGI's stock, and the involvement of Scott Gelbard.

37. DBGI reasonably and justifiably relied on Counterclaim-Defendants' representations and warranties in Section 3.2(b) of the SPA in entering into the SPA and in initially honoring certain of Counterclaim-Defendants' conversions. Had DBGI known the true facts, it would not have entered into the SPA on the same terms, if at all.

38. In or around late July and early August 2026, as evidence of the scheme emerged, DBGI declined to approve certain of the conversion notices at issue in the Complaint.

39. As a direct and proximate result of Counterclaim-Defendants' conduct, DBGI has suffered damages, including damage to the value of its common stock, damages resulting from reputational harm, loss of business, goodwill, and revenue, and the costs of investigating and responding to the scheme, in an amount to be determined at trial.

**COUNT I (Counterclaim) — Breach of Contract**

40. DBGI repeats and realleges paragraphs 1 through 39 of these Counterclaims as if fully set forth herein.

41. The SPA is a valid and binding contract between DBGI and each Counterclaim-Defendant, supported by adequate consideration.

42. DBGI performed its obligations under the SPA, except to the extent its performance was excused by Counterclaim-Defendants' prior material breaches.

43. Each Counterclaim-Defendant materially breached the SPA, including the representations and warranties in Section 3.2(b) and the covenant in Section 4.1(a), by: (1) acquiring the Series D Shares in furtherance of a coordinated pump-and-dump and market-

manipulation scheme; (2) falsely representing that each was acquiring the securities as principal for its own account, with no arrangement or understanding with others regarding their distribution, when in fact each was acting in concert with the Series D Group and reallocating securities among the group and its nominees to facilitate manipulation of DBGI's stock; and (3) using their securities in violation of Sections 10(b) and 9(a) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, and other securities laws. Each of these breaches was material because it went to the essence of the SPA: DBGI would not have sold the Series D Shares to Counterclaim-Defendants had it known they intended to accumulate and conceal a controlling interest in DBGI's stock and to use it to manipulate the market.

44. As a direct and proximate result of these breaches, DBGI has suffered damages in an amount to be determined at trial, together with pre- and post-judgment interest.

**COUNT II (Counterclaim) — Breach of the Implied Covenant of Good Faith and Fair Dealing**

45. DBGI repeats and realleges paragraphs 1 through 44 of these Counterclaims as if fully set forth herein.

46. The SPA, like every contract, contains an implied covenant of good faith and fair dealing.

47. Each Counterclaim-Defendant breached the implied covenant by participating in, and concealing from DBGI, the coordinated scheme to accumulate, control, and manipulate DBGI securities, thereby depriving DBGI of the fruits of the SPA.

48. Each Counterclaim-Defendant also breached the implied covenant by failing to disclose or affirmatively withholding material facts, including the existence of the cooperation between conspirators, the existence of the scheme, and the participation of Scott Gelbard.

49. As a direct and proximate result of these breaches, DBGI has suffered damages in an amount to be determined at trial, together with pre- and post-judgment interest.

**COUNT III (Counterclaim) — Fraudulent Inducement**

50. DBGI repeats and realleges paragraphs 1 through 49 of these Counterclaims as if fully set forth herein.

51. In Section 3.2(b) of the SPA, which each Counterclaim-Defendant executed on August 8, 2025, each Counterclaim-Defendant represented and warranted in writing that it was acquiring the securities as principal for its own account, with no present intention of distributing them in violation of the securities laws and no direct or indirect arrangement or understanding with any other person regarding the distribution of the securities. In connection with that same transaction, each Counterclaim-Defendant also failed to disclose, and affirmatively concealed, the existence of the Series D Group, the group's coordinated accumulation and control of DBGI shares, the group's intended manipulation of DBGI's stock, and the involvement of Scott Gelbard.

52. Those representations were false representations of then-existing material facts, and those omissions concerned material facts, when made on August 8, 2025. Counterclaim-Defendants knew the representations were false and the omitted facts were material, or made the representations with reckless disregard for their truth.

53. Counterclaim-Defendants had both the motive and the opportunity to make those misrepresentations and omissions: as members of the Series D Group, they stood to profit from inducing DBGI to sell them discounted convertible preferred stock that the group could accumulate, conceal, and use to manipulate the market, and they made the representations with the intent to induce DBGI to enter into the SPA and to honor their conversions.

54. DBGI reasonably and justifiably relied on Counterclaim-Defendants' representations in entering into the SPA and in honoring certain conversions.

