UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **PHILIP E. GAUCHER, JR. and JOEY GIAMICHAEL,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**DIGITAL BRANDS GROUP INC.,**<br><br>**Defendant.** | **Case No.: 26-cv-6889 (JMF)(SLC)** |

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR AN ORDER REQUIRING DEFENDANT TO POST A BOND AS SECURITY FOR COSTS AND ATTORNEYS' FEES PURSUANT TO LOCAL CIVIL RULE 54.2

**LAW OFFICES OF BARRY M. BORDETSKY**
570 Lexington Avenue, 24th Floor
New York, New York 10022
Tel: (212) 688-0008
barry@bordetskylaw.com

*Attorneys for Plaintiffs and Counterclaim-Defendants*

## TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES ........ iii

PRELIMINARY STATEMENT ........ 1

STATEMENT OF FACTS ........ 3

A. The SPA's Conversion, Bond, and Fee Provisions ........ 3

B. DBGI's Answer Admits the Breach ........ 4

C. DBGI Announced the Supposedly "Concealed" Agreements in February 2026, Then Released Plaintiffs and Kept Performing ........ 5

D. DBGI Repeats the Refuted Narrative in Its Counterclaims and Declines to Withdraw It ........ 6

E. DBGI's Financial Condition ........ 7

F. The Court Grants Plaintiffs' Motion for a Preliminary Injunction ........ 8

ARGUMENT ........ 9

I. LOCAL CIVIL RULE 54.2 AUTHORIZES THE COURT TO REQUIRE "ANY PARTY," INCLUDING A DEFENDANT AND COUNTERCLAIMANT, TO SECURE COSTS AND FEES ........ 9

II. EVERY FACTOR FAVORS REQUIRING DBGI TO POST SECURITY ........ 10

A. DBGI's Financial Condition Is Dire by Its Own Admission ........ 10

B. DBGI Is a Foreign Corporation With No Known Assets in New York ........ 12

C. The Court Has Already Held That Plaintiffs Are Likely to Succeed on the Admitted Breach ........ 12

D. DBGI's Counterclaims Have Substantially Expanded the Scope of Discovery ........ 14

E. Plaintiffs' Fees Are Substantial and Contractually Recoverable From DBGI ........ 14

F. DBGI's Litigation Conduct Weighs in Favor of Security ........ 15

III. THE COUNTERCLAIMS HAVE NO LEGAL VIABILITY ........ 16

IV. MR. DAVIS'S STATEMENTS ABOUT THIS DISPUTE HAVE REPEATEDLY PROVEN UNTRUE, AND HIS ASSURANCES OF SOLVENCY ARE ENTITLED TO NO WEIGHT ............ 17

V. DBGI'S CONTINUED PROSECUTION OF CLAIMS REFUTED BY ITS OWN FEBRUARY RELEASE INDEPENDENTLY WARRANTS SECURITY ............ 21

VI. THE COURT SHOULD SET SECURITY AT PLAINTIFFS' ANTICIPATED FEES AND COSTS ............ 23

VII. IF DBGI FAILS TO POST THE SECURITY, ITS COUNTERCLAIMS SHOULD BE STAYED OR STRICKEN ............ 24

CONCLUSION ............ 24

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87 (2d Cir. 2007) ....................................17

*Basic Inc. v. Levinson,* 485 U.S. 224 (1988)........................................................................16

*Beautiful Jewellers Private Ltd. v. Tiffany & Co.,* No. 06-cv-3085 (KMW), 2008 WL 2876508 (S.D.N.Y. July 21, 2008) ..........................................................9, 10, 23

*Bressler v. Liebman,* No. 96 Civ. 9310 (LAP), 1997 WL 466553 (S.D.N.Y. Aug. 14, 1997) .........................................................................................................................10

*Chambers v. NASCO, Inc.,* 501 U.S. 32 (1991)......................................................................22

*Cottam v. Glob. Emerging Cap. Grp., LLC,* 2020 WL 1528526 (S.D.N.Y. Mar. 30, 2020)..........9

*Cruz v. Am. Broad. Cos.,* No. 17-cv-8794 (LAK), 2017 WL 5665657 (S.D.N.Y. Nov. 17, 2017) .........................................................................................................................12

*Halifax Fund, L.P. v. Response USA, Inc.,* C.A. No. 15553, 1997 WL 33173241 (Del. Ch. May 13, 1997)...................................................................................................13, 16

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.,* 286 F.3d 613 (2d Cir. 2002)............17

*Hollander v. Am. Cyanamid Co.,* 172 F.3d 192 (2d Cir. 1999)..................................................18

*Kanongataa v. Am. Broad. Cos.,* No. 16-cv-7382 (LAK), 2017 WL 4776981 (S.D.N.Y. Oct. 4, 2017) ..................................................................................................................23

*Kensington Int'l Ltd. v. Republic of Congo,* No. 03-cv-4578 (LAP), 2005 WL 646086 (S.D.N.Y. Mar. 21, 2005) ...............................................................................9, 10

*Lowinger v. Morgan Stanley & Co.,* 841 F.3d 122 (2d Cir. 2016) ............................................17

*Mango v. Democracy Now! Prods., Inc.,* No. 18-cv-10588 (DLC), 2019 WL 3325842 (S.D.N.Y. July 24, 2019) .....................................................................................14

*MERA USA, LLC v. MCS Burbank, LLC,* No. 2024-0188-MTZ, 2026 WL 2547077 (Del. Ch. Aug. 28, 2026)..........................................................................................................16

*RAA Mgmt., LLC v. Savage Sports Holdings, Inc.,* 45 A.3d 107 (Del. 2012) ..............................17

*RLS Assocs., LLC v. United Bank of Kuwait PLC,* No. 01-cv-1290 (CSH), 2005 WL 578917 (S.D.N.Y. Mar. 11, 2005) ......................................................................10, 12

*Sea Trade Co. v. FleetBoston Fin. Corp.,* No. 03 Civ. 10254 (JFK), 2008 WL 161239 (S.D.N.Y. Jan. 15, 2008)...........................................................................................9, 10

*Selletti v. Carey,* 173 F.R.D. 96 (S.D.N.Y. 1997), *aff'd*, 173 F.3d 104 (2d Cir. 1999).......9, 10, 16

**Statutes**

15 U.S.C. § 78i(a) (Exchange Act § 9(a))....................................................................6

15 U.S.C. § 78j(b) (Exchange Act § 10(b))....................................................................6

15 U.S.C. § 78m(d) (Exchange Act § 13(d))....................................................................17

28 U.S.C. § 1927....................................................................15, 22

**Rules and Regulations**

17 C.F.R. § 240.10b-5....................................................................16

Fed. R. Civ. P. 11....................................................................7, 15, 21

Fed. R. Civ. P. 11(b)(3)....................................................................21

Local Civ. R. 54.2.................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 11 Advisory Committee's Note To 1993 Amendment ....................................21

## PRELIMINARY STATEMENT

Plaintiffs and Counterclaim-Defendants Philip E. Gaucher, Jr. and Joey Giamichael ("Plaintiffs") respectfully submit this memorandum of law in support of their motion, pursuant to Local Civil Rule 54.2 and the Court's inherent authority, for an order requiring Defendant and Counterclaim-Plaintiff Digital Brands Group, Inc. ("DBGI") to post a bond as security for Plaintiffs' costs and attorneys' fees under the parties' Securities Purchase Agreement (the "SPA").

