UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PHILIP E. GAUCHER, JR. and JOEY GIAMICHAEL,<br>Plaintiffs,<br>– against –<br>DIGITAL BRANDS GROUP, INC.,<br>Defendant. | Case No. 26-cv-6889 (JMF)(SLC) |

# PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION, BY ORDER TO SHOW CAUSE, TO HOLD DEFENDANT DIGITAL BRANDS GROUP, INC. AND JOHN H. DAVIS, IV IN CIVIL CONTEMPT


**LAW OFFICES OF BARRY M. BORDETSKY**
Barry M. Bordetsky (BB4218)
570 Lexington Avenue, 24th Floor
New York, New York 10022
Tel: (212) 688-0008
barry@bordetskylaw.com

*Attorneys for Plaintiffs and Counterclaim-Defendants*

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ........ ii

STATEMENT OF FACTS ........ 1

ARGUMENT ........ 6

POINT I DBGI AND DAVIS ARE IN CIVIL CONTEMPT OF THE ORDER ........ 6

A. Davis is Bound By the Order ........ 6

B. DBGI and Davis were Bound From the Moment the Court Ruled, and the Order Is Clear and Unambiguous ........ 7

C. The Proof of Noncompliance Is Clear and Convincing ........ 8

D. DBGI and Davis Made No Diligent Attempt to Comply – To the Contrary They Openly Disregarded The Order ........ 10

POINT II DAVIS'S EXCUSE IS THE KIND OF FALSE THIRD-PARTY AUTHORIZATION THIS COURT SANCTIONED IN USHERSON, AND THE SECOND CIRCUIT AFFIRMED IN LIEBOWITZ ........ 11

A. A Significant Sanction Should Be Issued ........ 14

B. A Coercive Daily Fine Should Issue ........ 16

POINT III THE COURT SHOULD ENTER RELIEF THAT MAKES COMPLIANCE SELF-EXECUTING ........ 16

A. Plaintiffs October 16, 2026, Notices Should Be Deemed By The Transfer Agent as Honored by DBGI and Processed as Submitted ........ 16

POINT IV PROCEEDING BY ORDER TO SHOW CAUSE IS WARRANTED ........ 18

CONCLUSION ........ 19

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*A.V. By Versace, Inc. v. Gianni Versace, S.p.A.*, 160 F. Supp. 2d 657 (S.D.N.Y. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ....15

*Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, No. 06-CV-0085-LBS, 2007 WL 2982295 (S.D.N.Y. Oct. 10, 2007) ....6

*Huber v. Marine Midland Bank*, 51 F.3d 5 (2d Cir. 1995) ....6

*Int'l Union, United Mine Workers v. Bagwell*, 512 U.S. 821 (1994) ....15, 16

*King v. Allied Vision, Ltd.*, 65 F.3d 1051 (2d Cir. 1995) ....6, 7

*Liebowitz v. Bandshell Artist Mgmt.*, 6 F.4th 267 (2d Cir. 2021) ....11, 12, 13, 15

*Maness v. Meyers*, 419 U.S. 449 (1975) ....7

*In re Marc Rich & Co., A.G.*, 736 F.2d 864 (2d Cir. 1984) ....6

*N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339 (2d Cir. 1989) ....15, 16

*Oliveri v. Thompson*, 803 F.2d 1265 (2d Cir. 1986) ....13

*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645 (2d Cir. 2004) ....6, 14, 16

*Regal Knitwear Co. v. NLRB*, 324 U.S. 9 (1945) ....10

*Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323 (2d Cir. 1999) ....13

*Usherson v. Bandshell Artist Mgmt.*, No. 19-CV-6368 (JMF), 2020 WL 3483661 (S.D.N.Y. June 26, 2020), *aff'd sub nom. Liebowitz v. Bandshell Artist Mgmt.*, 6 F.4th 267 (2d Cir. 2021) ....11

*Weitzman v. Stein*, 98 F.3d 717 (2d Cir. 1996) ....15

*Wilson v. United States*, 221 U.S. 361 (1911) ....6

**Rules**

Fed. R. Civ. P. 65(d)(2) ....6, 7, 17

Fed. R. Civ. P. 70(a) ....17

Local Civ. R. 6.1(d) ........................................................................................................17

Local Civ. R. 83.6 ........................................................................................................14, 15, 17

Plaintiffs Philip E. Gaucher, Jr. and Joey Giamichael (collectively "Plaintiffs") herein submit their motion for an order of contempt as against defendant Digital Brands Group, Inc. ("DBGI") and its chief executive officer, John H. Davis, IV, for willfully violating this Court's October 13 and 15, 2026, orders. For the reasons set forth herein, as supported by the Declarations of Philip E. Gaucher ("Gaucher Decl.") and Joey Giamichael ("Giamichael Decl."), both dated October 20, 2026, the motion should be granted in full.

