**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PHILIP GAUCHER, JR. AND JOE GIAMICHAEL,<br><br>Plaintiffs,<br><br>v.<br><br>DIGITAL BRANDS GROUP INC.,<br><br>Defendant. | Case No. 26-cv-6889 (JMF) |

**DEFENDANT DIGITAL BRANDS GROUP INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CIVIL CONTEMPT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .......... 1

STATEMENT OF FACTS .......... 3

I. The Court Grants a Preliminary Injunction .......... 3

II. The October 16 Notices of Conversion .......... 3

III. The Conversions are Approved .......... 5

LEGAL STANDARD .......... 6

ARGUMENT .......... 7

I. There Is No Violation in Connection with Plaintiff Gaucher's Requests .......... 7

A. DBGI Did Not Defy the Court's Order on October 19, 2026. .......... 7

1. The Parties Bargained For DBGI's Right to Amend the Floor Price .......... 9

2. Amendment Would Have Affected the Pending Notices .......... 10

3. The SPA Does Not Bar This Amendment .......... 13

B. Conversions of Gaucher's Shares Complied with the Court Order .......... 7

C. At a Minimum DBGI Had Fair Grounds for Doubt That it Violated the Court Order .......... 14

II. The Contempt Requested Exceeds What is Necessary to Ensure Future Compliance .......... 15

III. If The Court Finds Damages Are Warrented, DBGI Requests A Detailed Evidentiary showing .......... 18

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.V. By Versace, Inc. v. Gianni Versace, S.p.A.*,
279 F. Supp. 2d 341 (S.D.N.Y. 2003)....................7, 17

*In re Bicoastal Corp*,
600 A.2d 343 (Del. 1991)....................12

*BOC Aviation Ltd. v. AirBridgeCargo Airlines, LLC*,
2022 WL 17581775 (S.D.N.Y. Dec. 12, 2022)....................17

*Chao v. Gotham Registry, Inc.*,
514 F.3d 280 (2d Cir. 2008)....................15

*Ecopetrol S.A. v. Offshore Expl. & Prod. LLC*,
172 F. Supp. 3d 691 (S.D.N.Y. 2016)....................6

*Fox Corp. v. Media Deportes Mexico, S. de R.L. de C.V.*,
808 F. Supp. 3d 642 (S.D.N.Y. 2025)....................14

*Indep. Living Aids, Inc. v. Maxi-Aids, Inc.*,
349 F. Supp. 2d 509 (E.D.N.Y. 2004)....................16, 17

*King v. Allied Vision, Ltd.*,
65 F.3d 1051 (2d Cir. 1995)....................6, 13, 18

*Latino Officers Ass'n City of New York v. City of New York*,
519 F. Supp. 2d 438 (S.D.N.Y. 2007), *aff'd sub nom. Latino Officers Ass'n City of New York, Inc. v. City of New York*, 558 F.3d 159 (2d Cir. 2009)....................15

*N.Y. State Nat. Org. for Women v. Terry*,
886 F.2d 1339 (2d Cir. 1989)....................6

*Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*,
369 F.3d 645 (2d Cir. 2004)....................17

*Really Good Stuff, LLC v. BAP Invs., L.C.*,
2021 WL 2469707 (S.D.N.Y. June 17, 2021)....................15

*Taggart v. Lorenzen*,
587 U.S. 554 (2019)....................14

*In re Tesla, Inc. Derivative Litig.*,
2026 WL 982336 (Del. Ch. Apr. 13, 2026)....................11

*Usherson v. Bandshell Artist Mgmt.*,
2020 WL 3483661 (S.D.N.Y. June 26, 2020), *aff'd in part sub nom. Liebowitz v. Bandshell Artist Mgmt.*, 858 F. App'x 457 (2d Cir. 2021), and *aff'd sub nom. Liebowitz v. Bandshell Artist Mgmt.*, 6 F.4th 267 (2d Cir. 2021). ................................16

*Wood v. Coastal States Gas Corp.*,
401 A.2d 932 (Del. 1979) ..........................................................................................12

**Statutes**

Del. Code, tit. 8, § 151(e)............................................................................................10

Defendant Digital Brands Group Inc. ("DBG"), by and through its counsel, respectfully submits its memorandum of law in opposition to Plaintiffs' motion for civil contempt ("Motion" or "Mot."), Dkt. 80, DBGI's opposition is supported by the Declaration of Jonathan Hilburn Davis IV ("David Decl.") filed contemporaneously herewith.

**PRELIMINARY STATEMENT**

Since the Court conference on October 22, 2026, DBGI's understanding of the more developed record has changed in part. DBGI now submits that it did *not* violate the Court's injunction with respect to Plaintiff Gaucher's conversion request. Gaucher submitted his notice on the morning of October 19, 2026. Under the Transaction Documents, DBGI must deliver the unlegended shares "*two Trading Days following the date of receipt*." Accordingly, his converted shares were due on October 21, 2026 – the date he received the shares.

