# LAW OFFICES OF BARRY M. BORDETSKY

**570 Lexington Avenue, 24th Floor**
**New York, NY 10022**
**Tel.: (212) 688-0008**

**1719 NJ-10, West Wing, Ste. 300**
**Parsippany Troy Hills, NJ 07054**
**TeL: (973) 998-6596**
**Fax: (973) 937-7850**
***Please respond to NJ address**

**EMAIL: barry@bordetskylaw.com**

**Admitted in NY/NJ** ***Of Counsel, Littman Krooks LLP**


November 9, 2026

By ECF
Hon. Jesse M. Furman
United States District Court
For the Southern District of New York
500 Pearl Street, Room 2510
New York, New York 10007

Re: Philip Gaucher et al. v. Digital Brands Group, Inc. (26-cv-6889)

Dear Judge Furman:

This firm represents Plaintiffs-Counterclaim Defendants Philip E. Gaucher, Jr. and Joey Giamichael. We write to oppose the of Digital Brands Group, Inc. ("DBGI") for a temporary restraining order and order to show cause (the "Application"). The Application should be denied.

## 1. Facts DBGI Failed To Provide

*The ATM* Five days before the Application, Davis swore that DBGI "maintains an active at-the-market ('ATM') equity program of more than $75 million," which it "uses to raise capital on an as needed basis," and from which it has raised "over $1 million a day." (Dkt. 101 ¶3). An ATM program allows DBGI sell newly issued shares directly into the open market, through its sales agent, at prevailing prices, whenever it chooses. A premarket spike on extraordinary volume is precisely when an issuer short of cash would do so. Davis's November 6, 2026, declaration confirms DBGI was using the program: he complains that the price drop "limits the proceeds that DBGI can obtain from 'at-the-market' sales." (Davis Decl. ¶8).

Yet neither Davis nor Mr. Goetz says whether DBGI sold shares under the ATM on November 5 or 6, how many, or when. That silence is telling. "The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse." *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 226 (1939). If DBGI sold into the November 6, 2026, rally, then DBGI itself added supply to the market, contributed to the volume it calls "highly irregular," and helped drive the price decline it now blames on Plaintiffs. Fortunately for the Court, Giamichael has learned the answers. (Declaration of Joey Giamichael, dated November 9, 2026 ("Giamichael Dec."))

DBGI's Exhibit 4 does not answer the question. It is a ClearTrust report generated at 2:08 p.m. on November 6, 2026, covering only that day (Goetz Dec. Ex. 4), and ATM sales settle and are issued on a T+1 basis. DBGI chose not to submit the November 7, 2026, ledger.

*The Target conversion.* The same is true of conversions. Every Series D conversion requires DBGI's issuer confirmation, which Davis supplies personally. Plaintiffs remind the Court that Target Capital 16 LLC ("Target") is included in the "Series D Group" of alleged wrongdoers. (Dkt. 61, ¶18) If DBGI approved conversions by Target on or about November 5-6, 2026, then any resulting shares that traded on November 6, 2026, entered the market only because Davis and DBGI authorized them.

**2. DBGI Satisfies None of the Requirements for a TRO**

A TRO, perhaps even more so than a preliminary injunction, is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Free Country Ltd v. Drennen,* 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016). DBGI must show (1) likely irreparable harm, (2) likely success on the merits (or serious questions plus a balance of hardships tipping decidedly in its favor), (3) a favorable balance of equities, and (4) that relief serves the public interest. *Id.* DBGI calls its requested order "prohibitory." (Mem. 5). It is not; it is mandatory. *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.,* 60 F.3d 27, 33-35 (2d Cir. 1995). The "serious questions" alternative DBGI invokes (Mem. 15) is unavailable for mandatory relief.