55. As a direct and proximate result of Counterclaim-Defendants' fraud, DBGI has suffered damages in an amount to be determined at trial, together with pre- and post-judgment interest.

**COUNT IV (Counterclaim) — Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 (15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5)**

56. DBGI repeats and realleges paragraphs 1 through 55 of these Counterclaims as if fully set forth herein.

57. DBGI's claims under this Count arise under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. This Court has subject-matter jurisdiction over this Count under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, in addition to the bases of jurisdiction alleged above.

58. The SPA, the Series D Shares, and the shares of DBGI common stock issuable upon their conversion (the "Conversion Shares") are "securities" within the meaning of Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10). DBGI sold, and each Counterclaim-Defendant purchased, the Series D Shares pursuant to the SPA on August 8, 2025. DBGI was therefore a seller of the securities to which the misrepresentations and omissions alleged below relate.

59. In connection with that purchase and sale, each Counterclaim-Defendant, directly and indirectly, made use of the means and instrumentalities of interstate commerce, of the mails, and of the facilities of a national securities exchange.

60. In connection with that purchase and sale, each Counterclaim-Defendant made untrue statements of material fact and omitted to state material facts necessary, in light of the

circumstances under which they were made, to make the statements made not misleading, and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon DBGI. In particular, in Section 3.2(b) of the SPA, each Counterclaim-Defendant represented and warranted that it was acquiring the securities as principal for its own account, with no present intention of distributing them in violation of the securities laws and with no direct or indirect arrangement or understanding with any other person regarding the distribution of the securities. Each Counterclaim-Defendant further failed to disclose, and affirmatively concealed, that it was acting in concert with the Series D Group as a single economic unit; that the group was coordinating the accumulation, holding, and disposition of DBGI securities and concealing its aggregate beneficial ownership through a network of nominees each held just under the 5% reporting threshold; that the group intended to manipulate the market for DBGI's common stock; and that Scott Gelbard, an individual permanently enjoined by the SEC from penny-stock activity and criminally indicted for substantially similar conduct, was involved in the scheme.

61. These misrepresentations and omissions were material. A reasonable issuer in DBGI's position would have considered it important, in deciding whether to sell the Series D Shares to Counterclaim-Defendants and on what terms, to know that the purchasers were members of a coordinated group that would control a substantial percentage of DBGI's outstanding shares, that the group intended to manipulate DBGI's stock, and that a securities-fraud offender was involved.

62. Each Counterclaim-Defendant acted with scienter. Each knew that its representations in Section 3.2(b) were false and that the concealed facts were material when it executed the SPA on August 8, 2025, or made those representations and omissions with reckless disregard for their truth. Each Counterclaim-Defendant had both the motive and the opportunity

to defraud DBGI: as members of the Series D Group, Counterclaim-Defendants stood to profit by inducing DBGI to sell them deeply discounted convertible preferred stock that the group could accumulate, conceal, and use to manipulate the market for DBGI's common stock, and they possessed exclusive knowledge of the group's arrangements, which they withheld from DBGI.

63. DBGI justifiably and reasonably relied on Counterclaim-Defendants' representations and warranties in Section 3.2(b), and on the completeness of their disclosures, in agreeing to sell and issue the Series D Shares to Counterclaim-Defendants and in initially honoring certain of their conversions. DBGI's reliance was reasonable because those representations were made in writing, as express conditions of the transaction, and the concealed facts were peculiarly within Counterclaim-Defendants' knowledge.

64. Counterclaim-Defendants' misrepresentations and omissions were both the transaction cause and the loss cause of DBGI's injury. But for those misrepresentations and omissions, DBGI would not have sold the Series D Shares to Counterclaim-Defendants on the same terms, if at all. The concealment of the group's coordinated accumulation, concealed control, and intended manipulation, and the subsequent materialization of those concealed risks, directly and proximately caused DBGI to suffer damages, including impairment of the value of its common stock and the costs of investigating and responding to the scheme.

65. By reason of the foregoing, each Counterclaim-Defendant violated Section 10(b) of the Exchange Act and Rule 10b-5, and DBGI has been damaged in an amount to be determined at trial, together with pre- and post-judgment interest.

**COUNT V (Counterclaim) — Violation of Section 9(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78i(a), (f))**

66. DBGI repeats and realleges paragraphs 1through 65 of these Counterclaims as if fully set forth herein.

67. This claim arises under Sections 9(a) and 9(f) of the Securities Exchange Act of 1934 (the “Exchange Act”), 15 U.S.C. § 78i(a), (f). This Court has subject-matter jurisdiction over this Count under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, in addition to the bases of jurisdiction alleged above. DBGI’s common stock is, and at all relevant times was, registered pursuant to Section 12 of the Exchange Act and traded on a national securities exchange.