DBGI has now answered the Amended Complaint ("Answer") and within has asserted several counterclaims ("Counterclaims"), and its Answer resolves the central question of liability. DBGI "admits that it did not obtain a court injunction or temporary restraining order and did not post a surety bond." (Dkt. 61 ¶79; *accord id.* ¶93.) It admits that, beginning July 30, 2026, it declined to approve Plaintiffs' conversion notices (*id.* ¶¶9, 45, 63); that the "pending lawsuit" its CEO invoked to justify those refusals did not exist (*id.* ¶¶44, 54, 58); that it stopped authorizing the opinion letters it now says conversion required (*id.* ¶¶6, 49); and that it allowed other Series D holders to convert during the same period (*id.* ¶60). Section 4.1(e) forbids exactly that conduct: DBGI "may not refuse to deliver unlegended shares based on any claim that such Purchaser . . . has not complied with Purchaser's obligations under the Transaction Documents, or for any other reason," unless it first obtains a court order on notice *and* posts a surety bond. (Dkt. 14-1 ("SPA") § 4.1(e).) DBGI's only answer — that Plaintiffs' supposed prior breach excused its own performance (Dkt. 61 ¶¶79, 84) — is the very "claim" Section 4.1(e) says cannot justify a refusal.

On October 13, 2026, the Court so held. (Dkt. 70). Granting Plaintiffs' motion for a preliminary injunction from the bench and thereafter issuing an order, the Court found that the SPA "unambiguously prohibits the defendant's admitted refusal to deliver the unlegended shares," that DBGI's prior-breach defense is one the contract "contemplates and rejects," and that DBGI

"did not argue in its papers, let alone show, that it was fraudulently induced to enter the contract." (Dkt. 71 ("Tr.") 33:12–15, 34:15–35:5.) The Court further found "concrete evidence confirming the volatility of defendant's stock and the risk that DBGI 'will not be able to pay damages at the conclusion of the litigation.'" (Tr. 37:6–11.) That finding is the core of this motion: the same risk that warranted injunctive relief warrants security for the fees and costs DBGI will owe.

DBGI's excuse is not merely foreclosed by contract, it is contradicted by DBGI's own public statement. On February 13, 2026, DBGI announced to the market, over a national wire service, the very private agreements among Series D holders that its opposition and Counterclaims now describe as a concealed "pump-and-dump" conspiracy— and told investors that it was not a party to those agreements, could not enforce them, and that the option on Plaintiffs' shares had been "abandoned." (Bordetsky Decl. Ex. 2 (the "February Release")). Two months later, DBGI released Plaintiffs from all claims relating to matters through April 15, 2026, and confirmed their "conversion rights" in writing. (Dkt. 14-11 §2.) DBGI then honored Plaintiffs' conversions through July 31, 2026. (Dkt. 61 ¶¶8, 28, 43.) Nonetheless, after the February Release was put squarely before its counsel and withdrawal was demanded (Bordetsky Decl. Ex. 2), DBGI continues to prosecute Counterclaims and defenses built on facts its own press release refutes.

That combination — an admitted breach, a defense that is both contractually foreclosed and frivolous, two Exchange Act counterclaims that multiply the cost of this litigation, and a counterparty that by its own SEC filing faces "substantial doubt" about its ability to continue as a going concern — is precisely the circumstance Local Civil Rule 54.2 addresses. DBGI is a Nevada corporation headquartered in Texas, with roughly $1.1 million in unrestricted cash, a $12.85 million working capital deficit, a matured note in default, and senior and secured creditors ahead of any judgment Plaintiffs obtain. (Dkt. 38-32 at 4, 8, 22.) Another Series D investor has since

sued DBGI in this District over the same kind of refusal and alleges that a DBGI lender declared a default in an amount exceeding DBGI's market capitalization. (Dkt. 57-2 ¶¶11, 115.) The SPA entitles the prevailing party to its fees — relief DBGI itself demands (Dkt. 61 at 22, 38) — and DBGI should be required to secure through the requested bond the fees and costs it is likely to owe. DBGI's only answer to its precarious finances is the word of its CEO whose statements are consistently proven untrue - - either by the Answer or document issued or created by DBGI. Thus, any opposition by Mr. Davis deserves no weight.

## STATEMENT OF FACTS

### A. The SPA's Conversion, Bond, and Fee Provisions

On August 8, 2025, each Plaintiff purchased 1,250 shares of DBGI's Series D Convertible Preferred Stock ("Series D Shares") at $800 per share — $1,000,000 apiece — under the SPA; the SPA was amended on September 18, 2025 to increase the Stated Value of each share to $1,150. (Dkt. 61 ¶¶2, 4, 22.) DBGI "shall honor conversions of the Series D Shares," and the Notice of Conversion "sets forth the totality of the procedures required." (SPA §4.13.) DBGI must "cause its attorneys to promptly provide any opinion or reliance opinion to the Transfer Agent." (*Id.* § 4.1(f).) Section 4.1(e) provides that DBGI can only refuse the conversions if first receives an injunction from, at this point forward, this Court. (SPA §4.1(e)(ii).)

Section 5.9 provides that "[i]f any party shall commence an Action to enforce any provisions of the Transaction Documents, then, in addition to the obligations of the Company elsewhere in this Agreement, the prevailing party in such Action shall be reimbursed by the non-prevailing party for its reasonable attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of such Action." (SPA §5.9.) Section 4.8 separately obligates DBGI to hold Plaintiffs harmless from "court costs and reasonable attorneys' fees" they

"may suffer or incur as a result of or relating to (a) any breach of any of the . . . covenants or agreements made by the Company." (*Id.* §4.8.)

DBGI also acknowledged, "[n]otwithstanding anything in this Agreement or elsewhere to the contrary," that no Purchaser had agreed "to desist from purchasing or selling, long and/or short," or "to hold the Securities for any specified term," and that Purchasers' trading "may negatively impact the market price" of DBGI's stock. (SPA §3.1(ff).) The investment-intent representation on which DBGI now relies expressly preserves "such Purchaser's right to sell the Securities in compliance with applicable federal and state securities laws." (*Id.* §3.2(b).)

**B. DBGI's Answer Admits the Breach**

DBGI answered and asserted six Counterclaims on October 8, 2026. (Dkt. 61.) Its Answer admits each operative fact of Plaintiffs' breach claim:

> **The refusals.** DBGI admits that, "beginning on or about July 30, 2026, it declined to approve certain conversion notices submitted by Plaintiffs," including each notice identified in the Amended Complaint. (*Id.* ¶¶9, 34, 45, 55, 63.)
>
> **The non-existent lawsuit.** DBGI admits that its CEO referenced an "anticipated lawsuit" and a "potential collusion lawsuit" and held the notices "in light of the dispute," and admits that no lawsuit had been filed on any of those dates. (*Id.* ¶¶44, 48, 53–54, 57–58.)
>
> **The opinion letters.** DBGI admits that "the applicable conversion process called for a notice of conversion, an opinion letter, and payment of a fee," and that "it did not authorize further opinion letters for Plaintiffs' conversions." (*Id.* ¶¶6, 49.) DBGI thus withheld the one step it says conversion required — a step Section 4.1(f) obligated DBGI itself to provide.
>
> **No court order and no bond.** DBGI "admits that it did not obtain a court injunction or temporary restraining order and did not post a surety bond," and again "admits that it did not obtain a court order or post a surety bond." (Dkt. 61 ¶¶79, 93.)
>
> **Selective treatment.** DBGI admits that it approved a Gaucher conversion while declining a Giamichael conversion in the same period, and that "it did allow certain holders to convert a portion of their Series D Shares" during that period. (*Id.* ¶¶9, 60.)