## STATEMENT OF FACTS

Plaintiffs Philip E. Gaucher, Jr. and Joey Giamichael each invested $1,000,000 in DBGI under an August 8, 2025, Securities Purchase Agreement ("SPA"). (Dkt. 13-1; Dkt. 14-2.) That money filled the shortfall that stood between DBGI and the close of its financing and its Nasdaq uplisting. In return, DBGI issued them Series D Preferred Shares and promised to convert those shares into common stock whenever they asked. DBGI has not honored a single conversion notice from either Plaintiff since July 31, 2026. (Gaucher Decl. ¶3; Giamichael Decl. ¶3.) Over the same period, DBGI's common stock has fallen from $16.28 to $2.14, a decline of about 87%. (Dkt. 78-1)

On October 13, 2026, the Court granted Plaintiffs' motion for a preliminary injunction from the bench. The Court held that Section 4.1(e) "unambiguously prohibits" DBGI's refusal to deliver unlegended shares, and that DBGI "may not refuse" a conversion "based on any claim" of noncompliance "or for any other reason" without an injunction and a bond. (Dkt. 71 "Tr."; Tr. 33:12–35:1.) DBGI's counsel was present.

On October 15, 2026, it entered a written Order enjoining DBGI and its officers from "withholding performance of its obligations to honor and approve" Plaintiffs' conversion notices unless DBGI first complies with Section 4.1(e) of the SPA ("Order"). (Dkt. 70 ¶¶2, 4.) Paragraph

2 enjoins DBGI and the persons referenced in Paragraph 4 "from withholding performance of its obligations to honor and approve conversion notices to convert Plaintiffs' Series D Shares in accordance with" the SPA, the COD, and the other Transaction Documents "unless it first complies with the terms of Section 4.1(e) of the SPA." Paragraph 4 extends the Order to DBGI's "officers, agents, servants, employees, and attorneys" and to those in active concert with them. (*Id.* ¶¶ 2, 4.) That includes DBGI's Chief Executive Officer, Davis.

Giamichael submitted a new Notice of Conversion dated October 16, 2026, together with a Rule 144 opinion letter he obtained himself. The notice converts 74 Series D Shares, with an aggregate Stated Value of $85,100, at a Conversion Price of $1.90, into 44,789 shares of common stock. (Giamichael Decl. ¶¶4–5 & Ex. 1.) Gaucher did the same. He executed his own Notice of Conversion, dated October 16, 2026, by DocuSign on October 18, and at 8:24 AM on Monday, October 19, delivered it to Davis: "please find my conversion notice attached." (Gaucher Decl. ¶5 & Ex. 2) His notice is for the same amounts as Giamichael's: 74 Series D Shares, with an aggregate Stated Value of $85,100, at a Conversion Price of $1.90, into 44,789 shares of common stock, for delivery to his account at Alexander Capital. (*Id.* ¶4 & Ex. 1.)

At 8:56 AM on Monday, October 19, 2026, ClearTrust, DBGI's transfer agent, wrote to Davis that it had "received the attached request to convert 74 Series D Preferred shares owned by Joey Giamichael into 44,789 unrestricted shares of common stock." (Giamichael Decl. ¶6 & Ex. 2.) ClearTrust explained that, to process it, it "must receive acknowledgment of confirmation from Digital Brands Group in the form of Exhibit II," and warned that without it the conversion request will be rejected. (*Id.*) Exhibit II is a one-page acknowledgment for DBGI's signature. (*Id.* ¶6 & Ex. 1.)

About an hour later, at 9:58 AM, Davis answered ClearTrust:

> The floor price was raised by the lead investor who also is the one that can per the SPA enter into agreements for the class, sucha s the leak out[.] ***So this wlll not proceed*** based on the leak out agreement the lead investor (Target signed) and the higher floor price[.]

(Giamichael Decl. ¶7 & Ex. 2 (errors in original) (emphasis added).) Three minutes after that, at 10:01 AM, Davis wrote to Gaucher, copying ClearTrust, in response to Gaucher's notice: "Please note that the lead and majority investor per the SPA have the right enter into agreements for the class which was and has been done." (Gaucher Decl. ¶6 & Ex. 2.) At 10:00 AM, Giamichael replied to Davis and ClearTrust, copying Shapiro: "This is 100% not true, Dmitriy, have you agreed to raise the floor?" (Giamichael Decl. ¶8 & Ex. 2.)

Davis did not answer that question. Instead, at 10:08 AM, he added DBGI's litigation counsel at Kasowitz LLP to a separate email thread among the parties and Shapiro and demanded that Giamichael and Gaucher provide "your trading statements and all your account information on a daily basis from Tuesday morning through every day this week." (Giamichael Decl. ¶10 & Ex. 3; Gaucher Decl. ¶9.) At 11:00 AM, Davis wrote to everyone on the thread, including DBGI's litigation counsel:

> We have emails from Dmitriy last night where he states to increase the floor price to $5 as long as the Board resolution included a statement that said he could lower it back to the lower floor without the company consent[.] The Company agreed and Dmitriy agreed, and all this entire exchange is documented in the email chain[.] According to these emails from Dmitriy at Target Capital 16, the floor price is $5.00[.] And the past conversions that have not yet been executed are subject to that floor price.