Elsewhere, Plaintiffs' Motion paints an evocative picture of a willfully defiant DBGI "openly contemptuous to this Court's authority and maliciously intentional with intent to harm Plaintiffs." The record does not support this narrative. Plaintiffs' position that DBGI – or its counsel – knowingly and willfully violated the Court's order is premised almost entirely on an e-mail discussion on October 19, 2026. That discussion culminated with a proposal to raise the Floor Price for the rate of conversions or for Plaintiffs to execute an existing leak out agreement.

Neither ultimately materialized, as DBGI and the majority shareholder did not reach an agreement, but Plaintiffs' contentions that the proposal violated the Court's Order misunderstand the operative contracts. DBGI may not be able to assert prior breach as a basis not to comply with 4.1(e), but the conversion notices must still correspond to the conversion rate under the contracts. And there is no question that under the Certificate of Designation ("COD") which creates the conversion right and governs conversions, detailed provisions exist under which

Plaintiffs gave the holder(s) of a majority of the Series D shares the ability to amend the COD, even providing specific procedures if an amendment has an adverse impact on Series D.

Plaintiffs argue, without citing legal authority, that the Conversion Rate, and thus the Floor Price, was fixed upon DBGI's receipt of the notice of conversion. The Transaction Documents are silent as to whether this is the case – and an assumption of a vested right would be inconsistent with Delaware's strict construction of conversion rights. Moreover, various terms of the contract, the applicable statute, and Delaware law all support the interpretation that the conversion rate does not vest prior to conversion.

If the Court concludes otherwise, DBGI still respectfully submits that sanctions premised on the October 19, 2026 e-mail exchange are unwarranted because DBGI had fair grounds for doubt as to whether the amendment – or declining to process pre-amendment notices post amendment – would be inconsistent with DBGI's contractual obligations and therefore breach the Court's Order.

Finally, DBGI respectfully submits that the proposed remedies, to the extent not mooted by the conversion, exceed what is necessary to ensure future compliance. Mr. Davis has included a Declaration attesting that any violation was inadvertent, the conversions swiftly took place just over twelve (12) hours after the Motion was filed, and all subsequent notices filed by Plaintiffs have been processed in compliance with the Transaction Documents. DBGI respectfully submits that the significant and coercive remedies sought by Plaintiffs are not in proportion to the record.

DBGI is under no illusions about the gravity of non-compliance – or even the appearance of non-compliance – with the Court's Order.

## STATEMENT OF FACTS

### I. THE COURT ORDERS A PRELIMINARY INJUNCTION

On October 13, 2026, the Court granted Plaintiffs' Motion for a Preliminary Injunction "insofar as they seek an order enjoining DBGI from refusing to deliver unlegended shares." (Ex. 1 ("Tr.") (39:9-12).) On October 15, 2026, the Court entered a written Order enjoining DBGI "from withholding performance of its obligations to honor and approve conversion notices to convert Plaintiffs' Series D Shares in accordance with the [Transaction Documents] unless it first complies with Section 4.1(e) of the August 8, 2025 Securities Purchase Agreement…." (Dkt. 70 ¶ 2).

Section 4.1(e), in relevant part prohibit the Company from refusing to deliver unlegended shares "it is required to deliver" "based on any claim that the Purchaser… has not complied with [their] obligations under the Transaction Documents or for any other reason, unless, an injunction or temporary restraining order from a court, on notice, restraining or enjoining delivery of such unlegended shares shall have been sought and obtained by the company…" their unlegended shares "Transaction Documents" as defined in the SPA. (Dkt. 13-2, § 4.1(e)). The Court required DBGI and its Chief Executive Officer Hil Davis IV, as one of its "officers, agents, servants, employees, and attorneys," to comply with the Order. (Dkt. 70 ¶ 4).

### II. THE OCTOBER 16 NOTICES OF CONVERSION

On October 16, Gaucher and Giamichael executed Notices for conversion of 74 Series D Shares, with an aggregate Stated Value of $85,100, at a Conversion Price of $1.90, into 44,789 shares of DBGI common stock. (Dkt. 81-1 ("Gaucher October 16 Notice"); Dkt. 82-1 ("Giamichael October 16 Notice", collectively with Dkt. 81-1, the "October 16 Notices")). On October 17, Giamichael sent the notice to Davis.

On October 18, 2026, Davis engaged in conversations with the majority shareholder of Series D shares, Dmitriy Shapiro of Target Capital, including preparing legal documents pertaining to a potential amendment to raise the Floor Price (the "Proposed Amendment").