*No irreparable harm.* Irreparable harm is "the single most important prerequisite," and must be "actual and imminent," not "remote [or] speculative." *Faiveley Transp. Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 118 (2d Cir. 2009). The trading DBGI complains of ended on November 6, 2026, and an injunction cannot undo it. Moreover, every harm DBGI identifies — share price, ATM proceeds, litigation budget (Davis Decl. ¶¶7-8) — is monetary. *Sampson v. Murray,* 415 U.S. 61, 90 (1974). DBGI closed at about $0.47 on November 5, 2026, already below Nasdaq's $1.00 bid requirement, after falling from $16.28 in August. (Mem. 1; Goetz Dec. ¶7). That decline long predates November 6, 2026, and is DBGI's own doing. (Giamichael Dec. ¶¶6-7) Last, any November 6, 2026, price change cannot be separated from the ATM issuance and the Target sales that DBGI authorized. (Giamichael Dec. ¶¶13-14) Harm a movant inflicts on itself cannot be laid at its adversary's door. *Kilinc v. PMMUE Eduservices Priv. Ltd.,* 2026 WL 601937, at *8 (S.D.N.Y. Mar. 4, 2026), *report and recommendation adopted,,* 2026 WL 1230818 (S.D.N.Y. May 5, 2026), *superseded,.* 2026 WL 1471837 (S.D.N.Y. May 26, 2026), and *report and recommendation adopted,* 2026 WL 1471837 (S.D.N.Y. May 26, 2026) (It is settled that a plaintiff cannot meet the irreparable harm requirement by "manufactur[ing] [his] own exigency.")

*No likelihood of success.* DBGI does not identify a single trade, by time, size, or price, made by Gaucher or Giamichael on November 6, 2026, and ties no X post to either of them. It does not because there is nothing to tie into with them. A manipulation claim requires exactly that: "what manipulative acts were performed, which defendants performed them, when . . . , and what effect the scheme had on the market." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 102 (2d Cir. 2007). DBGI's fraud and "group" theories are the same ones it pressed in opposing Plaintiffs' preliminary injunction, which the Court granted. (Dkt. 70; Dkt. 71). The Application is nothing more than another attempt at DBGI to circumvent this Court's October 15 Order and the SPA.

DBGI's argument, without any evidence, credible or otherwise, is that "group" selling and involved in a "pump and dump" scheme depresses its price. Yet DBGI, treating Target as a group member (Dkt. 61, ¶18), approved Target's conversions and sales on November 6, 2026. (Giamichael Dec. ¶14). And it took the benefit of that same market by selling ATM shares for cash. (Id. ¶15) DBGI

cannot let the "group" sell, sell alongside it, pocket the proceeds, and then charge Plaintiffs with the price that resulted from its actions.

*Balance of hardships and public interest.* DBGI asks the Court to direct nonparties Nasdaq and DTCC to halt trading (Proposed Order §I) and to freeze the property of unnamed "persons in active concert" *(id.* §§II, IV). That would bind thousands of public shareholders who are strangers to this case, see Fed. R. Civ. P. 65(d)(2), and would usurp the SEC's statutory power to suspend trading, 15 U.S.C. § 781(k). A freeze of assets in aid of damages claims is beyond the Court's equitable power. *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 333 (1999); *Leadenhall Cap. Partners LLP v. Advantage Cap. Holdings LLC,* 171 F.4th 155, 166 (2d Cir. 2026). And DBGI asks that bond be waived (Mem. 18) on the strength of the same financial distress that makes a bond essential. Fed. R. Civ. P. 65(c). More to the point, DBGI seeks to continue its harassment of Gaucher and Giamichael to further damage them by stopping the very conversions this Court ordered had to continue less than three weeks ago. DBGI then asks this Court to rewrite §4(e)(1) of the SPA and to forego a bond as required by the governing agreement that serves as the basis for the counterclaims. The Application should be denied in full, but if not, a bond must be posted for each of Gaucher and Giamichael in the amount as set forth in the SPA.

**3. The Application Is an Attempt to Circumvent, or Appeal, the October 15 Order.**

On October 13, 2026, the Court held that SPA §4.1(e) "unambiguously prohibits" DBGI from refusing conversions "based on any claim" of noncompliance "or for any other reason" unless DBGI first obtains "an injunction or temporary restraining order from a court, *on notice,"* and posts a bond. (Dkt. 71 at 33:12-15, 34:1-35:1; Dkt. 13-2 §4.1(e)) (emphasis added). The October 15 Order directs DBGI and Davis to "honor and approve conversion notices . . . unless [DBGI] first complies with the terms of Section 4.1(e)." (Dkt. 70 ¶2).

The Application is DBGI's attempt to manufacture that compliance through the back door. Section III of the Proposed Order would bar Plaintiffs from "converting any Series D shares." DBGI has neither appealed the October 15 Order nor moved under Rule 60(b) to modify it, which would require a significant change in circumstances. *Home v. Flores, 557 U.S.* 433, 447 (2009). What DBGI is doing though this Application is using a counter-injunction as a proverbial second bite of the apple after the October 15 Order.