68. Each Counterclaim-Defendant, acting in concert with the other members of the Series D Group, directly and indirectly, by use of the mails and the means and instrumentalities of interstate commerce and of the facilities of a national securities exchange, effected, alone or with others, a series of transactions in DBGI common stock.

69. Those transactions created actual and apparent active trading in DBGI common stock and raised, depressed, and otherwise affected the price of that stock. Among other things, and as alleged above, the Series D Group acquired and concealed control of a substantial percentage of DBGI’s outstanding shares through a network of nominees each held just under the 5% reporting threshold; paid or caused others to pay for promotional efforts to inflate the price of DBGI common stock; and then engaged in coordinated sales and short sales of DBGI common stock through those nominees, controlling which members could sell, when, in what volume, and at what times, so as to move the price of DBGI’s thinly traded common stock.

70. Each Counterclaim-Defendant effected those transactions willfully and for the purpose of inducing the purchase or sale of DBGI common stock by others. The group’s conduct was not ordinary market activity but a deliberate scheme to create a false appearance of active trading and genuine supply and demand, and to raise and then depress the price of DBGI common

stock, in order to induce other market participants to trade and to enable the group to profit at the expense of DBGI and the market.

71. DBGI sold shares of its own common stock in the market during the period in which the price of that stock was affected by Counterclaim-Defendants' manipulative conduct, and did so at prices that were affected by that manipulation. DBGI was therefore a seller of securities at a price affected by the unlawful transactions within the meaning of Section 9(f).

72. DBGI relied on the integrity of the market price of its common stock in effecting those sales, and the prices at which DBGI sold did not reflect the price that would have prevailed in a market free of Counterclaim-Defendants' manipulation.

73. As a direct and proximate result of Counterclaim-Defendants' manipulation, DBGI suffered damages, because the manipulation artificially distorted the price at which DBGI sold its common stock and impaired the value and orderly market for that stock. DBGI sustained those damages in an amount to be determined at trial, together with pre- and post-judgment interest.

74. By reason of the foregoing, each Counterclaim-Defendant is liable to DBGI under Section 9(f) of the Exchange Act for the damages DBGI sustained as a result of the manipulation.

**COUNT VI (Counterclaim) — Declaratory Judgment (28 U.S.C. §§ 2201–2202)**

75. DBGI repeats and realleges paragraphs 1 through 74 of these Counterclaims as if fully set forth herein.

76. An actual, substantial, and justiciable controversy exists between DBGI and Counterclaim-Defendants concerning their respective rights and obligations under the SPA, including whether Counterclaim-Defendants' material breaches and fraudulent inducement excused DBGI from any obligation to honor the conversion notices at issue.

77. DBGI is entitled to a judicial declaration that Counterclaim-Defendants materially breached the SPA and fraudulently induced DBGI to enter into it, and that DBGI was and is excused from honoring the conversion notices at issue and from any further performance under the SPA with respect to Counterclaim-Defendants.

**PRAYER FOR RELIEF ON THE COUNTERCLAIMS**

WHEREFORE, Counterclaim-Plaintiff Digital Brands Group, Inc. respectfully requests that the Court:

A. Enter judgment in DBGI's favor and against Counterclaim-Defendants on each counterclaim;

B. Award DBGI compensatory damages in an amount to be determined at trial, together with pre- and post-judgment interest;

C. Enter a declaratory judgment that Counterclaim-Defendants materially breached and fraudulently induced the SPA and that DBGI is excused from performance with respect to Counterclaim-Defendants;

D. Award DBGI its costs and reasonable attorneys' fees, including as provided by the SPA; and

E. Grant DBGI such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Defendant Digital Brands Group, Inc. demands a trial by jury on all issues so triable.

Dated: New York, New York
October 8, 2026

Respectfully,

By: /s/ Stephen W. Tountas
Stephen W. Tountas
Kasowitz LLP
1633 Broadway

New York, New York 10019
Tel: (212) 506-1700
stountas@kasowitz.com

/s/ James W. Christian
James W. Christian
Christian Attar
1177 West Loop South, Ste 1700
Houston, Texas 77027
Tel: (713) 659-7617
jchristian@christianattarlaw.com

*Attorneys for Defendant*
*Digital Brands Group, Inc.*