> **Prior performance.** DBGI admits that it honored Plaintiffs' conversions from February 13 to 18, 2026, approved further conversions between February and July 2026 supported by opinion letters from its own counsel, and permitted Gaucher's July 31, 2026 conversion. (*Id.* ¶¶8, 28, 33, 43.)

DBGI's sole justification is that "Plaintiffs' prior breaches of the SPA" relieved it of any obligation "to honor Plaintiffs' conversion notices or to obtain an injunction or post a bond." (*Id.* ¶79; *see id.* ¶¶ 84, 111.) DBGI admits it is a Nevada corporation with its principal place of business in Texas. (*Id.* ¶16; Dkt. 61 ¶5.) And in both of its prayers for relief DBGI demands "its costs and reasonable attorneys' fees, including as provided by the SPA." (Dkt. 61 at 22, 38.)

### C. DBGI Announced the Supposedly "Concealed" Agreements in February 2026, Then Released Plaintiffs and Kept Performing

On February 13, 2026, DBGI issued a press release over GlobeNewswire titled "DBGI Announces Purchase of Existing Convertible Notes and Note Conversion Extension by Holders." (Bordetsky Decl. Exh. 2) DBGI announced that "existing holders of all of the Company's Series D Preferred Stock . . . have advised the Company that these holders have entered into various private agreements regarding their respective ownership of, and rights with respect to, the Series D Shares." (*Id.*) It stated that "[t]he Company is not party to any of the Shareholder Agreements" and "would have no ability to enforce their terms." (*Id.*) It then described their terms: a transfer of 4,687 Series D Shares between holders in exchange for a conversion standstill and a leak-out limitation; and an option granted by two "Extending Holders" who "collectively owned 2,500 Series D Shares" — Plaintiffs' combined position — for which they "received certain Pre-Funded Warrants," adding that "such proposed sale was abandoned." (*Id.*) DBGI reiterated that "[e]ach Series D Share is convertible, at the discretion of the holder thereof." (*Id.*) DBGI's CEO is the release's listed contact. (*Id.*) The release appears nowhere in DBGI's opposition, in its counsel's thirty-seven-exhibit declaration, or in its Counterclaims. (*See* Dkt. 30, 31, 61.)

With that knowledge, DBGI honored Plaintiffs' conversions on February 13 through 18, 2026. (Dkt. 61 ¶28.) On April 15, 2026, DBGI, through its CEO, executed a Consent and Waiver in which it "irrevocably and unconditionally release[d] . . . each of Gaucher and Giamichael from any and all claims . . . whether known or unknown, . . . arising out of or relating to any matter occurring on or prior to the date of this Waiver," and confirmed that Plaintiffs' rights, "including, without limitation, any conversion rights," were preserved. (Dkt. 14-11, §2) DBGI continued approving Plaintiffs' conversions through July 31, 2026. (Dkt. 61 ¶¶8, 33, 43.) On July 23, 2026, DBGI borrowed $3,529,412 from Shakawe Capital LLC (Dkt. 38-20 to 38-23).

**D. DBGI Repeats the Refuted Narrative in Its Counterclaims and Declines to Withdraw It**

DBGI's opposition to Plaintiffs' preliminary injunction motion asserted that DBGI "did not know" what its Series D investors were doing, that Plaintiffs concealed "the accumulation of shares by the group," and that it "remains DBG's understanding and belief that Bartch purchased the shares and that Plaintiffs and Bartch only sought to recharacterize the transaction after the fact." (Dkt. 30 at 4, 14 n.30, 20.) The Counterclaims repeat those contentions and add claims under Sections 10(b) and 9(a) of the Exchange Act, premised on Plaintiffs' supposed concealment of the "Series D Group" and DBGI's "reasonabl[e] and justifiabl[e]" reliance. (Dkt. 61 ¶¶3, 36–37, 51–65, 66–74.) The Counterclaims quote Section 3.2(b) with an ellipsis that omits its carve-out preserving each Purchaser's right to sell (*compare Id.* ¶16, *with* SPA §3.2(b)), and they incorporate by reference a declaration whose central exhibit counsel "intentionally omitted." (Dkt. 61 at 22 n.1; Dkt. 31 ¶19.)

The record DBGI did not cite refutes those contentions. Mr. Bartch has attested under penalty of perjury that he paid holders $1,150 per Series D share — the full Stated Value — not the deep discount DBGI describes, and that he delivered the executed purchase agreement, escrow

agreement, flow-of-funds memorandum, and stock powers to DBGI on February 11 and 12, 2026. (Dkt. 57-1 through 57-3; *compare* Dkt. 61 ¶25.) The February Release provides the details DBGI argued and continues to argue it had no knowledge of.

On October 12, 2026, Plaintiffs' counsel sent DBGI's counsel the February Release, identified each contention in the opposition and Counterclaims that it refutes, reminded counsel of Rule 11's continuing obligation, and demanded that DBGI withdraw the Counterclaims and its opposition and correct the record. (Bordetsky Decl. Ex. 2) DBGI did not do so, instead, relying upon the predicates known to be false. And at the October 13, 2026, argument, its counsel stated only that DBGI was "still processing" the release. (Tr. 29:1–7)

### E. DBGI's Financial Condition

DBGI's Form 10-Q for the quarter ended June 30, 2026, signed by its CEO on August 19, 2026, discloses (Dkt. 38-32 ("10-Q")):

> **Going concern.** DBGI's "recurring losses, negative operating cash flows, working capital deficit, the matured Bailey sellers' promissory note and the monthly payment obligations under the RallyTown secured note . . . raise substantial doubt about the Company's ability to continue as a going concern," and management "has concluded that its plans cannot be considered probable of being effectively implemented." (10-Q at 8.)
>
> **Liquidity and losses.** A working capital deficit of $12,851,221; cash of $1,386,167 at June 30, 2026, falling to "approximately $1.1 million" by August 19, 2026; a net loss of $20,375,455 and operating cash burn of $10,302,957 — more than $1.7 million per month — in the first six months of 2026. (*Id.* at 4–5, 7–8.)
>
> **Thin equity.** Stockholders' equity of $540,031 against total liabilities of $46,134,670; roughly 75% of reported assets consist of prepaid marketing ($24,912,027), goodwill ($5,788,445), and intangibles ($4,212,159). (*Id.* at 4, 18.)
>
> **Defaults and senior claims.** A $3,500,000 note matured on December 8, 2025 and "is in technical default," with $3,019,888 in unpaid interest; a $933,294 PPP loan is "past due"; accrued payroll liabilities of $4,040,953 relate "primarily" to "overdue payroll taxes"; an $11,249,786 RallyTown obligation, payable at $400,000 per month plus interest, is secured by a first-priority lien on DBGI's Avo-brand assets; the Shakawe note "ranks senior to the Company's other indebtedness and equity" and requires $1,000,000 payments on October

> 23, November 23, and December 23, 2026; and factoring advances are "collateralized by a security interest in substantially all of the [subsidiaries'] assets." (*Id.* at 19, 21–22, 30.) Since the 10-Q, Shakawe served a notice of default on September 29, 2026. (Dkt. 57-4.)