(Giamichael Decl. ¶11 & Ex. 3; Gaucher Decl. ¶10.)

Shapiro answered twenty-five minutes later:

> I have discussed the possibility of raising the Floor Price to $5.00 with the company and that I would be amenable to that assuming I have unilateral authority to lower the Floor Price back to $0.14 in the future. I have received the documents from the company on this

> matter; however, I have not reviewed those documents yet and nothing has been signed or finalized yet.

(Giamichael Decl. ¶12 & Ex. 3; Gaucher Decl. ¶11.) Shapiro said that when he agreed in July "to lower the Floor Price in exchange for a leak-out," he believed he was "representing the whole group," and that "Hil informed me that both Joe and Phil have been converting at significantly higher amounts, which sparked the discussion about potentially raising the Floor Price." (Giamichael Decl. ¶13 & Ex. 3.) That could not have been true. DBGI had not honored a single conversion by either Plaintiff since July 31. (Gaucher Decl. ¶¶3, 13; Giamichael Decl. ¶¶3, 15.) Nor had either Plaintiff sold, sold short, pre-sold, or hedged any DBGI common stock, as Giamichael had told Davis and Shapiro at 9:22 AM that morning. (Giamichael Decl. ¶¶9, 15; Gaucher Decl. ¶¶8, 13.) Another lie by Davis to further his breach and contempt of this Court's Order.

Shapiro then made a proposal: "If Joe and Phil can agree to be bound by the 3% leak out and sign the lock-up / leak-out agreement that I signed back in July (attached to this email), then there is no need to raise the Floor Price." He closed: "Again, for the avoidance of doubt, no agreement has been finalized yet." (Giamichael Decl. ¶13 & Ex. 3; Gaucher Decl. ¶12.)

The stakes of Davis's position are concrete. Giamichael's 74 shares carry a Stated Value of $85,100, which converts into 44,789 common shares at the $1.90 Conversion Price that applied when the notice was delivered. (Giamichael Decl. ¶4 & Ex. 1.) At a $5.00 floor, the same shares would convert into no more than 17,020 common shares, about 62% fewer.

Gaucher's conversion has not moved forward since. Davis never retracted his 10:01 AM email. (Gaucher Decl. ¶15) His 11:00 AM email went further, declaring that "the past conversions that have not yet been executed are subject to that floor price," which by its terms includes Gaucher's notice. (Giamichael Decl. ¶11 & Ex. 3; Gaucher Decl. ¶¶6, 10.) Shapiro's email twenty-

five minutes later made any resolution depending on Gaucher signing the lock-up. (Gaucher Decl. ¶12.) ClearTrust has since confirmed that the conversion is stalled for one reason only: DBGI will not approve it. At 10:23 PM on October 19, 2026, Gaucher asked ClearTrust whether it had everything it needed. At 10:48 AM on October 20, 2026, ClearTrust answered, copying Davis:

> No, we do not have everything needed for processing. ClearTrust has not received issuer confirmation in the form of a signed copy of Exhibit II from the issuing company. Once issuer confirmation is provided, we will proceed with our compliance review and request payment of transfer fees.

(Gaucher Decl. ¶14 & Ex. 3) ClearTrust identified nothing else missing. The only obstacle is DBGI's one-page acknowledgment, and Davis, copied on ClearTrust's email, has not provided it. As of the date of this motion, no Conversion Shares have been delivered to Gaucher or to Giamichael. (Gaucher Decl. ¶15; Giamichael Decl. ¶16.)

While DBGI refused to convert - - first in contravention to the terms of the SPA and thereafter this Court's Order, the value of the DBGI stock fell sharply. DBGI's common stock closed at $16.28 on August 5, 2026. It closed at $4.89 on September 1, at $3.81 on October 13 (the day of the Court's bench ruling), at $2.375 on October 16 (the date of Giamichael's notice), and at $2.14 on October 19 (the day Davis refused it). (Dkt. 78-1) That is a decline of about 87% since early August, and about 44% in the four trading days after the Court ruled. (*Id.*) Because the number of common shares a Series D Share yields depends on the market price at conversion, every refused or delayed notice exposes Plaintiffs to this volatility, and to the solvency risk the Court has already found. (Tr. 36:13–37:20.)

## ARGUMENT

### POINT I
### DBGI AND DAVIS ARE IN CIVIL CONTEMPT OF THE ORDER

A party may be held in civil contempt for failure to comply with a court order if "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (quoting *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995)). The movant "need not establish that the violation was willful." *Paramedics*, 369 F.3d at 655. Each element is met here.