On October, 19, Plaintiff Gaucher sent the October 16, 2026 Notice of Conversion to Davis. Shortly after, at approximately 9 am, Davis received an email from ClearTrust seeking DBGI's approval to convert the shares identified in the Giamichael October 16 Notice (Dkt. 82-2 at 2). Davis informed ClearTrust an hour later, with Giamichael copied, that Giamichael's shares would not be converted because of the Proposed Amendment. Davis explained:

> [t]he floor price was raised by the lead investor who also is the one that can per the SPA enter into agreements for the class, sucha s the leak out So this wlll not proceed based on the leak out agreement the lead investor (Target [Capital 16 LLC] signed) and the higher floor price

(*Id.* at 1-2 (errors in original)). Giamichael immediately followed up via email contesting whether Dmitriy Shapiro, the principal of Target Capital 16 LLC, the majority shareholder of the Series D shares, agreed to raise the floor price. (Br. at 7). The same morning, Shapiro clarified the following:

- In exchange for DBGI lowering the floor price, Shapiro had agreed in July 2026 to a leak-out agreement he had executed – limiting the sales of shares to 3% of the daily volume – which he believed he had executed "representing the whole group." (Dkt. 82-3 at 16-17).

- Because of the "significantly higher amounts" of the requests [Plaintiffs] had submitted for conversion,[1] he was in discussions "about potentially raising the Floor Price." *Id.*

Accordingly, Shapiro presented a proposal: "If Joe and Phil can agree to be bound by the 3% leak out and sign the lock-up / leak-out agreement that I signed back in July…, then there is no need to raise the Floor Price." He clarified: "Again, for the avoidance of doubt, no agreement has been finalized yet." *Id.* This exchange clarified that the parties were discussing a proposal relating to a proposed amendment of the Floor Price, rather than a finalized agreement.

On October 20, 2026, Davis asked Shapiro if he had received a response. Shapiro stated that he had not and that he assumed Plaintiffs were not agreeing. Shapiro and Davis continued to discuss the proposed floor price amendment. Mr. Shapiro did not agree to sign onto the amendment before the end of the day, with conversations continuing into the early morning.

On October 21, 2026, at approximately 12:15 a.m., Plaintiffs filed the Motion with the Court.

## III. THE CONVERSIONS ARE APPROVED

The same day, at approximately 1 p.m., Davis submitted both approval notices for Plaintiffs' conversions. On October 21, 2026 at 4:12 P.M., the transfer agent, ClearTrust, LLC, contacted Giamichael confirming the following:

> We received the confirmation needed from Digital Brands Group to proceed with your conversion request…. To proceed with your request, the following is needed.
>
> a. Please provide payment of transfer fees. The total amount needed is $500 for the conversion….

[1] Plaintiffs suggest Mr. Davis lied about Plaintiffs already having converted. (Br. at 4). This is either misleading or technocratic. Davis and Shapiro were discussing concerns about the amounts Defendants were seeking to convert, not amounts they had already converted.

b. Please instruction your broker to initiate the DWAC deposit request for delivery of the shares. Please ensure your broker includes your name in the shareholder name field or comment field. This way we can match the DWAC deposit to your account.

(Ex. 2 at 6.) On October 22, 2026, at 10:30 a.m., Plaintiffs' counsel informed DBGI that Plaintiff Gaucher had received his shares, but Giamichael had not. (Ex. 1 at 1.) During the conference with the Court, Plaintiffs' counsel confirmed that "Mr. Gaucher's [requested shares] [were] converted, proved and converted yesterday in the late afternoon." (Ex. 7 at 7:24-25.)

On October 22, 2026 at 11:05 a.m., ClearTrust reached out to Giamichael to confirm that the conversion request had been processed, but that Giamichael's broker had not yet initiated the DWAC deposit and that he should "Please reach out to your broker as soon as possible to request them to initiate the DWAC deposit request for further delivery." (Ex. 2 at 5.) ClearTrust confirmed again at 12:56 p.m. that "I have been checking the DWAC system frequently today to ensure we process the deposit for your shares as quickly as possible. Please note that I have not seen a DWAC request for your shares yet." (Ex. 2 at 3.)

## LEGAL STANDARD

This Court may find a party in contempt when three conditions are established: (i) a "clear and unambiguous order," (ii) "clear and convincing evidence that the order was not complied with," and (iii) "the contemnor has not diligently attempted to comply in a reasonable manner." *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995) (citation modified); *see also* *N.Y. State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1351 (2d Cir. 1989) (delineating same factors and collecting cases). Whether to impose civil contempt sanctions is discretionary. *See, e.g.*, *Ecopetrol S.A. v. Offshore Expl. & Prod. LLC*, 172 F. Supp. 3d 691, 698–99 (S.D.N.Y. 2016) (declining, in the court's "exercise of discretion," to impose civil contempt sanctions). To the end of exercising that discretion, courts consider whether the imposition would accomplish

either or both of two objections: "to coerce future compliance with the Court's order, or to compensate the complainant for losses stemming from the contemnor's past noncompliance." *A.V. By Versace, Inc. v. Gianni Versace, S.p.A.*, 279 F. Supp. 2d 341, 354 (S.D.N.Y. 2003) (citing *United States v. United Mine Workers*, 330 U.S. 258, 303–04, (1947) and *Perfect Fit Indus. v. Acme Quilting Co.*, 673 F.2d 53, 56–57 (2d Cir. 1982)).