**4. Like *ATSI,* the Application Rests on Pure Speculation — Here, From a Declarant Who Has Repeatedly Misled This Court.**

*ATSI* is instructive, and familiar to DBGI's counsel. There, an issuer of floorless convertible preferred stock blamed a price collapse on its preferred holders' supposed "death spiral" manipulation. Its only support was price and volume data and the conversions themselves. The Second Circuit affirmed dismissal because "ATSI has not adequately pled that the defendants engaged in any short sales or other potentially manipulative activity." *ATSI,* 493 F.3d at 104. Judge Kaplan then imposed mandatory PSLRA sanctions on counsel, including Mr. Christian, holding that market data showing only "that some person or persons were engaged in large sales" could not support a claim against any particular defendant: "that is simply ridiculous." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 2008 WL 850473, at *3 (S.D.N.Y. Mar. 27, 2008), *affd in part, vacated in part on other grounds,* 579 F.3d at

153-54. The Second Circuit agreed that it "was not objectively reasonable to sue . . . on no basis other than that [defendant] had the opportunity to participate in such a scheme." 579 F.3d at 154.

The Application is the same theory in form, with less. DBGI offers a single day's volume, anonymous X posts, and a conversion it approved. It identifies no trade or action by Gaucher or Giamichael, no account they control, and no communication with anyone. Its manipulation theory rests entirely on Davis's "view" (Davis Decl. ¶¶5, 10) and counsel's characterization that events "appear consistent with" a pump-and-dump. (Goetz Dec. ¶5). That is opportunity, not evidence. Davis's "view" is entitled to no weight based upon his submissions and conduct in this case. This is the same form of argument, conjecture without evidence, was rejected by this Court when it granted Plaintiffs' preliminary injunction. (Dkt. 70, 71).

## 5. The Goetz Declaration Puts Goetz As a Witness Should This Proceed To A Hearing

Rule 65(b)(1)(A) requires "specific facts in an affidavit." The facts on which the Application depends appear only in the submissions of Christopher Goetz, an associate at Kasowitz LLP. His declaration says he is "fully familiar with the facts" (Goetz Dec. ¶1), but it does no more than authenticate four exhibits *(id.* ¶¶2-5). His certification then impermissibly supplies the narrative that appears to be ghost written by Davis: that Giamichael made a "cryptic allusion to a forthcoming crash," had "apparent advanced knowledge" of the decline, and that Plaintiffs would "punish DBGI" or transfer shares "to cooperators in foreign jurisdictions." (Goetz Dec. ¶¶3, 5, 8-10).

The foundational principle limiting attorney declarations is the advocate-witness rule, which generally instructs counsel to avoid the risks associated with participating as both advocate and witness in the same proceeding. *M.K.B. v. Eggleston,* 414 F.Supp.2d 469 (S.D.N.Y. 2006). The rule seeks to avoid the confusion and prejudice that may result where a testifying lawyer may have to offer arguments about his own credibility, or where adversary counsel may have to cross-examine the testifying counsel, or where there may be an implication that the testifying lawyer is lying to benefit his client. *Id.* at 471-2. When an attorney submits a declaration in a preliminary injunction proceeding, these same concerns are implicated, and courts scrutinize whether the declaration is truly testimonial or merely argumentative.

An attorney's declaration remains confined to its traditional, narrow function: placing documents before the Court. *See generally United States v. Letscher,* 83 F. Supp. 2d 367, 381 (S.D.N.Y. 1999). Mr. Goetz has no personal knowledge of anything other than the words on the exhibits he seeks to introduce, and his submission averring personal knowledge of purported facts regarding the underlying basis for the motion is inappropriate, even in an application for emergency relief. *M.K.B. v. Eggleston,* 414 F. Supp. 2d 469, 472 (S.D.N.Y. 2006) Should this proceed to a hearing, Mr. Goetz is now a witness. And to that, he will have to answer questions as to content of the declaration. By example, it says the X posts began "at 4 a.m." (Goetz Dec. ¶4) when the first post in Exhibit 2 is timestamped 4:49 a.m., after DBGI was already up roughly 30% premarket. (Id. Ex. 2). It further misrepresents the email from Giamichael (Id. ¶3).