On October 2, 2026, Series D purchaser David Bartch ("Bartch") sued DBGI in this District, alleging under oath that DBGI refuses to convert or register the 7,999 Series D Shares he purchased — without seeking a court order or posting a Section 4.1(e) bond — and has failed to deliver warrants for which he paid approximately $4.1 million. (Dkt. 57-2 ¶¶2, 41–47, 82–96, 131) Bartch alleges that the September 29 default notice warned that the amount due "would rise to at least $5.7 million," that DBGI then had "less than a $5 million market capitalization," that DBGI had sold approximately $5 million of stock through its at-the-market program at prices below $6 per share, and that DBGI's stock fell from $11.85 on August 19, 2026, to $5.11 on October 1, 2026. (*Id.* ¶¶11, 114–116; Ex. 9 ¶¶30–31)

### F. The Court Grants Plaintiffs' Motion for a Preliminary Injunction

On October 13, 2026, after oral argument, the Court granted Plaintiffs' motion for a preliminary injunction and declaratory relief from the bench, enjoining DBGI from refusing to deliver unlegended shares. (Tr. 32:15–17, 38:21–22, 39:9–12; Dkt. 70). The following from the hearing is relevant to the motion:

> **The breach is admitted and the defense fails.** DBGI's counsel conceded that DBGI did not satisfy Section 4.1(e)'s condition precedent. (Tr. 17:25–18:3.) The Court held that the SPA "unambiguously prohibits the defendant's admitted refusal to deliver the unlegended shares," that DBGI "does not even attempt to argue that the condition precedent was satisfied," and that the contract "contemplates and rejects" DBGI's prior-breach defense: "even accepting defendant's allegations as true, it has limited its right to refuse conversion with allegations of breach, fraud, or misrepresentation." (Tr. 33:12–15, 34:7–35:1.)
>
> **No fraudulent inducement, and no securities-law end-run.** DBGI "did not argue in its papers, let alone show, that it was fraudulently induced to enter the contract"; its claim that Plaintiffs breached post-formation is, as this Court recognized, "squarely within the metes and bounds of section 4.1(e)." (Tr. 35:2–10.) DBGI's counsel conceded that DBGI was "relying on the material breach argument." (Tr. 21:13–14.) And "[t]o the extent that defendant anchors its defense not in contract but in federal securities law, courts in this

circuit have rebuffed efforts by parties to introduce conclusory allegations of deceptive conduct as a means to transform a state law breach of contract" claim. (Tr. 36:4–10 (citing *Cottam v. Glob. Emerging Cap. Grp., LLC*, 2020 WL 1528526, at *15 (S.D.N.Y. Mar. 30, 2020)).)

**Risk that DBGI cannot pay.** The Court found "concrete evidence confirming the volatility of defendant's stock and the risk that DBGI 'will not be able to pay damages at the conclusion of the litigation,'" citing DBGI's 10-Q disclosures that it "has lacked sufficient liquidity to satisfy obligations as they come due" and that its "existing cash resources and planned operations may not be sufficient to fund operations for at least 12 months." (Tr. 37:6–20.) DBGI's counsel conceded that DBGI's market capitalization is below $5 million. (Tr. 27:17–24.)

**DBGI's harm is self-inflicted; no bond from Plaintiffs.** Any harm from DBGI's failure to seek court intervention before withholding conversions "was 'self-inflicted.'" (Tr. 38:10–13.) The Court required no bond of Plaintiffs because DBGI did not respond to Plaintiffs' bond arguments, thereby forfeiting any objection, and "has not identified any loss independent of the obligations it agreed to sustain when it entered the SPA." (Tr. 39:16–40:15.)

## ARGUMENT

### I. LOCAL CIVIL RULE 54.2 AUTHORIZES THE COURT TO REQUIRE "ANY PARTY," INCLUDING A DEFENDANT AND COUNTERCLAIMANT, TO SECURE COSTS AND FEES

Local Civil Rule 54.2 provides that "[t]he court, on motion or on its own initiative, may order any party to file an original bond for costs or additional security for costs in such an amount and so conditioned as it may designate." Local Civ. R. 54.2. Upon noncompliance, the Court may enter orders "as are just," including "striking out pleadings or staying further proceedings until the bond is filed." *Id.* Courts have "broad discretion" in deciding whether to require a bond. *Beautiful Jewellers Private Ltd. v. Tiffany & Co.*, No. 06-cv-3085 (KMW), 2008 WL 2876508, at *2 (S.D.N.Y. July 21, 2008).

The security may include attorneys' fees to which the movant is potentially entitled to, by contract or by statute. *Kensington Int'l Ltd. v. Republic of Congo*, No. 03-cv-4578 (LAP), 2005 WL 646086, at *1 (S.D.N.Y. Mar. 21, 2005); Sea Trade Co. v. FleetBoston Fin. Corp., No. 03 CIV. 10254 (JFK), 2008 WL 161239, at *1 (S.D.N.Y. Jan. 15, 2008); *Selletti v. Carey*, 173 F.R.D.

96, 100 (S.D.N.Y. 1997), *aff'd*, 173 F.3d 104 (2d Cir. 1999); *RLS Assocs., LLC v. United Bank of Kuwait PLC*, No. 01-cv-1290 (CSH), 2005 WL 578917, at *1 (S.D.N.Y. Mar. 11, 2005); Bressler v. Liebman, No. 96 CIV. 9310 (LAP), 1997 WL 466553, at *8 (S.D.N.Y. Aug. 14, 1997). Its purpose is to ensure that the prevailing party can collect what it is owed before the paying party's assets are dissipated or become unreachable. *See Selletti*, 173 F.3d at 101 (holding that plaintiffs who brought meritless claims, using the litigation as a means to exert media pressure on defendants, were required to post bond to offset the likely attorney's fees to be awarded defendant)

Courts weigh "(1) the financial condition and ability to pay of the party who would post the bond; (2) whether that party is a non-resident or foreign corporation; (3) the merits of the underlying claims; (4) the extent and scope of discovery; (5) the legal costs expected to be incurred; and (6) compliance with past court orders." *RLS Assocs*, 2005 WL 578917, at *1. Not every factor need be considered. *Kensington Int'l Ltd.*, 2005 WL 646086, at *1. Each favors security here — and because DBGI is now a counterclaim-plaintiff pressing six claims, it stands precisely where Rule 54.2 bonds are most often imposed.

## II. EVERY FACTOR FAVORS REQUIRING DBGI TO POST SECURITY

### A. DBGI's Financial Condition Is Dire by Its Own Admission

Financial condition is the weightiest factor, and a party's "apparent 'lack of assets is itself sufficient to warrant attachment of costs under Rule 54.2.'" *Beautiful Jewellers*, 2008 WL 2876508, at *2 (quoting *Sea Trade Co.*, 2008 WL 161239, at *2). This is that case, and the Court has already so found. In granting the preliminary injunction, the Court found "concrete evidence confirming the volatility of defendant's stock and the risk that DBGI 'will not be able to pay damages at the conclusion of the litigation.'" (Tr. 37:6–11.) If DBGI may be unable to pay damages, it may equally be unable to pay a fee award. DBGI's counsel did not suggest otherwise;

he conceded that DBGI's market capitalization is below $5 million and disclaimed any suggestion that the 10-Q's going-concern disclosure is inaccurate. (Tr. 25:11–14, 27:17–24.) And today that figure is significantly lower based upon the share price. (Bordetsky Decl. Exh. 1)

The underlying evidence is DBGI's own certified SEC filing, which discloses substantial doubt about DBGI's ability to continue as a going concern and concedes that management's plans to cure it "cannot be considered probable." (10-Q at 8.) DBGI burns more than $1.7 million per month against roughly $1.1 million in unrestricted cash; owes Shakawe $1 million on each of October 23, November 23, and December 23, 2026, and RallyTown $400,000 per month plus interest; is in default on a $3.5 million note carrying more than $3 million in unpaid interest; is past due on a federal PPP loan; and carries more than $4 million in payroll liabilities consisting primarily of overdue payroll taxes. (*Id.* at 7–8, 21–22, 30.) Three-quarters of its reported assets are prepaid marketing, goodwill, and intangibles. (*Id.* at 4.) Its lenders hold first-priority liens, liens on "substantially all" of its subsidiaries' assets, or contractual seniority "to the Company's other indebtedness and equity." (*Id.* at 19, 22, 30.) Any judgment for Plaintiffs' fees would be unsecured and would stand behind all of them.