"A willful contempt is one where the contemnor had actual notice of the court's order, was able to comply with it, did not seek to have it modified, and did not make a good faith effort to comply." *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, No. 06-CV-0085-LBS, 2007 WL 2982295, at *4 (S.D.N.Y. Oct. 10, 2007) (internal quotation omitted). "The burden of proving 'plainly and unmistakably' that compliance is impossible rests with the contemnor". *In re Marc Rich & Co., A.G.*, 736 F.2d 864, 866 (2d Cir. 1984) (citation omitted). "[T]he court is not required to credit the alleged contemnor's denials if it finds them to be incredible in context". *Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir. 1995) (internal quotations omitted).

**A. Davis is Bound By the Order**

An injunction binds the parties and their "officers, agents, servants, employees, and attorneys" who receive actual notice of it. Fed. R. Civ. P. 65(d)(2)(A)–(B). The Order says so expressly. (Dkt. 70 ¶4.) It has long been the law of this country that a command to a corporation "is in effect a command to those who are officially responsible for the conduct of its affairs," and an officer who prevents compliance "may be punished for contempt." *Wilson v. United States*, 221

U.S. 361, 376 (1911). Davis is DBGI's CEO and the officer whose acknowledgment ClearTrust requires. He is the person who told ClearTrust that Giamichael's conversion "will not proceed," and who told Gaucher that the lead investor's agreement for the class "was and has been done." (Dkt. 13 ¶ 35; Giamichael Decl. ¶7 & Ex. 2; Gaucher Decl. ¶6 & Ex. 2.) He had actual notice of the Order: DBGI's counsel was present for the bench ruling, the written Order was entered on the docket on October 15, and DBGI's litigation counsel were added to the October 19 email thread in which Davis declared that every unexecuted conversion was subject to a $5.00 floor. (Giamichael Decl. ¶¶10–11 & Ex. 3; Gaucher Decl. ¶¶9–10.) As in *Liebowitz*, the person who gave the false excuse is the person who should answer for it. He should be held in contempt personally and jointly with DBGI.

### B. DBGI and Davis were Bound From the Moment the Court Ruled, and the Order Is Clear and Unambiguous

DBGI's and Davis's obligation began when the Court ruled from the bench on October 13, not when the written Order was docketed two days later. A ruling announced in open court is an order of the Court, and it binds the parties before it as fully as a written one. "[A]ll orders and judgments of courts must be complied with promptly." *Maness v. Meyers*, 419 U.S. 449, 458 (1975). *Maness* itself applied that rule to a directive the trial judge gave orally in open court. *See id.* at 450–52. An injunction binds the parties and their officers and agents who receive "actual notice of it by personal service or otherwise." Fed. R. Civ. P. 65(d)(2). DBGI received that notice through its counsel, who heard the ruling. The written Order confirms the point: it grants the motion "[f]or the reasons stated on the record during the October 13, 2026, hearing." (Dkt. 70 at 1.)

The Court need not decide whether DBGI was in contempt between October 13 and October 15, 2026, however. The refusals at issue here took place on October 19, 2026, after both the bench ruling and the written Order.

The Order is also clear and unambiguous. An order meets that standard when it is "specific and definite enough to apprise those within its scope of the conduct that is being proscribed." *King*, 65 F.3d at 1058 (internal quotation marks omitted). The Order identifies the obligation (to "honor and approve conversion notices" for Plaintiffs' Series D Shares), the governing documents (the SPA, the COD, and the other Transaction Documents), and the only exception (prior compliance with Section 4.1(e)). (Dkt. 70 ¶2.) Section 4.1(e) leaves nothing to interpretation. DBGI "may not refuse to deliver unlegended shares based on any claim that such Purchaser . . . has not complied with Purchaser's obligations under the Transaction Documents, or for any other reason," unless it obtains an injunction on notice and posts a bond. (Dkt. 13-2 at 28.) The Court explained on the record that this language "contemplates and rejects" any refusal based on alleged noncompliance, and that DBGI "has limited its right to refuse conversion" even if its allegations were true. (Tr. 34:15–24.) No reasonable reader could understand the Order to allow DBGI or Davis to refuse a conforming notice because of an agreement the Plaintiffs never signed, or because of a charter amendment that does not exist.

**C. The Proof of Noncompliance Is Clear and Convincing**

The proof is Davis's own email to the transfer agent: "So this wlll not proceed." (Giamichael Decl. ¶7 & Ex. 2.) ClearTrust had told Davis that it could not process Giamichael's notice without DBGI's acknowledgment and asked him to return it. He refused in writing, four days after the Order was entered. (*Id.* ¶¶6–7; *see* Dkt. 13 ¶¶33–35.) Three minutes later he gave Gaucher the same ground for not processing Gaucher's notice. (Gaucher Decl. ¶¶6–7 & Ex. 2.)