## ARGUMENT

### I. THERE IS NO VIOLATION IN CONNECTION WITH PLAINTIFF GAUCHER'S REQUESTS

Since developing the record after the conference on October 21, 2026, it has become clear that there was no lapse of the deadlines in connection with Mr. Gaucher's notice of conversion.

#### A. Conversions of Gaucher's Shares Complied with the Court Order

Mr. Gaucher sent his notice to DBGI on October 19, 2026. The Certificate of Designation, which governs the procedures for conversion under the SPA, dictates that:

> On or before the second Trading Day[2] *following the date of receipt* of a Conversion Notice…. (the "*Share Delivery Deadline*"), the Corporation shall… credit such aggregate number of shares of Common Stock to which such Holder shall be entitled to such Holder's or its designee's balance account…

(*See* Dkt. 13-1, § 5(c)(i)). Mr. Gaucher's Notice was received by DBGI on October 19, 2026. Accordingly, he had two Trading Days following the date of receipt to convert. The deadline was October 21, 2026 at 11:59 p.m.—indeed, Plaintiffs filed their motion for contempt at 12:15 a.m. on October 21, 2026, before the deadline even ran out. Since Gaucher's shares were

[2] A Trading Day is defined as "any day on which the Common Stock is eligible to be traded on the Principal Market or securities market on which the Common Stock is then traded." (Dkt. 13-1, §1(ddd)).

converted and received that day, DBGI did not withhold performance of its conversion duties and there was no violation of the Court's Order.[3]

**B. DBGI Did Not Defy the Court's Order on October 19, 2026.**

Completely ignoring the Share Delivery Deadline as defined and required by the Certificate of Designation, and without withdrawing their motion as moot when the conversions were approved, Plaintiffs argue instead that DBGI "openly disregarded" the Court's order on October 19, 2026, when Mr. Davis told ClearTrust, the transfer agent, that "[the conversion] will not proceed[.]" (Br. 8-9, 14).

This was not a refusal to perform. It is consistent with DBGI's obligation to honor its commitments under the Transaction Documents. Mr. Davis's contention was based on the Proposed Amendment. While the discussion made clear it was hypothetical based on a proposal rather than a finalized amendment, there was no misunderstanding on Plaintiffs' part after Shapiro's clarification proposal that any refusal was hypothetical and based on the prospect of an amendment that Davis contended would make the notices ineligible to be processed. (*See* Dkt. 82-3 at 16-17). Davis did *not* contend he would refuse to comply with the Court's Order if the Proposed Amendment never materialized. *Id.* at 13.

Seemingly aware of this, Plaintiffs argue that the amendment constituted "a proverbial 'end around' of the Order to preclude Plaintiffs from getting the benefit of their bargain." (Br. at 9). The reverse is true. The Proposed Amendment would have been entirely consistent with the terms bargained for by sophisticated parties.

---

[3] Plaintiffs also fail to establish when Giamichael submitted his notice of conversion, or, more precisely, when DBGI received the notice of conversion. Instead, Plaintiffs' brief, along with the Giamichael Declaration and the exhibits attached, merely stated the date when he executed the notice of conversion. That date, however, is irrelevant. The date of receipt, instead, was necessary to calculate the Share Delivery Deadline under the COD. Plaintiffs thereby fail to show with a "clear and convincing" evidence that "the order was not complied with." *See King*, 65 F.3d at 1058.

In unambiguous terms, the Court's Order dictates that:

> Defendant and those referenced in Paragraph 4 below are hereby **ENJOINED** during the pendency of this lawsuit from **withholding performance of its obligations** to honor and approve conversion notices to convert Plaintiffs' Series D Shares in accordance with the August 8, 2025, Securities Purchase Agreement, as amended on September 18, 2025 (collectively the "SPA"), the Certificate of Designation ("COD") and the "Transaction Documents" as defined in the SPA (Dkt. 13-2 at 6), unless it first complies with the terms of Section 4.1(e) of the SPA.

(Dkt. 70 ¶ 2). The Court's Order did not amend the terms of the agreement but enforces them as written.

The Proposed Amendment and its effect of prohibiting conversion at rates other than those under the Transaction Documents are both fully contemplated by the terms bargained for by the parties. As such, there is no refusal to perform in proposing it.