**6. Gaucher and Giamichael Did Nothing Wrong, and the Misquoted Email Reflects a Real Fear About DBGI's Finances.**

Gaucher and Giamichael categorically deny DBGI's accusations. Neither of them planned, coordinated, funded, or participated in any "pump-and-dump" or other manipulation of DBGI stock. Neither authored, paid for, or caused any of the X posts in Exhibit 2. Neither had any agreement with Bartch, MavDB, Blackstone, or anyone else about trading DBGI shares on November 6, 2026. (Declaration of Philip E. Gaucher, Jr., dated November 9, 2026, ¶¶5-7; Giamichael Dec. ¶¶11-13) Gaucher's name appears in the Application only because he was copied on the email.

That email does not say what DBGI says it does. On November 5, 2026, DBGI's CEO personally supplied the issuer confirmation for Giamichael's conversion of 21 Series D shares into 53,935 common shares, and ClearTrust confirmed delivery. (Goetz Dec. Ex. 1 at 1-2). Giamichael replied to that confirmation, in full: "Thank you, hopefully it's still trading on Monday." *Id.* at 1. DBGI's papers rewrite this sentence twice — as "I hope the stock is still trading on Monday" (Mem. 8; Goetz Dec. ¶3) and as "hopefully, [DBGI is] still trading on Monday" (Mem. 1) — to turn a shareholder's worry into a "cryptic allusion to a forthcoming crash." (Goetz Dec. ¶3).

Read as written, the email expresses a real and reasonable fear that DBGI would not survive long enough for the newly delivered shares to have value. By November 5, 2026, DBGI's stock had fallen roughly 97%, from $16.28 to $0.47, and sat below Nasdaq's $1.00 minimum bid. (Goetz Dec. ¶ 7; Mem. 1.) DBGI had disclosed substantial doubt about its ability to continue as a going concern. Its senior lender had declared a default on a missed $1,000,000 payment and accelerated the note at 120%, with another $1,000,000 due November 23, 2026. (Dkt. 38-32 at 30; Dkt. 107-1.) The Court itself recognized DBGI's financial distress in granting the injunction. (Dkt. 71 at 37:6-20). A shareholder who has just been forced to litigate for shares he paid $1,000,000 for, from a company in default, doesn't just hope, he prays the stock will still be trading on Monday. Conspirators do not announce their scheme to the target company's CEO and its transfer agent. Under DBGI's own authority, an inference of scienter must be "at least as compelling as any opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). DBGI's is not.

**7. DBGI's Own ATM Sales, and Any Conversion It Approved, Are the Likelier Source of the Volume**

These records are within DBGI's control through its transfer agent and the Court may order targeted, expedited production on a showing of good cause, Fed. R. Civ. P. 26(d)(1). Good cause is plain: DBGI has asked the Court for extraordinary relief based on trading volume while withholding the records that would show how much of that volume it created. Plaintiffs respectfully request if this Court does not summarily deny the Application and motion for a preliminary injunction that the Court order DBGI's transfer agent, ClearTrust, LLC, to produce to Plaintiffs within one business day all records relating to the period November 5 through November 7, 2026 of: (i) every conversion notice and DBGI's approval/acknowledgment documentation of Series D Preferred Stock involving Target; (ii) every issuance of common stock under DBGI's ATM program, including the issuance instructions, the number of shares, and the recipient broker or sales agent; and (iii) the complete daily registrar control reports for November 5, 6, and 7.

For these reasons, the Application should be denied.

Respectfully submitted,

**Law Offices of Barry M. Bordetsky**

By•________________
Barry M. Bordetsky

As stated on the record at today's conference, DBGI's request for a TRO in this case and 26-CV-8734 is DENIED, and the Court reserves judgment on the request for a preliminary injunction. Further, Plaintiffs' request for limited discovery is hereby GRANTED. No later than **November 12, 2026**, DBGI's transfer agent, ClearTrust, LLC, shall produce to Plaintiffs in both this case and Plaintiffs in 26-CV-8734 all records relating to the period November 5 through November 7, 2026 of: (i) every conversion notice and DBGI's approval/acknowledgment documentation of Series D Preferred Stock involving Target; (ii) every issuance of common stock under DBGI's ATM program, including the issuance instructions, the number of shares, and the recipient broker or sales agent; and (iii) the complete daily registrar control reports for November 5, 6, and 7.

The Clerk of Court is directed to docket this order in both 26-CV-6889 and 26-CV-8734.

SO ORDERED.

November 10, 2026

EMAIL: barry@bordetskylaw.com