DBGI's exposure to other claimants compounds the risk. Bartch, a Series D purchaser who holds nearly eight times Plaintiffs' remaining position, has sued DBGI over the same refusal to convert and seeks to recover millions of dollars in shares, warrants, and damages, together with fees under the identical Section 5.9. (Dkt. 57-2) He alleges that the September 29 default notice warned that DBGI's obligation on the Shakawe note "would rise to at least $5.7 million" — more than DBGI's then-market capitalization. (*Id.* ¶¶11, 115.) Every dollar DBGI pays those parties is a dollar unavailable to Plaintiffs.

The Davis Declaration does not alter the analysis. Capacity to *sell stock* is not cash in hand; it depends, as Mr. Davis concedes, on "how aggressive a discount" DBGI offers, and DBGI's own 10-Q states that those very financing plans are "not solely within the Company's control" and cannot be considered probable. (Dkt. 63-1, ¶3; 10-Q at 8.) The $3.2 million "governmental contract" payment is a projection supported by no document; Bartch alleges under oath that, upon information and belief, the counterparty DBGI has portrayed as a government contractor is not one (Dkt. 57-3, ¶101); and even if paid in full, it would not cover two months of operating burn. And the asserted oral "rescission" of Shakawe's default notice, reached the day the declaration was signed and unaccompanied by any writing from Shakawe, confirms rather than dispels the point: ***DBGI's senior lender declared a default within ten weeks of funding***. (Dkt. 57-4)

This factor weighs decisively in favor of security.

### B. DBGI Is a Foreign Corporation With No Known Assets in New York

DBGI admits that it is a Nevada corporation with its principal place of business in Texas. (Dkt. 61 ¶16; Dkt. 61 ¶5) Its operating subsidiaries and warehouse are located outside New York, and Plaintiffs are aware of no DBGI assets in this District. (*Id*. at 28, 32.) Enforcing an award would require Plaintiffs to domesticate the judgment elsewhere and then compete with DBGI's secured and senior creditors. This factor favors security. *See RLS Assocs.*, 2005 WL 578917, at *1.

### C. The Court Has Already Held That Plaintiffs Are Likely to Succeed on the Admitted Breach

Courts considering this factor ask whether the movant has a reasonable prospect of prevailing. *See Cruz v. Am. Broad. Cos.,* No. 17-cv-8794 (LAK), 2017 WL 5665657 *1-2 (S.D.N.Y. Nov. 17, 2017) (security warranted where there was "a reasonable possibility" the movant would prevail and recover fees). Plaintiffs' prospects are far stronger than that based upon the circumstances. DBGI has admitted every element of the breach, and the Court has already

held that Plaintiffs are likely to succeed on the merits under any standard. (Tr. 33:10–11, 36:11–12.)

Section 4.1(e) permits DBGI to refuse delivery "for any . . . reason" only after obtaining a court order on notice and posting a surety bond. (SPA §4.1(e).) DBGI admits it did neither. (Dkt. 61 ¶¶79, 93.) It admits it refused Plaintiffs' notices beginning July 30, 2026. (*Id.* ¶¶9, 45, 63.) It admits it stopped authorizing the opinion letters it now says the conversion process required, notwithstanding its own covenant to "cause its attorneys to promptly provide any opinion." (*Id.* ¶¶ 6, 49; SPA §4.1(f).) It admits the "pending lawsuit" its CEO invoked did not exist. (Dkt. 61 ¶¶44, 54, 58.) And it admits it let other holders convert in the same period. (*Id.* ¶ 60.)

DBGI's only defense — that Plaintiffs' alleged prior breach of Section 3.2(b) excused its performance (*id.* ¶¶79, 84, 111) — is foreclosed by the text it invokes. Section 4.1(e) addresses exactly that situation: DBGI may not refuse delivery "based on any claim that such Purchaser . . . has not complied with Purchaser's obligations under the Transaction Documents" without first obtaining a court order and posting a bond. A claimed prior breach is the very circumstance Section 4.1(e) governs; it cannot also be the reason Section 4.1(e) does not apply. The Court so held: "the contractual language contemplates and rejects" DBGI's defense, and "[d]efendant provides no legal basis for why it should not be held to the terms of its bargain." (Tr. 34:15–35:1.) The Delaware Court of Chancery rejected materially identical excuses — short sales, a declining stock price, and assurances that holders would be long-term investors — as not "legally relevant" to a preferred holder's conversion right, and held that an issuer's reliance on them to refuse conversion "constitutes a repudiation." *Halifax Fund, L.P. v. Response USA, Inc.*, C.A. No. 15553, 1997 WL 33173241, at *1–2 (Del. Ch. May 13, 1997). DBGI's position is weaker still: it expressly agreed that Plaintiffs' alleged trading, including short sales, is no breach and that no Purchaser (as defined

in the SPA) agreed to hold for any term (SPA §3.1(ff)); Section 3.2(b) preserves each Purchaser's "right to sell" (*id.* §3.2(b)); and DBGI released all claims arising from matters through April 15, 2026 while confirming Plaintiffs' conversion rights (Dkt. 14-11, §2(b)–(c)). And, as shown in Point III, the Counterclaims DBGI offers in place of a defense have no legal viability. This factor strongly favors security.

**D. DBGI's Counterclaims Have Substantially Expanded the Scope of Discovery**

What Plaintiffs brought as a contract action has, by DBGI's choice, become a six-count counterclaim action asserting fraud and two Exchange Act claims against a purported "Series D Group" of at least eight investors, "their counsel," offshore nominees, and a non-party stock promoter. (Dkt. 61 ¶¶13, 18–35, 50–74.) DBGI has demanded a jury (Dkt. 61 at 38) and insisted on discovery into that theory. Defending those claims will require document discovery, multiple depositions, and likely third-party and expert discovery on trading, beneficial ownership, and price impact. This factor favors security. *See Mango v. Democracy Now! Prods., Inc.*, No. 18-cv-10588 (DLC), 2019 WL 3325842, at *6 (S.D.N.Y. July 24, 2019).