Neither notice has moved since. On October 20, ClearTrust confirmed to Gaucher, copying Davis, that it "has not received issuer confirmation in the form of a signed copy of Exhibit II from the issuing company" and so does "not have everything needed for processing." (Gaucher Decl. ¶14) As of the filing of this motion, DBGI has acknowledged neither notice, and no Conversion Shares have been delivered on either. (Gaucher Decl. ¶15; Giamichael Decl. ¶16) That is "withholding performance" of DBGI's obligation to "honor and approve" the notices. (Dkt. 70 ¶2.)

Davis's stated reasons were false, and he knew it. *First*, the Floor Price has not been raised. The Floor Price is a term of the COD. If permissible, it can be changed only by a Certificate of Amendment that is properly authorized and filed with the Nevada Secretary of State, not by email between DBGI's CEO and one investor. Davis told ClearTrust that the floor "was raised." He told Gaucher that the lead investor's agreement for the class "was and has been done." He told everyone at 11:00 AM that "[t]he Company agreed and Dmitriy agreed" and that "all this entire exchange is documented in the email chain." (Giamichael Decl. ¶¶7, 11 & Exs. 2, 3; Gaucher Decl. ¶6 & Ex. 2.) The investor Davis named wrote that he had "not reviewed" the documents DBGI sent him, that "nothing has been signed or finalized," and that "no agreement has been finalized." (Giamichael Decl. ¶¶12–13 & Ex. 3.) Davis did not misunderstand a negotiation in progress. He told the transfer agent that a deal existed so that the transfer agent would stop processing a court-ordered conversion. And the Floor Price agreement is nothing more than an attempt to do a proverbial "end-around" of the Order to preclude Plaintiffs from getting the benefit of their bargain.

*Second*, the premise Davis gave Shapiro for raising the Floor Price was also false. Shapiro wrote that "Hil informed me that both Joe and Phil have been converting at significantly higher amounts, which sparked the discussion about potentially raising the Floor Price." (Giamichael

Decl. ¶13 & Ex. 3.) Neither Plaintiff has had a conversion honored since July 31, 2026, and Davis is the person who refused them. (Gaucher Decl. ¶¶3, 13; Giamichael Decl. ¶¶3, 15.) Davis invented the reason for the floor increase and then invoked the floor increase as the reason to refuse. The truth is not a concern to Davis.

*Third*, Giamichael and Gaucher are not parties to any leak-out agreement with DBGI, and no other holder can make them parties. *See* Point III, *infra*. DBGI's transfer agent rejected the same "3% leak-out" excuse when Davis raised it last summer. (Dkt. 14 ¶¶10, 14.) And DBGI told the market in February that it "would have no ability to enforce" agreements among Series D holders to which it is not a party. (Dkt. 78-2)

A Floor Price amendment adopted later, if permitted, would not help DBGI avoid the Order. The Order requires DBGI to honor notices "in accordance with" the Transaction Documents. (Dkt. 70 ¶2.) Those are the documents in effect when the notice is delivered, not an amendment adopted afterward to shrink a conversion the Court has ordered DBGI to honor. DBGI also agreed that it would not, by "any other voluntary action," avoid its obligations, and that it would act to protect the rights of all holders. (Dkt. 13-2 §11; Dkt. 13-3 §5.22.) A charter amendment obtained from one holder to cut the number of shares the Court has ordered DBGI to deliver to two others is precisely that kind of voluntary action. And DBGI "may not nullify a decree by carrying out prohibited acts through aiders and abettors." *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945).

**D. DBGI and Davis Made No Diligent Attempt to Comply – To the Contrary They Openly Disregarded The Order**

DBGI made no attempt to comply, diligent or otherwise. DBGI knew exactly what the Order required. It is clear and unambiguous. Its counsel heard the Court's ruling on October 13, 2026 (Tr. 32:15–39:15), and received the written Order was entered on October 15, 2026.

More troubling, DBGI's litigation counsel was added to the October 19, 2026, email thread in which Davis openly and in writing violated the Order. (Giamichael Decl. ¶¶ 10–11 & Ex. 3; Gaucher Decl. ¶¶9–10.) Shockingly, there is no evidence litigation counsel intervened to ensure this Court's Order was properly complied with by their client. The undeniable evidence is that DBGI and Davis are in contempt of this Court's order - - and doing so with the knowledge of counsel.