1. The Parties Bargained For DBGI's Right to Amend the Floor Price

Under the COD, the source of the conversion right, Plaintiffs are entitled to conversion according to its terms. There is no contractual entitlement to conversion on terms inconsistent with the contract. Plaintiffs do not contend otherwise. (*See* Br. at 8 ("No reasonable reader could understand the Order to allow DBGI or Davis to refuse a *conforming notice* because of an agreement Plaintiffs never signed, or because of a charter amendment that does not exist." (emphasis added))). And the alternative is nonsensical. Under that reading, Plaintiffs could submit any non-conforming "conversion notice" in any quantity and at any price (and for any security) and demand compliance.[4] Accordingly, the Order does not mandate conversion of notices seeking conversion other than pursuant to the conversion formula in the COD.

[4] Nor is this inconsistent with 4.1(e)'s plain language. The condition precedent of 4.1(e) is that the DBGI must be "required to deliver" the shares. DBGI is not required to deliver shares Plaintiffs have no contractual basis to demand.

Plaintiffs do not dispute that COD plainly prohibits conversion at a price below the Floor Price. (*See generally* Br. at 9-10). Section 5(e) of the COD states, in relevant part that:

> a Holder may, at such Holder's option, by delivery of a Conversion Notice to the Corporation to convert all, or any number of Series D into shares of Common Stock at the Triggering Event Conversion Price. . . . [p]rovided that the Triggering Event Conversion Price under this Section 5(e)(ii) shall be subject to Shareholder Approval and *in no event* may be lower than the Floor Price.

The COD also provides a mechanism to amend the COD without a meeting or the support of all Series D holders. Section 26 states that:

> This Certificate of Designation or any provision hereof (other than Section 5(d)) may be modified or amended or the provisions hereof waived with the written consent of the Corporation and the Holders of 50.1% of the outstanding shares of Series D at the time of the waiver. No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving party."[5]

(Dkt. 13-1, § 26). The Floor Price for conversions is one such term defined by the COD and is therefore subject to amendment regardless of whether Plaintiffs object. (*Id.* § 1(aa)).

Together, these provisions are clear: DBGI is contractually permitted to raise the Floor Price. There is no contractual right to conversion other than under the Conversion Rate in the COD, including the Floor Price. Plaintiffs, as sophisticated parties, bargained for DBGI to be able to amend the Floor Price without their consent provided they had sufficient support from other Series D shareholders.

2. Amendment Would Have Affected the Pending Notices

Plaintiffs content that a subsequent amendment would not alter the obligation to honor the notices submitted because these documents are "in effect" when the notice is delivered. (Br.

[5] In the event that the amendment is considered "adverse to the Series D", a higher percentage threshold may apply unless there is a shareholder meeting. (*See* Dkt. 13-1, § 15(a)). Regardless of which threshold applies, Plaintiffs would not be needed to meet it. Provided that DBGI and Shapiro complied with that threshold (or gathered enough support to do so), they are fully empowered to change the Floor Price without Plaintiffs' consent.

at 9). Plaintiffs offer no support for this assertion. For their assertion to be correct, the right to conversion at a specific rate must vest at the time of notice rather than the time of conversion.

Adjustment to conversion rates are fully contemplated under Delaware law. Under Del. Code, tit. 8, § 151(e), the terms of share conversion are defined by the certificate outlining their procedures. The statute makes clear that such rates are subject to modification of that instrument. *Id.* ("Any stock of any class or of any series thereof may be made convertible… at such rate or rates of exchange *and with such adjustments as shall be stated* in the certificate of incorporation or in the resolution or resolutions providing for the issue of such stock adopted by the board of directors as hereinabove provided.").

The Transaction Documents are silent on *when* the right to conversion at a specific rate vests. However, there is significant legal support for the contention that the rights vest at the time of conversion, not the submission of the notice.

**First**, the language of the transaction documents provides support for DBGI's reading. For example:

- The conversion itself occurs at the time of delivery, not notice. Under 5(c)(ii), if DBGI fails to deliver the shares by the Share Delivery Date, this is defined as a "Failure to Timely Convert" and, separately, as a "Conversion Failure." (Dkt. 13-1, § 5(c)(ii)). Such terms are nonsensical if conversion takes effect upon notice. Indeed, conversion is not self-executing, but executed by the Company and transfer agent. If an amendment is made before conversion, there is no longer a basis for the contractual right to that rate when DBGI would be obligated to perform.
- The Conversion Price, by its own definition, should "in no event" fall below the Floor Price. (Dkt. 13-1, § 5(c)). This is a core term that precludes conversion beneath a

price and the language firmly prohibits conversion calculated with a Conversion Price below the Floor Price.