**E. Plaintiffs' Fees Are Substantial and Contractually Recoverable From DBGI**

Plaintiffs have incurred substantial fees to date, all based upon one admitted fact: DBGI breached the SPA. The work included drafting and filing of the pleadings, the preliminary injunction motion and supporting declarations, the reply and evidentiary submissions, multiple motions prepared for the case, and additional work associated with discovery and addressing the Counterclaims and affirmative defenses. (Bordetsky Decl. ¶15.) As of October 18, 2026, those fees total approximately $128,250 and costs approximately $2,781; with no discovery served on the Amended Complaint, or the six Counterclaims, Plaintiffs will incur considerable costs associated with depositions, dispositive motions, travel and hotel accommodations, pre-trial work,

and a ten day prospective jury trial yet to come, Plaintiffs reasonably anticipate total fees and costs of not less than $550,000. (*Id.* ¶17)

Those fees are recoverable from DBGI under the SPA's plain terms. Section 5.9 provides that in any Action to enforce the Transaction Documents, "the prevailing party in such Action shall be reimbursed by the non-prevailing party for its reasonable attorneys' fees and other costs and expenses," and does so "in addition to the obligations of the Company elsewhere in this Agreement," including Section 4.8's indemnity for "court costs and reasonable attorneys' fees" arising from DBGI's breach of its covenants. (SPA §§4.8, 5.9.). DBGI cannot dispute that the fee provision applies: both of its prayers for relief demand fees "as provided by the SPA." (Dkt. 61 at 22, 38.) Because DBGI has admitted the breach and the Court has already held that Plaintiffs are likely to succeed, Plaintiffs are likely to be the prevailing party. And, as shown in Point V, DBGI's continued prosecution of claims refuted by its own public statement independently exposes it to fee-shifting under Rule 11, 28 U.S.C. §1927, and the Court's inherent power. This factor favors security.

### F. DBGI's Litigation Conduct Weighs in Favor of Security

The Court's August 26, 2026 scheduling order directed DBGI to address in its opposition both the merits and whether an evidentiary hearing was necessary. (Dkt. 23) DBGI's opposition did not address the latter (*see* Dkt. 30), and the Court noted that DBGI "didn't actually request" a hearing. (Tr. 41:11–14.) DBGI likewise did not respond to Plaintiffs' bond arguments and was held to have "forfeited any objection." (Tr. 39:17–20, 40:9–12.) That opposition relied on exhibits its own declarant stated were excluded from the filing and cited an exhibit left as a blank placeholder, but more to the point, relied upon patently false predicates. (Dkt. 36 ¶3; Dkt. 30 at 13; Bordetsky Decl. Exh. 2) Its Counterclaims incorporate that same declaration by reference and

quote Section 3.2(b) with an ellipsis that omits the carve-out preserving Plaintiffs' right to sell. (Dkt. 61 at 22 n.1, ¶16.) Neither filing disclosed the February Release or the true nature of the i2i relationship, and more troublesome to this Court should be the fact that, in the face of the Plaintiffs' reply submission that detailed the falsities of the content contained in the opposition, DBGI ignored the same and simply cut and pasted the same arguments from the opposition to the Counterclaims.

And DBGI has refused to follow the only procedure the SPA prescribes for withholding shares — seek a court order and post a bond — choosing self-help instead, as it is alleged to have done with another Series D holder. (Dkt. 61 ¶¶79, 93). This continues to date with DBGI's continued refusal to comply with this Court's orders. (Dkt. 68-3, 68-4, Bordetsky Decl. Exh. 3). *See Selletti*, 173 F.3d at 101 (prior noncompliance relevant to security). This factor favors security.

## III. THE COUNTERCLAIMS HAVE NO LEGAL VIABILITY

The Counterclaims do not alter the merits calculus; they add only expense. The Court's preliminary injunction ruling has already rejected their premise — that Plaintiffs' supposed breach excused DBGI's performance — and each fails as a matter of law on the face of the pleading and the documents it incorporates. In brief:

> **Contract claims (Counts I, II, VI).** Section 3.2(b) is a Securities Act investment-intent representation, made "for itself and for no other Purchaser" as of August 2025, that twice preserves each Purchaser's "right to sell." (SPA §3.2(b).) DBGI agreed that Purchasers' trading, "specifically including . . . Short Sales," is not a breach and that nothing makes the Purchasers "a group." (*Id.* §§3.1(ff), 5.17.) The only conduct pleaded against Plaintiffs — the January 2026 side agreements — postdates the representation by five months. DBGI then released "any and all claims . . . whether known or unknown" arising from matters through April 15, 2026, while confirming Plaintiffs' conversion rights. (Dkt. 14-11 §2(b)–(c).) Count VI's requested declaration that DBGI was "excused" from honoring conversions is foreclosed by Section 4.1(e), as the Court has held (Tr. 34:15–35:10), and by *Halifax*, 1997 WL 33173241, at *1–2, and Count II merely restates Count I. *See MERA USA, LLC Plaintiff, v. MCS BURBANK, LLC Defendant. MCS BURBANK, LLC,* No. CV 2024-0188-MTZ, 2026 WL 2547077, at *24 (Del. Ch. Aug. 28, 2026)

**Fraud and Rule 10b-5 (Counts III, IV).** Silence is not actionable absent a duty to disclose, *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988), and DBGI agreed that the Plaintiffs were arm's-length counterparties who made no representations beyond Section 3.2 and that its decision rested "solely" on its own evaluation. (SPA §§3.1(y), (ee).) That disclaimer forecloses reliance, *RAA Mgmt., LLC v. Savage Sports Holdings, Inc.*, 45 A.3d 107, 118–19 (Del. 2012), as does the February Release, in which DBGI announced the very agreements it claims were concealed. The Court has already found that DBGI did not argue, "let alone show," that it was fraudulently induced, and that its securities-law framing is the kind of effort to "transform a state law breach of contract" claim that courts in this Circuit have rebuffed. (Tr. 35:2–10, 36:4–10.) DBGI, the seller, received full value; the "impairment of the value of its common stock" (Dkt. 61 ¶64) is not its loss — the Court found DBGI "has not identified any loss independent of the obligations it agreed to sustain when it entered the SPA" (Tr. 40:12–14)

**The "group" theory.** Every count depends on a Section 13(d) "group." But there is no private damages remedy for issuers under Section 13(d), *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 620–21 (2d Cir. 2002), and DBGI cannot obtain one by relabeling the claim as contract or fraud. Restrictions that keep holders out of the market, such as the leak-outs DBGI cites, do not form a group. *Lowinger v. Morgan Stanley & Co.*, 841 F.3d 122 (2d Cir. 2016). DBGI concedes neither Plaintiff held more than 5%, and the Certificate of Designations caps each holder at 4.99% for Section 13(d) purposes. (Dkt. 30 at 18; Dkt. 13-1, §5(d))

**Manipulation (Count V).** A manipulation claim must plead "what manipulative acts were performed, which defendants performed them, when . . . , and what effect the scheme had on the market." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007). Count V identifies no trade by either Plaintiff, and on several of the dates it cites DBGI was refusing Plaintiffs' conversions, so Plaintiffs had no conversion shares to sell. (Dkt. 61 ¶¶24, 68; Dkt. 61 ¶¶45, 47–53.)

Claims that cannot survive a motion to dismiss do nothing to offset an admitted breach. They serve only to raise the cost of a case DBGI cannot win, which is the cost Rule 54.2 security exists to protect.