**POINT II**
**DAVIS'S EXCUSE IS THE KIND OF FALSE THIRD-PARTY AUTHORIZATION THIS COURT SANCTIONED IN USHERSON, AND THE SECOND CIRCUIT AFFIRMED IN LIEBOWITZ**

This Court confronted the same kind of conduct in *Usherson v. Bandshell Artist Management*, No. 19-CV-6368 (JMF), 2020 WL 3483661 (S.D.N.Y. June 26, 2020), *aff'd sub nom. Liebowitz v. Bandshell Artist Mgmt.*, 6 F.4th 267 (2d Cir. 2021). The Court had ordered the parties to conduct an in-person mediation by a fixed date. *Liebowitz*, 6 F.4th at 274. Neither the plaintiff nor his lawyer, Richard Liebowitz, appeared. *Id.* at 274. Liebowitz's explanation was that a third party, the court-appointed mediator, had given permission for the plaintiff to appear by telephone. He repeated that explanation in a joint letter, in a response to the sanctions motion, at the pretrial conference after the Court warned him to be "very careful about the representations you make to me," and in a sworn declaration. *Id.* at 274–76. The mediator "testified unequivocally" that Liebowitz never raised the subject, and none of the contemporaneous emails reflected any such permission. *Id.* at 282. This Court found by clear and convincing evidence that Liebowitz had violated no fewer than six of its orders, that the violations were willful, and that he had "repeatedly lied to the court" about the mediator's permission in subjective bad faith. *Id.* at 279. It imposed

$83,517.49 in fees, an additional $20,000 sanction, and nonmonetary sanctions. *Id.* at 272, 279–80. The Second Circuit affirmed in every respect. *Id.* at 273, 293.

Davis's conduct has the same structure, point for point, albeit violating the October 13 and 15 orders and Magistrate Judge Cave's September 11, 2026 order[1]:

> *The order.* In *Usherson*, the Court ordered a specific act: appear in person at the mediation. Here, the Court ordered a specific act: honor and approve Plaintiffs' conversion notices. (Dkt. 70 ¶2.)
>
> *The excuse.* Liebowitz claimed that the mediator, a third party with apparent authority over the mediation, had excused compliance. Davis claims that Shapiro, the "lead investor," had the authority to "enter into agreements for the class," had "raised" the Floor Price, and had signed a leak-out binding Plaintiffs. (Giamichael Decl. ¶¶7, 11 & Exs. 2, 3; Gaucher Decl. ¶6 & Ex. 2.)
>
> *The denial by the third party.* The mediator testified that he never gave permission. *Liebowitz*, 6 F.4th at 282. Shapiro wrote, the same morning and to the same recipients, that "nothing has been signed or finalized" and that "no agreement has been finalized." (Giamichael Decl. ¶¶12–13 & Ex. 3.)
>
> *No supporting document.* Liebowitz "made no notation of the oral permission he allegedly obtained," and the contemporaneous emails were inconsistent with his account. *Liebowitz*, 6 F.4th at 282. Davis asserted that "all this entire exchange is documented in the email chain." (Giamichael Decl. ¶11 & Ex. 3.) The only document in the record is a two-party agreement with a single "Holder" signature block that neither Plaintiff signed, and Shapiro said he had not even reviewed the new documents. (*Id.* ¶¶12–13 & Ex. 3) More

[1] Just as DBGI and Davis are not concerned with ignoring orders of this Court, they are equally unconcerned with complying with orders issued from Magistrate Cave. (Dkt. No. 53).

importantly, there is no reference by Davis or his litigation counsel that any such transactional agreement with Shapiro (or Target) is permissible or removes DBGI's and Davis's obligations of compliance pursuant to the Order.

*Repetition.* Liebowitz repeated his story in successive filings and in open court. Davis gave his account to ClearTrust at 9:58 AM, to Gaucher and ClearTrust at 10:01 AM, and to all parties and DBGI's litigation counsel at 11:00 AM. (Giamichael Decl. ¶¶7, 11; Gaucher Decl. ¶6.)

*A pattern.* The Second Circuit relied on Liebowitz's "pattern of misconduct." *Liebowitz*, 6 F.4th at 292–93. Davis has offered a series of excuses for refusing Plaintiffs' conversions. In July he invoked a "3% leak-out" that the transfer agent found did not exist. He then claimed that Plaintiffs had sold their Series D Shares to a third party, which was false. He then announced that further conversions would "wait until discovery and depositions" in a lawsuit that did not yet exist. (Dkt. 14 ¶¶10–17.) Now, after a court order, he points to a floor increase and a class-wide agreement that the counterparty says were never made.

Liebowitz made his false statements to the Court, while Davis made his to the transfer agent and the parties. That difference does not help DBGI or Davis. Davis's statements were the means by which the Order was violated: ClearTrust cannot process a conversion without DBGI's acknowledgment, and Davis used a false account of a third party's agreement to withhold it. A party that disobeys an order by misrepresenting the facts to the person who must carry it out has done more than disobey; it has tried to hide the disobedience.

*Liebowitz* also confirms the Court's authority to respond with significant sanctions to a party willfully flaunting this Court's orders. District courts have "inherent, statutory, and rule-

based powers to sanction a party for conduct that impedes the efficient administration of justice." *Liebowitz,* 6 F.4th at 280. Sanctions under the inherent power are "not restricted to cases where the action is filed in bad faith"; they reach bad-faith conduct in the course of the litigation, *Id.* at 282–83 (quoting *Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir. 1986)), and they may be made against a party. *id.* at 287. Bad faith is shown where conduct "was without a colorable basis" and was "motivated by improper purposes such as harassment or delay." *Id.* at 282 (quoting *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999)).