**Second**, Delaware courts have long declined to find the implied existence of vested rights immune to amendments where the sophisticated parties have agreed to provisions that expressly permit amendment to governing documents without their consent. *In re Tesla, Inc. Derivative Litig.* is instructive. There, the Court of Chancery noted that "Our corporate law has long rejected the so-called 'vested rights' doctrine, the notion that a corporation's governing documents cannot be amended in a manner that diminishes or divests pre-existing stockholder rights." 2026 WL 982336, at *8 (Del. Ch. Apr. 13, 2026). Where the articles of bylaws "put all on notice" that they may be amended at any time, "no vested rights can arise that would contractually prohibit an amendment." *Id.* Accordingly, any "obligation" derived therefrom "always remained subject to change." *Id.*

Here, the contractual language of the COD weighs even more heavily against a finding of vested conversion rights. Not only is there notice that the COD may be amended, but there is an amendment provision that expressly contemplates the possibility of amendments *that would adversely impact shareholder rights*. Section 15(a) of the COD addresses additional protections pertaining to such amendments, imposing additional requirements that can be resolved either by an elevated threshold for majority shareholder interest or a requirement of a meeting and vote. (Dkt. 13-1, § 15(a)). By providing the specific mechanism to do so, the contract unambiguously puts signatories on notice that DBGI is empowered to make amendments that could adversely impact the rights of Series D shareholders.

**Third**, contractual rights for conversion are narrowly construed under Delaware law. The conversion rights are specific to the Series D preferred stock. "Since stock preferences are

in derogation of the common law, they must be strictly construed." *See In re Bicoastal Corp.,* 600 A.2d 343, 350 (Del. 1991). Delaware law has long held that strict construction is particularly apt "as to the conversion privilege, [where] it has been said that the rights of a preferred shareholder are least affected by rules of law and most dependent on the share contract." *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 937 (Del. 1979). This strict construction bars liberal inferences regarding vested rights. There is no such provision for vesting of rights at the time of notice prior to conversion itself. That silence must be construed strictly against vesting the right to performance under contractually defined conditions prior to performance itself.

3. The SPA Does Not Bar This Amendment

Plaintiffs invoke various provisions of the SPA to assert immunity from amendment of the Floor Price. (*See* Br. at 10). But Plaintiffs are not immune from their bargain. First, Plaintiffs cite to a Non-Circumvention provision of the SPA, Dkt. 13-2, § 5.22, but there is no refusal to perform in the amendments. Plaintiffs would have been entitled to performance under the new rate. Plaintiffs' implicit reading that amendment adversely impacting rights constitutes *de facto* non-performance would read out of existence the part of the COD that expressly contemplates the possibility of amendments with some impact adverse to Series D holders. (Dkt. 13-1 at § 15(a)). Nor does the generic requirement to take additional actions as "may be required" to protect the rights of "all holders" preclude or override the express mechanisms that allow either 50.1% or 66.7% of Series D shareholders to choose amendments that may have some adverse impact on the Series D if they believe that is in the interest of the shareholder class as a whole. Plaintiffs expressly contracted for the majority of shareholders to make that decision for them.

### C. At a Minimum DBGI Had Fair Grounds for Doubt That it Violated the Court Order

The Court need not actually decide whether the Proposed Amendment would have constituted an actual violation. The Proposed Amendment never materialized. "Contempt may not be imposed where there is a fair ground of doubt as to the wrongfulness of the [alleged contemnor's conduct]." *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019) (citation modified). Thus, the question is whether "fair grounds for doubt" existed that by stating an intent to amend, Plaintiffs violated the Order. *Id*. at 561. If Davis had "an objectively reasonable basis for believing [his] proposed conduct did not violate the [o]rder," *Fox Corp. v. Media Deportes Mexico, S. de R.L. de C.V.*, 808 F. Supp. 3d 642, 653-54 (S.D.N.Y. 2025) (citing *Taggart*, 587 U.S. at 561), his proposal should not be read as intent as a refusal to comply.

While the "mere existence of competing legal arguments is insufficient to establish a fair ground of doubt," the kind of legal ambiguity sufficient to create such doubt typically arises in the context of a "novel" and "substantial" question of law that "was not the subject of an obvious answer." *Fox Corp.*, 808 F. Supp. 3d at 654 (S.D.N.Y. 2025) (citing *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 292 (2d Cir. 2008)). This is contrasted with the "mere pretext" of interpreting an injunction to create ambiguity where none exists. *Fox Corp.*, 808 F. Supp. 3d at 654.

For the reasons stated above, fair ground for doubt exists as to whether the proposal to pass the amendment—and not convert in accordance with it—violated the Court's Order.[6] There is, at minimum, an unresolved and substantial question of contractual interpretation and Delaware law.

[6] For avoidance of doubt, the "fair ground" does not pertain to any lack of clarity in the Court's spoken or written decision. Rather, the Order to enjoin withholding performance unless 4.1(e)'s terms are satisfied inherently implicates question of when performance is owed under the Transaction Documents.