## IV. MR. DAVIS'S STATEMENTS ABOUT THIS DISPUTE HAVE REPEATEDLY PROVEN UNTRUE, AND HIS ASSURANCES OF SOLVENCY ARE ENTITLED TO NO WEIGHT

DBGI's response to the evidence of its financial distress rested entirely on the word of its CEO. At argument on the preliminary injunction, DBGI's counsel relied on Mr. Davis's declaration) for the propositions that DBGI's business is "treading in a positive direction" and that

the Shakawe default "has been resolved." (Tr. 26:4–14, 27:10–16; Dkt. 63-1 ¶¶2–9.) Notably that declaration is not based upon Mr. Davis's personal knowledge, and as such, should be disregarded. (Hollander v. Am. Cyanamid Co., 172 F.3d 192, 198 (2d Cir. 1999) The record — including DBGI's own Answer — shows that Mr. Davis's statements about this very dispute have repeatedly proven untrue.

**Mr. Davis repeatedly invoked lawsuits that did not exist.**

> On or about July 31, 2026, that Plaintiffs' remaining conversions "will need to wait until discovery and depositions." (Am. Compl. ¶43.) DBGI admits that no lawsuit had been filed. (Dkt. 61 ¶44.)
>
> On August 5, 2026, that Plaintiffs' notices were being held "due to a pending lawsuit." (Am. Compl. ¶53.) DBGI's Answer admits no lawsuit was pending. (Dkt. 61 ¶¶53–54.)
>
> Days later, in an email copied to third parties, that Gaucher's counsel might "also be representing you in the collusion lawsuit." (Am. Compl. ¶57.) DBGI admits that it "had not filed a lawsuit alleging collusion against Plaintiffs as of the date of the email." (Dkt. 61 ¶¶57–58.)

**Mr. Davis's other stated reasons were abandoned as each was contradicted.** Before settling on "collusion," Mr. Davis invoked a "3% leak-out," which DBGI's transfer agent found did not restrict Gaucher's conversion. (Dkt. 7 ¶¶38, 40; Dkt. 61 ¶¶38, 40.) He then asserted that Plaintiffs had sold their Series D Shares and that Gaucher no longer owned them. (Dkt. 7 ¶ 41; Dkt. 61 ¶41.) DBGI's own Counterclaims refute that assertion: they plead that on July 29, 2026 Mr. Davis received written confirmation that Plaintiffs' notes "were not purchased" and that Plaintiffs were "still the owner[s]." (Dkt. 61 ¶32.) He then accused Gaucher of "making up numbers." (Am. Compl. ¶50; Dkt. 61 ¶50.)

**Mr. Davis has never sworn to the "collusion" on which the Counterclaims rest.** DBGI has never offered Mr. Davis's testimony in support of the theory he invoked to refuse conversions. Its opposition rested impermissibly on its litigation counsel's declaration (Dkt. 31); the

Counterclaims incorporate that declaration (Dkt. 61 at 22 n.1) and plead the heart of the alleged scheme — 77.4% common control, paid promotion, and coordinated sales through nominees — only "upon information and belief." (*Id.* ¶¶19, 21, 23.) At argument on the preliminary injunction, DBGI's counsel could not identify where DBGI had argued the fraudulent inducement it pleads. (Tr. 20:6–21:14.)

In opposing the preliminary injunction, answering the Amended Complaint, asserting affirmative defenses and counterclaims, DBGI accused Plaintiffs of acting as an undisclosed "group" with the other owners of Series D Shares - - one of which was Dmitriy Shapiry of Target Capital 16, LLC ("Target"). (Dkt. 61, ¶18) It now turns course and by its action asserts Mr. Shapiro and Target can bind the rest by contract. It cannot have it both ways, regardless, the SPA rejects both versions. DBGI's new position contradicts its own litigation position, confirming the frivolity of the opposition and counterclaims, but more importantly, the legal invalidity of DGBI's defenses and counterclaims.

**His solvency assurances therefore deserve no weight.** Mr. Davis declares that "[a]ll suggestions . . . that we are going out of business are false." (Dkt. 63-1) But the 10-Q he signed discloses "substantial doubt about the Company's ability to continue as a going concern" (10-Q at 8), DBGI's counsel disclaimed any suggestion that the disclosure is inaccurate (Tr. 25:11–14), and the Court found a concrete risk that DBGI cannot pay. (Tr. 37:6–11.) Mr. Davis describes DBGI's stock as having "remained stable since the commencement of this action" (Dkt. 63-1), but that ignores the fact that it fell from a high price of $30.93 on August 5, 2026 to $3.06 on October 14, 2026 (Bordetsky Decl. Ex. 1); DBGI's counsel conceded that its market capitalization is below $5 million (Tr. 27:17–24), and the Court observed that "the collapsing share price and the reverse stock split and the recent default notice . . . all . . . seem to point in the same direction." (Tr. 26:15–

19.) Mr. Davis is not a reliable source of assurance that DBGI will be able to pay a fee award, and the Court should rely instead on DBGI's certified 10-Q, which the Court has already found shows a concrete risk that DBGI "will not be able to pay damages at the conclusion of the litigation." (Tr. 37:6–11.) The same conduct bears on the sixth factor: refusing conversions on the strength of invented litigation, rather than seeking the court order and bond the SPA requires, is the antithesis of compliance.

**The Gelbard allegations are contradicted by DBGI's own annual report.** DBGI's fraud and Exchange Act Counterclaims, and its fraudulent-inducement defense, rest heavily on Plaintiffs' supposed concealment of the "involvement of Scott Gelbard," a non-party with a regulatory history, in a scheme in which group members "paid marketing firms to promote DBGI's stock." (Dkt. 61 ¶¶3, 21, 36, 51, 60; Dkt. 61 ¶12.) The only connection DBGI pleads is a May 2025 email thread with the marketing firm i2i, on which, "[a]part from Davis, Gelbard was the only individual Bartch included." (Dkt. 61 ¶¶22, 33.) Neither Plaintiff is alleged to have been on that thread, but notably DBGI's CEO was on it. Here is what should trouble this Court: DBGI's Form 10-K for fiscal 2025, signed by Mr. Davis on April 15, 2026, discloses that "[i]n September 2025, the Company entered into . . . a one-year agreement with i2i Marketing for $425,000," and lists i2i among the "cash-based marketing agreements" that drove DBGI's marketing expense. (Bordetsky Decl. Ex. 4 at 48, F-21.) Thus, the "marketing firm" DBGI accuses the "Series D Group" of paying to promote its stock was retained and paid by DBGI itself, one month after the SPA closed, following discussions in which Mr. Davis participated – all of which have nothing to do with Plaintiffs. DBGI cannot have been deceived about promotional arrangements its CEO took part in and its company paid for and reported to the SEC. That Mr. Davis nonetheless accused Plaintiffs

of "collusion" on this basis, and that DBGI pleaded it as fraud, is further reason to give any statement from him no weight.

**Mr. Davis continued to refuse conversions after the Court's ruling.** Within hours of the Court's bench ruling, Plaintiffs submitted new conversion notices. (Dkt. 68-3, 68-4) Mr. Davis refused them. That evening he wrote: "We need the court order signed and the legal opinion." (*Id.*) The next morning, when DBGI's transfer agent asked DBGI to acknowledge conversions of 7 and 6 Series D Shares, he replied: "We cannot do this yet as we do not have a signed court order or a legal opinion[;] they were well aware of this." (*Id.*) Plaintiffs' counsel promptly advised DBGI's counsel that the Court's ruling governed and that, under the SPA, DBGI must have its own counsel supply the opinion. (Dkt. 68-2) Neither excuse withstands scrutiny. The obligation the Court enforced is DBGI's contractual duty, which the SPA "unambiguously" imposed long before any order issued and which DBGI conceded it has no excuse for refusing. (Tr. 17:25–18:3, 33:12–15.)