Both are present. Davis's claim that the Floor Price had been raised had no factual basis, as Shapiro's email evidences. Its purpose was to withhold court-ordered conversions until Plaintiffs signed a lock-up they had never agreed to or accepted a reduced share count, or otherwise preclude Plaintiffs from converting and selling the common shares. DBGI and Davis's actions are openly contemptuous to this Court's authority and maliciously intentional with the intent to harm Plaintiffs. An appropriate sanction should be issued to ensure DBGI and Davis stop ignoring the authority of this Court.

### A. A Significant Sanction Should Be Issued

Since July 2026, Plaintiffs have not been able to enjoy the benefit of their two million dollar investment in DBGI through the SPA. Similar to *Liebowitz*, this Court should issue a considerable sanction to include both coercive and compensatory compoentents against DBGI and Davis, first requiring them to pay to each Plaintiff, jointly and severally, $116,451.40. The math is easily justified. The Notices of Conversion sought to convert 74 Series D Shares into 44,789 common shares. (Gaucher Decl. ¶4 & Ex. 1; Giamichael Decl. ¶4 & Ex. 1.) The high price of the stock on October 19, 2026, the day Davis refused the notice, was $2.60. (Dkt. 78-1) DBGI and Davis should be ordered to pay an amount that reflects the number of common shares that should

have been delivered and sold on the date (44,798 x. $2.60 = $116,451.40), and such payment should be required to be paid by wire within seven (7) business days of the issuance of an order. These sanctions will have the effect of both securing future compliance with court orders as well as to compensate Plaintiffs for the wrongs brought upon them by DBGI's willful violation of the Order. *Paramedics*, 369 F.3d at 657–58; Local Civ. R. 83.6(a), (c).

The losses incurred by Plaintiffs based upon DBGI's and Davis's actions are considerable, and DBGI should have consequences beyond a contempt order: if it does not pay any set contempt, its affirmative defenses and counterclaims should be dismissed. A.V. By Versace, Inc. v. Gianni Versace, S.p.A., 160 F. Supp. 2d 657, 661 (S.D.N.Y. 2001) *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)

A fee award may also include the cost of litigating the sanctions motion itself. *Id.* at 287–88. And where a party's conduct shows that "unusual measures are required to deter future misbehavior, protect other litigants, and maintain the integrity of the judicial system," the Court may tailor its sanctions accordingly. *Id.* at 293. Those principles apply with full force to a party and its CEO who disobeys an Order in the first instance, and on the second instance, lies about an agreement that does not exist in an effort to avoid permitting the Plaintiffs the right to convert pursuant to the SPA. Reasonable attorneys' fees incurred in a contempt proceeding are recoverable as damages, Local Civ. R. 83.6(a), and are appropriately awarded where, as here, the violation is willful. *Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir. 1996). Those fees should include the cost of litigating this motion. *Liebowitz*, 6 F.4th at 287–88. Plaintiffs propose to submit evidence of these amounts on a schedule the Court sets.

### B. A Coercive Daily Fine Should Issue

In addition to the sanctions above, a per-day fine that the contemnor can avoid by complying is a classic coercive civil sanction. *Bagwell*, 512 U.S. at 829; *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352-3 (2d Cir. 1989) (the court considers "the character and magnitude of the harm threatened by continued contumacy," the "probable effectiveness of any suggested sanction," and the contemnor's financial resources). The harm here is measurable. DBGI's stock fell about 44% in the four trading days after the Court's bench ruling. (Dkt. 78-1) Each trading day of delay exposes Plaintiffs to that volatility and to the solvency risk the Court has already found. (Tr. 36:13–37:20.) Plaintiffs request a fine of $5,000 per trading day, jointly and severally against DBGI and Davis, for each day Giamichael's or Gaucher's future notices are not complied with in accordance with the Order or subsequent order issued in response to this motion. To be clear, the coercive sanction is $5,000 per Plaintiff.

## POINT III
## THE COURT SHOULD ENTER RELIEF THAT MAKES COMPLIANCE SELF-EXECUTING

Civil contempt sanctions serve "to coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance." *Terry*, 886 F.2d at 1352; *see Int'l Union, United Mine Workers v. Bagwell*, 512 U.S. 821, 827–29 (1994). The district court "has broad discretion to design a remedy that will bring about compliance." *Paramedics*, 369 F.3d at 657 (internal quotation marks omitted).

### A. Plaintiffs October 16, 2026, Notices Should Be Deemed By The Transfer Agent as Honored by DBGI and Processed as Submitted

The problem here is that DBGI controls the gate. ClearTrust, the transfer agent, will not process a conversion without DBGI's Exhibit II acknowledgment, and that acknowledgment runs

through Davis. (Giamichael Decl. ¶6 & Ex. 2; Gaucher Decl. ¶14; Dkt. 13 ¶¶33–35.) ClearTrust confirmed exactly that for Gaucher's notice on October 20: it "has not received issuer confirmation in the form of a signed copy of Exhibit II from the issuing company," and it will begin processing only "[o]nce issuer confirmation is provided." (Gaucher Decl. ¶14) As long as Davis keeps that control, each notice is another chance for a new excuse.