Accordingly, there is a fair ground for doubt that the proposed amendment would have violated the Court's Order. Since "[c]ontempt may not be imposed where there is a fair ground of doubt as to the wrongfulness of the alleged contemnor's conduct," *Taggart*, 587 U.S. at 561. DBGI respectfully submits that premising any escalation of sanctions imposed on the theory that proposing the amendment demonstrated willful non-compliance would be inconsistent with the record.

## II. THE CONTEMPT REQUESTED EXCEEDS WHAT IS NECESSARY TO ENSURE FUTURE COMPLIANCE

DBGI respectfully submits that Plaintiffs' requests exceed what is needed to ensure future compliance or for compensation.

*First*, DBGI's violation of the Order was technical. It converted the entirety of Gaucher's shares in compliance with the Transaction Documents and effectuated the conversions of Giamichael's shares within a day of recognizing its misunderstanding of the deadline. (*See supra* § I; Ex. 7 at 7:24–8:1; Davis Decl. at 6) Far from evidencing "the intent to harm Plaintiffs," Br. at 14, this turnaround shows that DBGI in fact diligently and substantially complied with the Order, defeating any showing of contempt. *See, e.g.*, *Latino Officers Ass'n City of New York v. City of New York*, 519 F. Supp. 2d 438, 446 (S.D.N.Y. 2007), *aff'd sub nom. Latino Officers Ass'n City of New York, Inc. v. City of New York*, 558 F.3d 159 (2d Cir. 2009) (despite initial delays that violated "strict deadlines" in the at-issue order, "defendants were reasonably diligent and energetic in attempting to comply with the Court's order and have since brought themselves into substantial compliance with it," and denying motion for contempt); *see also* *Chao*, 514 F.3d at 293 (affirming district court's denial of civil contempt motion because defendant "attempted to comply in a reasonable manner"; defendant's efforts to comply with consent judgment, while falling short of its legal obligations and not exhausting "all means

available" to comply, were adequate); *Really Good Stuff, LLC v. BAP Invs., L.C.*, 2021 WL 2469707, at *13–14 (S.D.N.Y. June 17, 2021) (denying motion for contempt where defendant detailed the "substantial steps" it took to comply with injunction).

*Second*, DBGI's technical violation of the Order does not merit the "significant sanction" Plaintiffs seek. (Br. at 14). Plaintiffs' heavy reliance on *Usherson v. Bandshell Artist Mgmt.* is misplaced. 2020 WL 3483661 (S.D.N.Y. June 26, 2020), *aff'd in part sub nom. Liebowitz v. Bandshell Artist Mgmt.*, 858 F. App'x 457 (2d Cir. 2021), and *aff'd sub nom. Liebowitz v. Bandshell Artist Mgmt.*, 6 F.4th 267 (2d Cir. 2021). *Usherson* involved "repeated violations of court orders and outright dishonesty, sometimes under oath." *Id.* at *1. The instant motion, in contrast, pertains to one *partial* violation that DBGI concedes occurred and that was promptly rectified, and no alleged "pattern of misconduct" exists here. (*See supra* § I; Ex. 7 at 7:24–8:1.) As discussed *supra*, Mr. Davis's statement to ClearTrust was not a misrepresentation of fact but an attempt at exercising DBGI's contractual rights Plaintiffs have sought to enforce. (*See supra* § I; Ex. 7 at 5:14-17.) Plaintiffs cannot, on the one hand, complain of DBGI's failure to comply with an agreement while, on the other, protesting DBGI's valid exercise of certain rights—including with respect to the Floor Price, (*See supra* § I; Dkt. 81 at 2-3; Dkt. 82 at 2-3; Dkt. 82-2 at 1)—under the same agreement.

Despite Plaintiffs' attempt to recast DBGI's violation of the Order as conduct akin to that detailed in *Usherson*, there are no grounds to justify the imposition of a "significant" or otherwise coercive sanction. "To determine whether coercive sanctions are appropriate courts must balance: '(1) the character and magnitude of the harm threatened by the continued contumacy; (2) the probable effectiveness of any suggested sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the