On September 15, 2026, the Court issued a formal written order (Dkt. 70). And yet DBGI still refuses to comply with its obligations and effectuate the conversions as recent as the morning of this filing. (Bordetsky Decl. Exh. 3)

Mr. Davis's response to the ruling confirms what his conduct before it showed: DBGI will not perform unless compelled, and the cost of compelling it should be secured.

## V. DBGI'S CONTINUED PROSECUTION OF CLAIMS REFUTED BY ITS OWN FEBRUARY RELEASE INDEPENDENTLY WARRANTS SECURITY

Rule 11 imposes a continuing obligation. By "signing, filing, submitting, or later advocating" a paper, counsel certifies that its factual contentions "have evidentiary support." Fed. R. Civ. P. 11(b)(3). The 1993 amendment added "later advocating" precisely so that a litigant may not continue to press a contention "after learning that it ceases to have any merit." Fed. R. Civ. P. 11, advisory committee's note to 1993 amendment. Counsel who "multiplies the proceedings . . .

unreasonably and vexatiously" may be required to satisfy the resulting fees personally, 28 U.S.C. §1927, and the Court may shift fees against a party that litigates in bad faith under its inherent power. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991).

DBGI's opposition and Counterclaims rest on four factual contentions, each refuted by DBGI's own February Release:

> **Concealment and reliance.** DBGI alleges that Plaintiffs concealed the "Series D Group" and its private agreements, and that DBGI "reasonably and justifiably relied" on that concealment. (Dkt. 61 ¶¶3, 36–37, 51, 63.) But the Series D holders "advised the Company" of those agreements, and DBGI published their terms to the market. (February Release.) A party cannot have been deceived by the nondisclosure of agreements it announced.
>
> **The "leak-out" as proof of conspiracy.** DBGI calls leak-out provisions among shareholders evidence of "coordination or control." (Dkt. 61 ¶26; Dkt. 30 at 10.) In February DBGI described those same leak-outs as private terms it "would have no ability to enforce," and in July it entered into its own leak-out with the majority Series D holder. (February Release; 10-Q at 31.) Its CEO nonetheless refused Gaucher's conversion on the basis of a "3% leak-out" the transfer agent found inapplicable. (Dkt. 61 ¶38; Dkt. 14 ¶¶9–14.)
>
> **"Bartch purchased Plaintiffs' shares."** DBGI told the Court it "remains DBG's understanding and belief that Bartch purchased the shares." (Dkt. 30 at 14 n.30; *see* Dkt. 61 ¶¶29–32.) Its own release reported that "such proposed sale was abandoned," and titled the announcement a "Note Conversion Extension by Holders." (February Release.) Bartch's July 29, 2026 statement that Plaintiffs remained the owners — which DBGI calls an effort to "disguise" the transaction — restates what DBGI itself announced. (*Id.* ¶32.)
>
> **"$4.8 million for $2 million."** DBGI calls Bartch's purchase of Series D interests the most probative evidence of the scheme. (*Id.* ¶25; Dkt. 30 at 9, 19.) Bartch has sworn that he paid $1,150 per share — the full Stated Value — and that he delivered the transaction documents to DBGI two days before the February Release. (Dkt. 57-3 ¶¶10, 12.). But importantly, this has nothing to do with Plaintiffs.

Each fact was known to DBGI — announced by DBGI — seven months before it told this Court it had uncovered a concealed scheme. With that knowledge DBGI honored Plaintiffs' conversions, released all claims through April 15, 2026, confirmed Plaintiffs' conversion rights, and continued approving conversions through July 31, 2026. (Dkt. 61 ¶¶8, 28, 43; Dkt. 14-11 §2.)

Plaintiffs put the February Release in counsel's hands on October 12, 2026, and demanded withdrawal. (Bordetsky Decl. Ex. 2.) DBGI did not withdraw. (*id.* ¶20)

The point here is not to adjudicate sanctions. It is that DBGI's decision to keep litigating claims its own public statements refute bears directly on three of the six Rule 54.2 factors. It confirms the weakness of DBGI's position on the merits. It is the source of the discovery burden and expense the affirmative defenses in the Answer and Counterclaims impose, and it enlarges DBGI's likely liability for fees beyond the SPA itself. A party that elects to multiply the cost of litigation on a refuted premise while disclosing substantial doubt about its ability to continue as a going concern should be required to secure the costs it is imposing.

## VI. THE COURT SHOULD SET SECURITY AT PLAINTIFFS' ANTICIPATED FEES AND COSTS

The amount of a Rule 54.2 bond lies within the Court's discretion. *Beautiful Jewellers*, 2008 WL 2876508, at *4; *Kanongataa v. Am. Broad. Cos.,* No. 16-cv-7382 (LAK), 2017 WL 4776981 *3 (S.D.N.Y. Oct. 4, 2017). Based on fees and costs incurred to date and those reasonably anticipated through trial on the claims and Counterclaims, Plaintiffs request security of $550,000. (Bordetsky Decl. ¶¶15-18.)

The Court's preliminary injunction ruling does not diminish the need for security, it heightens it. DBGI must now prosecute six Counterclaims premised on the very defense the Court has rejected and it does so while the Court has found a concrete risk that it cannot pay. The Court required no bond of Plaintiffs because DBGI identified no loss beyond what it agreed to bear under the SPA. (Tr. 40:12–15.) The opposite is true of DBGI: Plaintiffs' fees are a real and growing liability, recoverable under Sections 5.9 and 4.8, that DBGI's financial condition places at risk. And DBGI itself agreed, in Section 4.1(e), that any dispute over its obligation to deliver shares would be litigated only with DBGI's surety bond in place "until the completion of the litigation of

the dispute." (SPA §4.1(e).) Requiring DBGI to secure Plaintiffs' costs and fees is consistent with the allocation of risk DBGI accepted.

## VII. IF DBGI FAILS TO POST THE SECURITY, ITS COUNTERCLAIMS SHOULD BE STAYED OR STRICKEN

Local Civil Rule 54.2 expressly authorizes, upon a party's failure to post ordered security, "an order striking out pleadings or staying further proceedings until the bond is filed." Local Civ. R. 54.2. Plaintiffs respectfully request that, should DBGI fail to post the security within the time the Court sets, DBGI's Answer and Counterclaims be automatically stricken and that the Court grant such further relief as is just.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court order DBGI to show cause why it should not be required to post a bond under Local Civil Rule 54.2 in the amount of $550,000 as security for Plaintiffs' costs and attorneys' fees; direct that DBGI's Counterclaims be stayed or stricken upon any failure to comply; and grant such other relief as the Court deems just and proper.

Dated: New York, New York
October 19, 2026

LAW OFFICES OF BARRY M. BORDETSKY

By: /s/ Barry M. Bordetsky
Barry M. Bordetsky (BB4218)
570 Lexington Avenue, 24th Floor
New York, New York 10022
Tel: (212) 688-0008
Email: barry@bordetskylaw.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), I certify that this memorandum of law contains 8,263 words, exclusive of the caption, table of contents, table of authorities, signature block, conclusion and this certificate, as counted by the word-processing program used to prepare it, and therefore complies with the applicable word limit.

/s/ Barry M. Bordetsky
Barry M. Bordetsky

## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2026, I electronically filed the foregoing Memorandum of Law, together with the accompanying Order to Show Cause and Declaration of Barry M. Bordetsky and its exhibits, with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Barry M. Bordetsky
Barry M. Bordetsky