Plaintiffs therefore ask that DBGI be ordered to deliver to ClearTrust, within one Trading Day, executed Exhibit II acknowledgments for both Giamichael's and Gaucher's October 16 Notices of Conversion. If it does not, the Court should fashion an order that should itself serve as the acknowledgment, and ClearTrust should be ordered to deliver the Conversion Shares (44,789 shares to each Plaintiff) within the time periods the Transaction Documents prescribe, at the Conversion Price in effect when each notice was delivered. (Dkt. 13-2, §§4.1(c), 4.13; Giamichael Decl. ¶4 & Ex. 1; Gaucher Decl. ¶4 & Ex. 1.) ClearTrust should also be directed to keep both notices in its processing queue notwithstanding its October 26, 2026 rejection date.

To the extent ClearTrust needs anything more, DBGI must "cause its counsel to issue a legal opinion" within a day any Notice of Conversion is submitted by Plaintiffs, at DBGI's expense. (Dkt. 13-2, §4.1(c).) This relief adds nothing to DBGI's obligations. DBGI "shall honor conversions" and "shall deliver Conversion Shares in accordance with the terms, conditions and time periods set forth in the Transaction Documents" (*Id.* §4.13), and it agreed that Plaintiffs are entitled to specific performance (*Id.* § 5.15).

The Court has ample authority to direct the transfer agent. The Order already binds DBGI's "agents" and those "in active concert or participation" with it. (Dkt. 70 ¶4; Fed. R. Civ. P. 65(d)(2)(B)–(C).) A transfer agent issuing shares on the issuer's instruction is the issuer's agent for that purpose. Rule 70 independently provides that when a party fails to perform a specific act

the Court has ordered, the Court "may order the act to be done — at the disobedient party's expense — by another person appointed by the court," and "the act has the same effect as if done by the party." Fed. R. Civ. P. 70(a).

**POINT IV**
**PROCEEDING BY ORDER TO SHOW CAUSE IS WARRANTED**

Local Civil Rule 83.6(a) authorizes contempt proceedings by order to show cause, and Local Civil Rule 6.1(d) permits that procedure on a showing of good and sufficient reasons. There is a fixed deadline here. ClearTrust will reject Giamichael's notice from its processing queue on October 26, 2026, unless DBGI acknowledges it. (Giamichael Decl. ¶¶6, 16 & Ex. 2.) Gaucher's notice, delivered the same morning, has not moved at all; ClearTrust confirmed on October 20, 2026, that it cannot process it without DBGI's signed Exhibit II. (Gaucher Decl. ¶¶14–15) Meanwhile, DBGI is negotiating a Floor Price amendment that Davis says will apply retroactively to conversions not yet processed. (Giamichael Decl. ¶11 & Ex. 3; Gaucher Decl. ¶10.) The stock has lost most of its value since August and nearly half since the Court ruled, and the Court has found that DBGI's financial condition puts Plaintiffs' eventual recovery at risk. (Dkt. 78-1; Tr. 36:13–37:20.) On a regular motion schedule, the notice would be rejected and the amendment possibly adopted before the motion was heard. That would accomplish the very refusal the Order prohibits.

## CONCLUSION

Plaintiffs respectfully request that the Court sign the proposed Order to Show Cause, including its interim directive (a) that DBGI deliver the Exhibit II acknowledgment for Giamichael's and Gaucher's October 16 Notices of Conversion and (b) that ClearTrust keep those notices in its queue pending the hearing. On the return date, Plaintiffs ask the Court to adjudge DBGI and Davis in civil contempt and grant the relief set forth in the proposed order.

Dated: New York, New York
October 20, 2026

**LAW OFFICES OF BARRY M. BORDETSKY**

By: /s/ Barry M. Bordetsky
Barry M. Bordetsky (BB4218)
570 Lexington Avenue, 24th Floor
New York, New York 10022
Tel: (212) 688-0008
barry@bordetskylaw.com
*Attorneys for Plaintiffs and Counterclaim-Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), I certify that this memorandum of law contains 5,806 words, exclusive of the caption, table of contents, table of authorities, signature block, conclusion and this certificate, as counted by the word-processing program used to prepare it, and therefore complies with the applicable word limit.

/s/ Barry M. Bordetsky
Barry M. Bordetsky

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2026, I electronically filed the foregoing Memorandum of Law, together with the accompanying Order to Show Cause and Declarations of Joey Giamichael and Philip E. Gaucher, dated October 20, 2026, and their exhibits, with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Barry M. Bordetsky
Barry M. Bordetsky