burden of the sanction upon him.'" *Indep. Living Aids, Inc. v. Maxi-Aids, Inc.*, 349 F. Supp. 2d 509, 517 (E.D.N.Y. 2004) (quoting *Dole Fresh Fruit Co. v. United Banana Co.*, 821 F.2d 106, 110 (2d Cir. 1987)). Plaintiffs do not, and cannot, show any harm "threatened by [DBGI's] continued contumacy" because DBGI is in compliance with the Court's Order. As to the second factor, just like the defendants in *Indep. Living Aids, Inc.*, DBGI "[has] been complying with the injunction and [has] not shown any propensity to violate the injunction in the future." 349 F. Supp. 2d at 517. And as to the third, Plaintiffs themselves continue to bemoan DBGI's financial state. (*See* Br. at 16; Dkt. 11 at 2, 10, 17, 18.); *see also, e.g.*, *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 658 (2d Cir. 2004) ("A contemnor may be excused from the burden of a civil contempt sanction if it lacks the financial capacity to comply; but the contemnor bears the burden of production in raising such a defense." (citing *United States v. Rylander*, 460 U.S. 752, 757 (1983))).[7] Accordingly, all three factors weigh against the imposition of a coercive sanction, and Plaintiffs' request should be denied. *Cf.* *Indep. Living Aids, Inc.*, 349 F. Supp. 2d at 518 (denying request to levy sanctions for coercive purposes where the first two factors outweighed the third).

Finally, Plaintiffs make a conclusory claim of entitlement to attorneys' fees that should be rejected. As an initial matter, Plaintiffs fail to demonstrate that DBGI's noncompliance with the Order was willful. Willfulness "merely requires a specific intent to consciously disregard an order of the court," *BOC Aviation Ltd. v. AirBridgeCargo Airlines, LLC*, 2022 WL 17581775, at *16 (S.D.N.Y. Dec. 12, 2022) (exercising discretion to deny motion for attorneys' fees without prejudice) (citation modified) – a showing that Plaintiffs have not made. Plaintiffs' argument

[7] Even if these factors favored Plaintiffs, they offer no basis for the Court to impose a coercive per-day sanction of "$5,000 per Plaintiff." (Br. at 16.) This Court "must use the least possible power sufficient to coerce compliance," *A.V. By Versace, Inc.*, 279 F. Supp. 2d at 354 (citation modified), and Plaintiffs cannot show how this amount on this schedule meets that requirement.

supporting willfulness based entirely on Mr. Davis's communication on October 19, 2026, that, among other things, "[the conversion] will not proceed[.]" Br. 8-9, 14. As explained in §I(B)-(C), *supra*, DBGI has demonstrated that its contentions regarding the Proposed Amendment did not violate the Order or, at minimum, did not evidence willful violation of the Order. Without a showing of willfulness, Plaintiffs are not entitled to this relief. *See, e.g.*, *King*, 65 F.3d at 1063 (remanding district court's award of attorneys' fees in light of no finding of willful contempt, and further noting that, while defendant "may have been careless in attempting to comply" with the at-issue orders, "we are reluctant to conclude that the noncompliance was willful").

Ultimately, where, as here, a violation the party attests was inadvertent was swiftly resolved, *see* Davis Decl. ¶ 4-6, coercive sanctions of the type Plaintiffs request are not warranted. *See, e.g.*, *id*.

## III. IF THE COURT FINDS DAMAGES ARE WARRENTED, DBGI REQUESTS A DETAILED EVIDENTIARY SHOWING

To the extent the Court deems compensatory damages appropriate, DBGI requests that Plaintiffs they provide evidence of the actual sale of the securities at a loss upon receipt of the converted shares. If they were not sold at the lower stock price, or Plaintiffs did not actually sell.

Further, DBGI notes that there is evidence that delays in Plaintiff Giamichael resulted from Plaintiff Giamichael not producing certain documents to the transfer agent. *See supra* at 3-4; Exs. 2, 4. DBGI requests that the Court finds Plaintiffs are entitled to compensation, that compensation should only reflect the harm resulting from the time that Mr. Giamichael would have received his shares had his broker provided the relevant information to ClearTrust in a timely fashion.[8]

## CONCLUSION

[8] DBGI respectfully submits that Plaintiff's request for injunctive relief is moot, as all shares subject to the Notices of Conversion have been converted. *See* Br. at 16-18.

For the foregoing reasons, DBGI respectfully requests that the Court deny the Motion.

Respectfully Submitted,

Dated: New York, New York
October 29, 2026

By: /s/ James W. Christian

Stephen W. Tountas
Christopher R. Goetz
Kasowitz LLP
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
stountas@kasowitz.com

James W. Christian
ChristianAttar
1177 West Loop South, Ste 1700
Houston, Texas 77027
Tel: (713) 659-7617
jchristian@christianattarlaw.com

*Attorneys for Defendant*

## CERTIFICATE OF WORD-COUNT COMPLIANCE

The undersigned hereby certifies that this memorandum of law complies with the word count limitation under Local Rule 7.1 because, excluding the parts of the document exempted by Local Rule 7.1, this document contains 5,708 words. In preparing this certification, I have relied on the word count of the word-processing system used to prepare this affirmation.

Dated: New York, New York
October 29, 2026

/s/ *Christopher R. Goetz*

Christopher R. Goetz
Kasowitz LLP
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
cgoetz@kasowitz.com